# EXHIBIT A

Click to Print                                                  Printed on: 9/26/2023 19:37:42 GMT-0400 (Eastern Daylight Time)

## Case History Search
Search Created:
9/26/2023 19:37:42 GMT-0400 (Eastern
Daylight Time)

---

| | | | | | |
|---|---|---|---|---|---|
| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Fioravanti Jr, Paul A | **File & ServeXpress Live Date:** | 9/22/2023 |
| **Division:** | N/A | **Case Number:** | 2023-0961-PAF | **Document(s) Filed:** | 11 |
| **Case Type:** | Breach of Fiduciary Duties | **Case Name:** | Maxwell Roux, et al. v. Krishna Okhandiar, et al. | **Date Range:** | All |

⬇ Export   1 transaction   <<Prev  Page 1 of 1  Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 70932733 | 9/22/2023 4:00 PM EDT | File Only | 2023-0961-PAF Maxwell Roux, et al. v. Krishna Okhandiar, et al. | Steven L Caponi, K & L Gates LLP-Wilmington | 1 | Complaint with 3 or More Defendants | Verified Complaint for breach of fiduciary duty | Accepted | 0.8MB |
| | | | | | | Verification to Complaint | Verification of Maxwell Roux to Verified Complaint | Accepted | 0.1MB |
| | | | | | | Verification to Complaint | Verification of John Duff III to Verified Complaint | Accepted | 0.2MB |
| | | | | | | Verification to Complaint | Verification of Henry Smith to Verified Complaint | Accepted | 0.1MB |
| | | | | | | Verification to Complaint | Verification of Bruno Nispel to Verified Complaint | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibits A-K to Verified Complaint | Accepted | 1.3MB |
| | | | | | | Exhibits | [CONFIDENTIAL FILING] Exhibit L to Verified Complaint | Accepted | 1.7MB |
| | | | | | | Exhibits | Exhibits M-T to Verified Complaint | Accepted | 3.5MB |
| | | | | | | Certificate of Rule 5.1 | Rule 5.1 Certification to Exhibit L to Verified Complaint | Accepted | 0.2MB |
| | | | | | | Summons | Letter to Register | Accepted | 0.2MB |

| | | | | | Instructions | in Chancery from Steven L. Caponi providing summons instructions | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Supplemental Information Sheet | Supplemental Information Sheet with Statement of Good Cause | Accepted | 0.1MB |

1 transaction    <<Prev   Page 1 of 1   Next>>

EFiled:  Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MAXWELL ROUX, JOHN DUFF III,
HENRY SMITH, and BRUNO NISPEL,

      Plaintiffs,

      v.

KRISHNA OKHANDIAR (a/k/a Rohit
Okhandiar, Charlotte Fang, Charlie Fang,
Wonyoung Jang, Miya, Xinma33, MissJo,
and Sonya); REMILIA CORPORATION
LLC, a Delaware limited liability
company; REMILIA INDUSTRIES LLC,
a Delaware limited liability company,

      Defendants.

C.A. No.:

## VERIFIED COMPLAINT

Plaintiffs Maxwell Roux ("Roux"), John Duff III ("Duff"), Henry Smith ("Smith"), and Bruno Nispel ("Nispel") (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Defendants Krishna Okhandiar ("Okhandiar"), Remilia Corporation LLC, a Delaware limited liability company ("RemCorp"), and Remilia Industries LLC ("RemIndustries") (collectively "Defendants"), and allege as follows:

## SUMMARY OF THE ACTION

1.    This case involves the formation, development, and profitable operation of a digital art collective joint venture between and among the four Plaintiffs and Defendant Okhandiar.  Unfortunately, it was not long before defendant

Okhandiar's greed, megalomaniacal thirst for control, and demand for cult-leader adoration and "loyalty" not only from the Plaintiffs but from everyone associated with the group's projects and the broader digital art community, revealed his true nature and intentions.

2.      Okhandiar has schemed to seize control of the venture's operations, assets and treasury of valuable digital assets.  Despite agreeing that the parties would incorporate and jointly own a formal corporate entity to be a managerial agent for the collective venture's business, Okhandiar instead formed several of his own "Remilia" companies in which he secretly made himself the sole member.  He misappropriated digital assets worth more than $600,000 from the venture's treasury, and began asserting control over the venture's operations and assets through his companies.

3.      Plaintiffs demanded Okhandiar return the venture's treasury and that they be included in the business's management and profits as the parties had originally agreed, either through the formation of a new company with the agreed Executive Board and shareholder rights, or through similar amendments to the structures of Okhandiar's already existing companies.  Okhandiar and his LLCs asked Plaintiffs not to file suit or to go public about their claims while they prepared a response to the allegations.  They never responded.  Instead, they doubled-down on their plot to steal and seize full control of the collective venture's business by

removing Plaintiffs from the venture's online multi-signature wallet, seizing control of and locking Plaintiffs out of their email accounts, draining additional digital assets worth $1.7 million from the venture's treasury, and filing their own preemptive and baseless lawsuit in Nevada without jurisdiction and without attaching a single document in support of the complaint.

4.      Despite the existence of several contracts and countless other writings in which Ohkandiar previously recognized Plaintiffs as "co-founders" and "significant equity holders" in the venture and corporation—which promises he used to get Plaintiffs to remain in the business as purported board members and c-suite level officers, and to sign non-disclosure agreements—Okhandiar's Nevada complaint falsely labels Plaintiffs as mere "independent contractors" who he accuses of extortion and breaching non-disclosure agreements that the Plaintiffs were defrauded into signing with promises that they were co-founders, equity holders, directors and officers of the corporation.  He then sent plaintiffs Duff, Roux, and Smith purported termination letters without any authority.  Now, for the past week, he has been waging an online campaign of defamation and threats against Plaintiffs, not only through his own social media accounts, but through those belonging to other "independent contractors" or agents that he has cultishly induced and convinced to join his defamation through false claims of "spirituality" and "righteousness."

5.      For their own parts, and contrary to Okhandiar's attempted retaliatory

3

finger-pointing, Plaintiffs have not "stolen" anything from the venture.  Except for the amounts that Okhandiar has misappropriated, the entirety of the digital crypto treasury funds that Plaintiffs had access to remain undisturbed on-chain.  Plaintiffs have also refused to engage in Okhandiar's war of libel and slander.  Despite his self-anointed and self-aggrandizing titles, Okhandiar is neither the "Crown Prince" of the business nor the Plaintiffs' "Father."  He was supposed to be their partner, but instead is a schemer and fraudster.  This action is necessary to remedy his breaches of fiduciary duty and to protect the Plaintiffs' financial and reputational interests in the joint venture.

## PARTIES

6.     Plaintiff Roux is an individual and resident of Montana.  He is a founding member of the unincorporated joint venture collective known as Remilia.

7.     Plaintiff Duff is an individual and resident of New York.  He is a founding member of the unincorporated joint venture collective known as Remilia.

8.     Plaintiff Smith is an individual and resident of New Zealand.  He is a founding member of the unincorporated joint venture collective known as Remilia.

9.     Plaintiff Nispel is an individual and resident of New York.  He is a founding member of the unincorporated joint venture collective known as Remilia.

10.     Upon information and belief, defendant Okhandiar is an individual residing in Illinois or possibly Nevada.  With the Plaintiffs, he is the only other

member of the unincorporated joint venture collective known as Remilia.

11.     Defendant RemCorp is a Delaware limited liability company, with its registered agent, Zenbusiness Inc., located at 611 South DuPont Highway, Suite 102 Dover, DE 19901.  Upon information and belief, Okhandiar is RemCorp's only member.

12.     Defendant RemIndustries is a Delaware limited liability company, with its registered agent, LegalInc Corporate Services Inc., located at 651 N. Broad Street, Suite 201, Middletown, DE 19709.  Upon information and belief, Okhandiar is RemIndustries' only member, and on RemIndustries' formation documents, Okhandiar lists his address as 651 N. Broad St., Suite 205 #9409, Middleton, Delaware 19709.

13.     On information and belief, at all material times and except when expressly noted below, each of the Defendants was acting as the principal, agent, partner, representative, fiduciary, successor or assignee of each of the other Defendants, and each such Defendant was acting within his or its authority, with the approval or ratification of each of the other Defendants, in committing the breaches, acts, omissions and occurrences alleged herein.  Each defendant is therefore responsible, jointly and severally, for the wrongful acts of the other Defendants and liable for a judgment in Plaintiffs' favor.

## JURISDICTION

14.     The Court has subject matter jurisdiction over this action because one or more of the Plaintiffs' claims for relief is equitable in character and because the Plaintiffs' requested relief is primarily equitable in nature, particularly the breaches of fiduciary duty by defendant Okhandiar as a member of the unincorporated joint venture association, with the requested relief including the issuance of a constructive trust and/or cancellation or conversion of RemCorp's and RemIndustries' LLC corporate structure (which is solely owned by Okhandiar) to a shareholder corporation with stock issued to Plaintiffs and managed by a Board of Directors with at least two of the Plaintiffs holding at least 50% of the Board voting positons. Subject matter jurisdiction is also conferred by statute including, *inter alia*, 6 *Del. C.* §§ 18-110, 18-111, 18-112, 18-205, 18-209, 18-216, & 18-802 and 10 *Del. C.* § 341.

15.     Jurisdiction over the Defendants and venue of this action is proper in this State because Defendants have substantial contacts with this State, including but not limited to that the LLC defendants are incorporated in this State, Okhandiar is the sole member of the company defendants and lists his address in filings made with the State of Delaware in this State, and because the Defendants transact business in this State, have directed activities to this State, have expressly and intentionally sought to take advantage of the protection of the laws of this State, and

because a substantial part of the activities, conduct, and/or wrongful Okhandiar's incorporation of RemCorp and RemIndustries in Delaware as part of and in furtherance of his tortious conduct to wrongfully seize control of the Remilia business, assets and treasury, and thereby profit from his breaches of fiduciary duty and misappropriation, through the Delaware LLC companies he formed.

## FACTUAL ALLEGATIONS

**A.    Background on Digital Assets, Cryptocurrency, and NFTs**

16.    A "cryptocurrency" is a digital or "virtual" asset transacted over the Internet and typically used as a medium of exchange.  Cryptocurrencies are created, and their transaction records are verified and maintained, by a decentralized network using cryptography, rather than a centralized authority like a bank or government. Cryptocurrencies are one popular type of digital asset, an emerging asset class that includes, among other things, tokens, stablecoins, and NFTs.

17.    Cryptocurrency owners control their cryptocurrency using digital "wallets." Wallets allow cryptocurrency users to control and spend their digital assets, and in some cases support multiple different types of digital assets.  Each wallet has a unique cryptographic address, which is used to facilitate transfers of digital assets (*i.e.* to spend) between wallet addresses.

18.    Transactions of cryptocurrency are generally completed using (1) a "public key address," which is akin to a logical location on a blockchain where assets

may be controlled, and (2) a corresponding "private key," which is used to authorize a spend of an asset to another address on that blockchain network.  A user authorizes a spend transaction using their private key; the recipient of that transaction uses their public key.  Only the holder of an address's private key can authorize a spend of digital assets from that address to another cryptocurrency address.  A user may control multiple wallets and thus multiple public key addresses simultaneously.

19.    A multi-signature wallet is a cryptocurrency wallet that requires the use of multiple private keys—instead of just one—to execute a transaction.  When assets are held in a multi-signature wallet, any transaction involving the wallet must be validated by a defined threshold of the existing keys.  For example, a "3 of 5" multi-signature wallet would have five private keys, for which any three must be used together to authorize a spend of any digital asset controlled thereby.

20.    Generally transactions of digital assets like cryptocurrencies are recorded on a "blockchain," which is a network of computers operating software that creates and maintains a ledger that tracks the state of transactions made by users of that system.  Unlike a traditional bank ledger which is generally only maintained and viewable by the bank, a blockchain network is comprised of numerous computers called nodes which collectively maintain and update the ledger of transactions by users of that blockchain.  Generally a blockchain will record and publicly display transactions by its users via a blockchain explorer, which is a web- enabled viewer that

allow anyone to view transactions occurring on that blockchain, which typically includes transaction details including the date and time, the public key addresses of the sender(s) and recipient(s) in the transaction, and the amount of cryptocurrency transferred.

21.     An NFT or "non-fungible token" is a specific type of digital asset that is uniquely identifiable and distinguishable from other assets on its blockchain.  Because it is a unique digital asset created and tracked on a blockchain, many NFTs are linked to or associated with digital audiovisual content, real life experiences, or sometimes combinations thereof and used to represent unique claims or rights over that content. NFTs are often used as a novel means of distributing art, typically through associated or linked image data files similar to a .jpeg image file (i.e. NFT art).

22.     NFT art can be collected, sold or traded, just like traditional art.  Many NFTs have been created on the Ethereum blockchain due to its early adoption of a standard for NFT issuances, ERC721.

23.     NFTs are created through a process referred to as "minting," which relies on the use of a "smart contract."  Despite its name, a smart contract is an instruction to a computer, not a legal contract, although a smart contract may be used to execute an obligation found in a legal contract.  A smart contract may be used to mint NFTs.  Smart contracts are code that is deployed at specific blockchain public key address which can control digital assets sent to it and which may automatically execute to cause a transaction affecting that digital asset when and if certain information is provided to that code.  For

example, a smart contract might be coded to transact a digital asset within its control upon the report to the code of the occurrence of an event.  The code for smart contracts are generally publicly viewable using a blockchain explorer.

24.    A single NFT can also be created through multiple NFTs creating what are known as "composable NFTs."  Composable NFTs allow creators and collectors to bundle together different NFT assets and create a bespoke NFT package. For example, a single image of a girl linked to an NFT can be broken down into an image of the girls' hair linked to an NFT or the image of a shirt can be linked to an NFT, *etc*.

**B.    The Founding Group Members Form the Remilia Collective Joint Venture**

25.    Plaintiffs met Okhandiar through a community of digital artists and began collaborating as friends in 2020.  Okhandiar is not an artist, and even well into the first half of 2021, knew very little about NFTs.  What he knew, he learned primarily from the Plaintiffs.

26.    It was not until around September 2021 when the Plaintiffs and Okhandiar agreed to start a digital art business.  Plaintiffs, together with defendant Okhandiar (collectively the "Founding Group"), created Remilia, an unincorporated joint venture digital art collective association ("Remilia" or the "Collective Venture"), whose primary business is creating and distributing art NFTs and related NFT Projects (as defined below).  Remilia originated informally online through

10

direct message group chats on Twitter, Discord, Guilded, and Telegram by and amongst the Founding Group.

27.    The Founding Group agreed, both orally and as memorialized in various written and signed agreements, and as further acknowledged in numerous other writings, that they would each participate in the development, growth, operation and management of the Collective Venture, and share in its decision-making and profits.  While each of the Founding Group members played different roles in the Collective Venture (e.g., artist, developer, etc.), significant decisions on how the Collective Venture would operate and be managed, such as the control of its digital assets and treasury, were to be made collectively.  These decisions were sometimes made between and among the Founding Group members orally, and sometimes through a hybrid of online communications including written chat group messages and blockchain-based decisions evidenced by code and smart contracts. No single member of the Founding Group was given the authority or right to control, access, or distribute the Collective Venture's digital assets or treasury without the knowledge and consent of at least a majority of the Founding Group members.

28.    The Founding Group members' contributions to the Collective Venture, including any intellectual property they created or developed, would be controlled and exploited by the Collective Venture.  However, each Founding Group member retained the right to exit the Collective Venture and remove their lifetime

contributions from it at any time.

29.    The Founding Group, as part of the Collective Venture, also agreed that at some time in the future the Collective Venture would form a corporate entity to act as its agent.  That formal corporate entity, when formed, was intended to employ the Founding Group and others to support the Collective Venture's operations and promote the sale, distribution and monetization of its NFT Projects.  The Founding Group called this intended company Remilia Corporation, or "RemCo" for short.

30.    Each member of the Founding Group was to be an equity holder in RemCo when formed and incorporated.  The Founding Group also agreed that RemCo would be governed by an Executive Board comprised of at least three members, including a CEO, a COO or CFO, and a Lead Artist. The Executive Board would manage RemCo's strategic operations as agent for the Collective through a "1/4 vote structure," with the CEO retaining 2 votes, and the other two Executive Board members each having 1 vote. In this way, the CEO would have veto power to prevent the other two Executive Board members from acting in concert together, but the CEO would need the support vote of at least one other Executive Board member before taking action. Okhandiar was to be RemCo's CEO, with Nispel as COO, and Smith as Lead Artist.

31.    Throughout the last six months of 2021, the Founding Group considered, negotiated, and in some instances entered into various written and verbal

agreements ("Agreements"), concerning the management of the Collective Venture and the eventual structure and formation of a corporate entity that would be owned by the Founding Group to be an agent for the Collective Venture, and how that agent-corporation would be governed and managed.

32.     The Agreements provide, in pertinent part, that:

    a.     The Collective Venture would own and control the assets and funds generated by sales of Remilia's collection of work.

    b.     The Founding Group agreed that all of the Collective Venture's funds and digital assets generated by Remilia would be held in a treasury under their joint control and would require at least a majority of the different members to approve any significant transaction.

    c.     The Collective Venture established a commission payment structure based on the revenue generated from the sale of the Collective Venture's NFTs. For example, the Founding Group agreed that most of the members would be paid $100,000 as consideration for their work on the Milady Maker NFT project.

    d.     As it became necessary, the Collective Venture would form and incorporate a corporation to act as an agent for the Collective Venture, primarily for the purposes of handling administrative

tasks, for contracting, and assisting with the use, disposition, and exploitation of the Collective Venture's intellectual property, assets and treasury. As alleged above, that expected corporation was referred to as "RemCo."

e.    While one of Okhandiar's designated tasks and responsibilities to the Collective Venture was to establish the RemCo corporation when and as agreed, the five Founding Group members were each to be considered "co-founders" and "equity holders" in the RemCo stockholder corporation, which was also supposed to include a shareholder agreement between them.

f.    At least two Plaintiffs and Okhandiar would be appointed to a seat on RemCo's Executive Board, and all Founding Group members would be employed with executive officer roles in RemCo.

g.    The members of the Founding Group would each have a unique role in Remilia and in RemCo when formed, and as a result would be entitled to different annual salaries and bonuses.

33.    As alleged above, some of the terms of these Agreements were memorialized in signed written contracts that the parties labeled "Letters of Intent" ("LOIs"). Other parts of the Agreements were memorialized in emails and chats.

14

Among other things, the Agreements provided the Plaintiffs' salaries and other compensation understandings, and expressly recognized Plaintiffs as co-founders and substantial equity holders in RemCo when formed.

34.    In October 2021, Okhandiar provided Smith a Letter of Intent (the "Smith LOI"), ratifying the Founding Group's agreement that Smith would be recognized as a co-founder and Lead Artist.  The "Expectation" for Smith as Lead Artist was that he would commit his full-time efforts to Remilia. As a "co-founder with a significant stake in Remilia," he would have certain fiduciary duties to it, including an obligation to "make a good faith effort to introduce any new enterprises and opportunities to Remilia," and "not expend significant time pursuing interests that do not in some way have a path to feed back into Remilia, and "to make best efforts to develop [those paths] towards Remilia."  Smith would be compensated "$60,000.00 annual salary and up to $25,000.00 annual incentive bonus in a USD pegged cryptocurrency."  *See* **Exhibit A**, which is attached hereto and incorporated by this reference.

35.    The Smith LOI included the Collective Venture's intent to create a formal corporate infrastructure, and expressly recognized that the then-unincorporated RemCo would have a principal-agent relationship whereas the Collective Venture (principal) would authorize the Company (agent) to act on its behalf.

15

36.    The Smith LOI recognized Smith "as a co-founder with a significant stake" in the then still unincorporated RemCo.  It explicitly stated:

> [T]his letter of intent is provided in place of an employment agreement *as a written promise of the offered role and its compensation and expectations*.

37.    The Smith LOI also recognized that Smith would be part of RemCo's "formal governance," which would be comprised of an Executive Board of three of the co-founders holding a total of four votes.  Okhandiar, who would hold the title of CEO, would hold two votes on the Executive Board.  Smith, as the Lead Artist and creative director member of the Executive Board would hold one vote.  As discussed below, Nispel, as Chief Operating Officer, would be the third member of the Executive Board also holding one vote.

38.    On several other occasions, members of the Founding Group assured Smith that his position as co-founder of RemCo was definite and that as a co-founder, he would receive equity once the Collective Venture formed that corporation.  Indeed, on several occasions, Smith agreed to accept lesser amounts of salary and compensatory payments from the Collective Venture than his contributions would otherwise merit because he was promised to be compensated with a larger equity stake in RemCo instead.

39.    In October 2021, Nispel signed an LOI (the "Nispel LOI") with the same terms as Smith, including fiduciary duties, except that he had the formal title

of Chief Operating Officer and was supposed to receive an annual salary of $125,000, and up to $125,000 annual incentive bonus is a USD pegged cryptocurrency. *See* **Exhibit B**, the contents of which are incorporated herein by this reference.

40.    Like Smith, Nispel was recognized as a co-founder of the then-unincorporated RemCo, and was to be issued a significant equity stake in that corporation upon its formation.  Indeed, Okhandiar countersigned the Nispel LOI, and as such, acknowledged the Founding Group's agreements that Nispel would be a co-founder and substantial equity holder in RemCo when it was formed.

41.    As described more fully below, Roux was Remilia's lead financial and quantitative analyst, as well as being a developer, project manager, and artistic director of several NFT Projects In several verbal and written communications authored or acknowledged by Okhandiar, Roux was a Remilia co-founder and was to receive a substantial amount of equity resulting in his "serious exposure" to RemCo's ownership. *See* **Exhibit C**, the contents of which are incorporated herein by this reference.

42.    Duff, who was the Lead Programmer and project manager, was also provided an LOI in October 2021 with the same general terms as the Smith and Nispel LOIs, including the fiduciary duties they agreed existed between and amongst themselves.  He was to receive an annual salary of $70,000, with bonus and

commission compensation for his work on specific NFT Projects (the "Duff LOI"). *See* **Exhibit D**, attached hereto and incorporated by reference. Like the other Founding Group members, Duff was recognized as a co-founder of the Collective Venture and was to receive a significant equity ownership stake in RemCo upon its formation.

### C.    The Collective Venture's NFT Projects

43.    Since its inception, Remilia, as a brand, has valued esotericism, anonymity, and underground originality. Among other attractive elements of Remilia's past and current projects, these characteristics resonate with thousands of cryptocurrency and NFT market participants. As a result, Remilia has an estimated total value of over $5,500,000 including stablecoins, ether, and NFTs held by the Collective Venture's treasury.

44.    Each Founding Group member had a critical role in developing and managing the NFT Projects, and in growing and managing the Collective Venture's business long before Okhandiar purportedly formed the Collective Venture's formal corporate agent, RemCo, which he calls RemCorp.

45.    Okhandiar, otherwise known as "Charlotte Fang," "Charlie Fang," "Wonyoung Jang," "Miya," "Xinma33," "MissJo," and "Sonya," was tasked by the Founding Group with operational oversight and some project management responsibilities. He also held treasurer duties. While he had the ability to move funds

into and out of the Collective Venture's wallets, such as for paying approved expenses, he did not have unilateral authority over the treasury, which authority was vested in the Collective Venture. While Okhandiar acted as a coordinator and liaison between the Founding Group members, at no point did the Founding Group agree that Okhandiar was authorized to act as the sole principal or owner of the Collective Venture or RemCo.

46. Smith, otherwise known as "Sprite," "Sonora Milady," and "Nijino Saki," is Remilia's lead artist, and has been responsible for its NFTs' creative design and direction, including the creation of the original art from which Milady was derived.

47. Milady is the original character art on which Remilia's most valuable NFT project is based. Smith solely created Milady for his personal Twitter account in August 2020. *See* **Exhibit E**, the contents of which are incorporated into this Complaint.

48. In April 2021, at the time "Milady Maker" was first coined as the project's title, Smith established Milady's proof of concept website and created the composable art of Milady's hair, shirt, hat, etc., that could be reassembled on a website. Smith's "Milady Maker" concept and project therefore predated the eventual Milady Maker NFT, which he brought into existence before joining Remilia.

49.    From June 11, 2021, through July 22, 2021, Smith organized and carried out Remilia's first showing, making prints of Remilia art, maintaining online systems, and setting up Remilia's physical art gallery.  He was the only Remilia Founding Group member present in person during this inaugural showing of Milady in New Zealand.  Smith also developed the metadata naming conventions of Milady that enabled Milady's NFT mint, in August 2021.  Smith also designed, produced and coordinated with manufacturers for the first Milady Fumo Merchandise, and then also produced the initial design that would be adapted by 3D Artists into the Milady Alien Fumo for the $FUMO token.  The first mint of Milady was completed on August 24, 2021.

50.    In addition to his role as Milady's primary creator, Smith created the Bonkler collection, has acted as the director of graphic design for the Remilia collective as a whole, and generated promotional materials for Remilia including flyers, posters, and merchandise.  He undertook a majority of the groundwork for the NFT Projects, including acquiring the merchandise, and securing and setting up venues, such as the RemiliaCon Tokyo event.

51.    Nispel, otherwise known as "Jimbo" and "Yojimbo," acts Remilia's Chief Operating Officer, as well as its head of sales and marketing, public representative, and strategic advisor.  He brings a vast knowledge and experience, along with a broad network of contacts, in the NFT and cryptocurrency space to the

Collective Venture.  Okhandiar also referred to him as a co-founder.  *See* Exhibit F, the contents of which are incorporated into this Complaint.

52.    Nispel led the marketing side of the Milady launch in August 2021 and advised the Founding Group on strategy for the project.  Nispel led several large-scale sales of Milady which led to Milady's successful mint and launch.

53.    Nispel played an essential role in establishing Remilia's collaborations with Canto in March 2023 for the Yayo project.  In addition, he was primarily responsible for the development and success of the Fumo project, which launched in July 2023.

54.    In his various roles, Nispel also organized and hosted Milady Raves, concerts, and parties in Los Angeles, New York City and Denver, and helped to organize a Bonkler event held in Tokyo, Japan.

55.    Nispel, along with Roux, also created Remilia's investor opportunity pitch materials and played a key role in seeking investors.

56.    Roux, otherwise known as "Reginald," "Q," and "Peabody," is Remilia's lead financial and quantitative analyst and serves as Remilia's developer, project manager, and the artistic director of several Remilia projects.  Along with plaintiff Nispel, Roux created Remilia's investor opportunity pitch materials and took the primary lead and key role in its search for investors.

57.    In June 2022, Roux and another artist, Ursula G., created and curated

the original art for Remilio.  In July 2022, Roux, with Duff, developed and launched the Remilio.org website.  Roux and Ursula G. also created and curated a majority of the original art for Fumo in June 2023.

58.    Roux also manages several social media accounts and chat servers promoting Remilia, including @REMILIONAIRE, Remilia's official Remilio Twitter Account.

59.    Duff, otherwise known as "ccc," and "ccccaa," is the lead engineer, programmer, developer and project manager of Remilia.  He acts as Remilia's Director of Software Development, programmer, web developer, and project manager.  Duff is primarily responsible for the creation of Yayo, and Bonkler.  He also implemented an image generator for Milady and saved the project from catastrophic failure at its launch as the technical lead on the project.

60.    An estimated fifty percent of Remilia's workforce reports directly to Mr. Duff.  He has acted as the head manager and oversees the development of one of Remilia's unreleased products, RemiChat, since September 2022.

61.    The Collective Venture has generated revenue from these various NFT Projects (collectively, the "NFT Projects"), that Plaintiffs played the primary roles in creating, developing and actively managing, including:

        a.    Milady Maker NFT ("Milady"), the sales of which has generated estimated revenues for the collective of $2,145,000 in USD since

August 2021;

b.    Banners NFT, the sales of which has generated estimated revenues for the collective of $100,000 in USD since July 2022;

c.    Redacted Remilio Babies NFT ("Remilio"), the sales of which has generated estimated revenues for the collective of $1,750,000 in USD since August 2022;

d.    Bonkler NFT ("Bonkler"), the sales of which has generated estimated revenues for the collective of $900,000 in USD since April 2023;

e.    Yayo NFT ("Yayo"), the sales of which has generated estimated revenues for the collective of $250,000 in USD since May 2023;

f.    Milady Fumo NFT ("Fumo"), the sales of which has generated estimated revenues for the collective of $800,000 in USD since July 2023.

62.    From September 2021 until May 2022, the Founding Group focused their attention on the Collective Venture's first and primary NFT project, Milady Maker, which is a limited collection of NFT profile pictures modeled after "Chibi"-style anime art that purchasers use as online profile pictures such as Twitter avatars. Smith had created the first Milady before the Founding Group had agreed to form the Collective. He contributed this art to the Collective, and the sales of the Milady

Maker NFTs earned in excess of $2 million.

63.    The Founding Group never formed or incorporated RemCo before Okhandiar nearly destroyed the Milady Maker project and the entire Collective Venture in May 2022.  In a 20-tweet megathread and detailed GitHub post, a Twitter user published a series of screenshots of extremist and overtly racist posts (e.g., repeated used of the "N-word" and lengthy anti-Semitic statements and other slurs) by a person using the name "Miya" apparently connected to Milady Maker.  The market price of Milady's crashed.  Under extreme community pressure, on May 21, 2022, Okhandiar made a "full disclosure" on Twitter that he was Miya.  In an attempt



OK, full disclosure: I was Miya. And its toxic baggage that's hurting Milady community & poisoning the vibe. I apologize about trying to hide the past account—Miya has nothing to do with Milady Maker & should stay that way so I'll be stepping down from the team from here.

5:21 AM · May 21, 2022

to avoid any correlation between his unrelated "Miya" posts and the Collective's activities, he publicly stepped down from any involvement in the Milady Maker NFT Project.

64.    The Collective Venture announced that Smith and Nispel would be taking the lead on the Milady Maker project, and they pressed on with developing

the other NFT Projects as part of the Collective Venture, with Okhandiar eventually joining back into the daily operations. Going forward, the Founding Group members agreed that Nispel and Smith would be added as key holder "signatories" to the Collective Venture's multi-signature wallet so that Okhandiar would not have the ability to exercise unilateral control over the Collective Venture's treasury.

65.    Based on his contributions, Smith's agreed annual compensation was increased to $85,000, and he was supposed to receive 20% of the Bonkler mint funds.

66.    By July/August 2022, a logistical and administrative need arose to form the envisioned agent-corporation, RemCo, so that the Collective Venture could continue to market and sell certain products and continue running promotional events. For example, a company needed to be formed so proper labels could be applied to clothing items that the Collective Venture was selling, and so contracts could be entered into with vendors and service providers for the rave events the Collective Venture was promoting, as well as for tax reasons. It was Okhandiar's responsibility to form RemCo as agreed by the Founding Group's when appropriate.

67.    Since August 2021, Plaintiffs have continued to work on the Collective Venture's NFT Projects based on their agreement and the understanding that each of them is a co-founder of and would hold substantial equity in the RemCo corporation when formed, and would receive substantial payments from the creation, development, and marketing of the collection of the NFT Projects. Moreover,

Plaintiffs also reasonably believed they would earn significantly more as members of the Founding Group and as equity owners and, in some cases, executive officers and directors of RemCo from which their salaries and bonuses would eventually be paid.

68.     The working experience is far from pleasant or acceptable.  Okhandiar subjects the other Founding Group members and employees to verbal abuse and harassment.  For example, in multiple chat messages Okhandiar has called Roux a "pathetic lazy retard," "faggot," "nigger" who "should just stop lying [that he] is a functioning human and leave the hot pot [group]…instead of wasting my time treating you like a person with a soul."  *See* Exhibit G, the contents of which are incorporated herein by this reference.

69.     Despite the abuse, the Founding Group members continued to work on the Collective Venture's NFT Projects in reliance on their equity ownership and receipt of their promised compensation.

**D.     Defendants' Wrongful Conduct**

70.     Despite his public resignation from the Milady Maker project (or perhaps because of it), and in violation of his fiduciary duties and in breach of the parties' agreements, Okhandiar started acting as if he single-handedly owns and controls the Collective Venture, its assets, and its treasury.

71.     On July 5, 2022, in a concealed attempt to seize control and

26

unbeknownst to the Plaintiffs, Ohkandiar unilaterally incorporated a limited liability company he calls Remilia Corporation LLC in Delaware ("RemCorp"). *See* **Exhibit H**, the contents of which are incorporated herein by this reference. Okhandiar made himself the sole member of RemCorp to the exclusion of each of the other Founding Group members. Okhandiar then hid RemCorp's existence from Plaintiffs for months, and when he finally revealed it, did not disclose that he had (1) failed to create RemCo as the parties had envisioned with an 3-member Executive Board, (2) failed to include any of the Plaintiffs as equity owners, and (3) failed to provide a shareholders' agreement or an operating agreement for the company.

72.    On October 14, 2022, also unbeknownst to Plaintiffs, Okhandiar formed a second Delaware limited liability company, Remilia Industries LLC ("RemIndustries"). *See* **Exhibit I**, the contents of which are incorporated herein by this reference. Okhandiar again made himself the sole member and owner of this company. And again, Okhandiar (1) failed to create RemCo as the parties had envisioned with a 3-member Executive Board, (2) failed to include any of the Plaintiffs as equity owners, and (3) failed to provide a shareholders' agreement or an operating agreement for the company. Indeed, Okhandiar has never explained the need for this second company, or its relation to Remilia, RemCo, or RemCorp.

73.    By November 2022, Okhandiar had added four other "persons" as key holders to the Collective Venture's multi-signature wallet besides himself, Smith

and Nispel.  Smith and Nispel knew the identity of one of the additional signatories, who was providing services to the Collective Venture that Plaintiffs believed would provide additional oversight of the treasury and assist with approved transfers as needed.  However, Okhandiar led them to believe that the other three signatories were similarly-situated employees.  As it turns out, that was false.  Despite their agreement, Okhandiar secretly created three additional signatory keys for himself, thereby giving himself control of 4 of the multi-signature wallet's 7 keys, and thus full control over the Collective Venture's treasury wallets.

74.    By November 2022, Plaintiffs were still owed various amounts of salary, bonuses, and commissions from work they had completed and were still performing on the NFT Projects; however Okhandiar refused to release these payments from the Collective Venture's multi-signature wallet.

75.    On November 15, 2022, Okhandiar presented the Plaintiffs with and demanded they sign "Confidentiality and Non-Disclosure Undertaking" agreements with RemCorp (the "NDAs").  Smith, Roux, and Nispel, believing that they were already equity owners of RemCorp (and in Smith and Nispel's cases, members of its Executive Board), and fearing that they would not receive their owed compensation otherwise, agreed to sign their NDAs.  Okhandiar also led them to believe that he had also signed a similar NDA, as he represented that all employees would be asked to do.

76.    In addition to withholding Duff's compensation, Okhandiar demanded that he sign the original LOI, which was previously presented to him by Okhandiar but which Duff had not yet signed, and the NDA, explaining that by the NDA, "You won't be giving anything new away."   Duff, however, refused to sign either document until he received written assurance from Okhandiar that he owned equity in RemCorp, that Duff would receive an acceptable form of a shareholders' agreement for RemCorp, and that the LOI would be amended to reflect the true amounts he was owed, which he demanded be paid.

77.    Okhandiar amended the original Duff LOI to recognize Duff's formal title as Director of Software Development with an increased annual salary of $100,000 (the "Duff Amended LOI").  Okhandiar then used ChatGPT to create what he called an "Agreement to Negotiate" between himself and Duff, by which Okhandiar promised that, in exchange for Duff's agreement to sign the NDA and the Amended LOI, he would "come to an agreement on [Duff's] initial shareholding distribution," and that such "shareholding allotment" would be "in writing before any further shares are issued or allotted, including to the other founders, investors or employees."   Okhandiar and Duff then signed the Agreement to Negotiate, NDA and Amended LOI on December 28, 2022.  That Agreement to Negotiate attaches and incorporates the signed NDA and the Duff Amended LOI as Exhibits A and B, respectively.  *See* **Exhibit J**, the contents of which are incorporated herein by this

reference.

78.    Plaintiffs have still not been paid the full amount of what they are owed for their contributions to the Collective Venture.  This includes:

      a.    Smith has not received his full annual salary or any bonuses.  He has also only received $60,000 of his revised salary, and has not received any of the 20% of the Bonkler project mint funds, which percentage amounts to approximately $200,000.

      b.    Nispel has not received his full $125,000 annual salary or any bonuses.  He is also still owed an additional $20,000 for his work on Milady.

      c.    Roux has not received any of the $15,000 for his work on Fumo, which was supposed to be paid in the form of a Milady NFT asset worth $15,000 at the time.

      d.    Duff is owed $87,500 in unpaid wages, bonuses, and commissions, including at least $40,000 in unpaid commissions on the Milady project, $17,500 for his work on the Solsprites NFT project that the Founding Group had decided not to pursue, and $30,000 in an unpaid bonus.

79.    Plaintiffs recently came to learn that Okhandiar, improperly using his control of the Collective Venture's multi-signature wallet, transferred approximately

$600,000 worth of Remilia's digital assets (a) to his personal wallet as arbitrary unilateral "bonuses" to himself that exceed the amounts agreed upon by the Founding Group, and (b) to RemCorp's treasury. *See* **Exhibit K**, the contents of which are incorporated by reference.

80.     Okhandiar failed and refused to provide to Plaintiffs a sign shareholders' agreement or provide to Plaintiffs *any* corporate formation documents of any kind, such as an operating agreement or membership roll, for RemCorp or RemIndustriues.    Okhandiar failed to issue any equity in either RemCorp or RemIndustries to the Plaintiffs despite his written promises to do so.  He also refused to recognize any of Plaintiffs as members of any Executive Board for either RemCorp or RemIndustries, or even to acknowledge that an Executive Board exists RemCorp or RemIndustries.    And Okhandiar continues to refuse to release to Plaintiffs their full promised salaries and bonuses.  However, Okhandiar continues to siphoning away the Collective Venture's treasury's funds for himself, while baselessly and fraudulently claiming to have the authority to exercise unilateral and complete control over the Collective Venture's intellectual property and assets.

81.     On August 22, 2023, Plaintiffs sent Defendants a letter demanding several corrective actions if the Collective Venture is to continue, and which are needed to redress Okhandiar's breaches of fiduciary duty, including among other things:

a.  that copies of all corporate books and records for RemCorp and RemIndustries be provided to the Plaintiffs;

b.  the formation of the envisioned RemCo in which Plaintiffs will be equity owners and participate in the corporate governance through their seats on the Executive Board and roles as officers in the company, *or* that they be issued their equity shares and control of RemCorp;

c.  payment of their owed compensation, bonuses and commissions; and

d.  return of the embezzled funds and assets wrongfully taken by Okhandiar to the Collective Venture's treasury.

*See* **Exhibit L**, the contents of which are incorporated by reference.

82.  In response, Defendants refused to disclose any of the corporate documents, and instead have taken the position that RemCorp (and Okhandiar as its sole member) control 100% of the Collective Venture's treasury, assets and intellectual property.  They asked for additional time to respond to the Plaintiffs' claims to equity and for the return of the misappropriated funds, and requested that Plaintiffs refrain from filing a lawsuit or making these issues public in the interim. Contrary to their own request to keep things private at least until they responded to the issues in Plaintiffs' letter, however, last week, without notice, Okhandiar and

RemCorp filed a preemptive and baseless lawsuit against Smith, Duff and Roux, in Nevada. They also delivered letters purporting to terminate Plaintiffs' in their mischaracterized roles of "independent contractors" to RemCorp, removed Plaintiff's access to their Collective Venture email and social media accounts, and prevented Plaintiffs from having access to any continuing work on the NFT Projects.

83. On September 11, 2023, Okhandiar made a public tweet that proclaiming his intent to transfer all of the remaining funds from the Collective Venture's online treasury to his own control, writing "After this event I'll be moving funds from crypto into fiat." *See* **Exhibit M**, the contents of which are incorporated by reference. That is exactly what he did. Less than 24 hours later, he transferred $1.7 million from the Collective Venture's treasury, purportedly under the guise that he is protecting it from Plaintiffs, to his personal account. By liquidating those funds from digital assets which are visible and may be tracked on-chain to fiat, Okhandiar has wrongfully taken those assets or the value derived therefrom off-chain and for himself.

84. For the past week, in a bald-faced attempt to deflect attention away from his own breaches and bad acts, Okhandiar has also been waging a malicious and defamatory public smear campaign against Plaintiffs, wrongfully accusing them of having stolen potions of the Collective Venture's treasury, lying about their roles with the Collective Venture, and falsely depicting himself as being Remilia's sole

creator and owner.

85.    When questioned by a third party investor about RemCorp's role in the Collective Venture, however, Okhandiar confessed that the entire business began as a collective joint venture, and that the corporate structure was only intended to support the reinvestment of the Collective Venture's funds into newer projects. On September 13, 2023, Okhandiar tweeted: "Before it was an LLC it was a wallet. The openly stated plan was always to reinvest earnings into the new art and the new internet."

86.    RemCorp and RemIndustries are the shells through which Okhandiar is attempting to unlawfully exercise control of Remilia's assets and treasury, and to steal them away from Plaintiffs. Their corporate existence and structure are being used as a sham and to perpetrate a fraud. The entity defendants are being operated as a mere tool and business conduit for Okhandiar to evade his legal obligations and breach his fiduciary duties; and to protect against the discovery of his crimes and justify his wrongs. The corporate veils for RemCorp and RemIndustries should therefore be pierced.

## COUNT I
### Breach of Fiduciary Duty
### (Plaintiffs against All Defendants)

87.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

88.    Plaintiffs and Okhandiar entered into an Agreement for purposes of creating a digital asset collective for the Founding Group's mutual benefit into which each Founding Group member contributed their intellectual property, assets, effects, skills, time, and/or knowledge.

89.    As members of the Collective Venture, each member of the Founding Group had a fiduciary duty of utmost good faith, fairness, and honesty with respect to their relationship to each other and to the Collective Venture.

90.    Okhandiar was tasked by the Collective Venture with forming the RemCo corporation.  Based on the LOIs and other promises, both written and oral, Plaintiffs understood and expected that the purpose of RemCo was to act as an administrative and logistical agent of the Collective Venture for the purposes of help it develop and monetize the Collective Venture's various NFT Projects, as well as for tax purposes.

91.    Okhandiar breached his duties of care, loyalty and good faith when he formed RemCorp as a limited liability company with himself as the sole member instead of forming it as a corporation that included each of the Plaintiffs as equity shareholders and with an Executive Board comprised of three members including two of the Plaintiffs.  He further breached his duties of care and loyalty to the extent he claims that RemCorp and/or RemIndustries control or own any of the Collective Venture's intellectual property, assets or treasury by refusing to provide Plaintiffs

with RemCo's corporate books and records, and continuing to refuse to provide Plaintiffs equity in the entity that supposedly controls or owns any of the Collective Venture's intellectual property, assets or treasury.

92.    Okhandiar further breached his duties of care, loyalty and good faith when he secretly and fraudulently gave himself three additional signature keys on Collective Venture's multi-signature treasury wallet, and then used those signatures to transfer and misappropriate to himself in excess of $600,000 worth of the Collective's funds and assets to RemCorp, RemIndustries and to himself.

93.    Okhandiar further breached his duties of care, loyalty and good faith by removing Plaintiffs from the multi-signature wallet and then transferring and misappropriating an additional $1.7 million of the Collective Venture's funds and assets to RemCorp, RemIndustries, and to his personal wallet, and then moving those asset and funds off-chain and into his personal fiat account.

94.    Okhandiar further breached his duties of care, loyalty and good faith when he unilaterally purported to terminate Plaintiffs from the Collective and their employment thereof, denied them access to their email accounts, social media accounts, and NFT Project software, data, and information.

95.    Okhandiar further breached his duties of care, loyalty and good faith by failing and refusing to release payment of Plaintiffs' respective salaries, bonuses and commissions.

96.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered harm.

97.    Plaintiffs are without an adequate remedy at law.

## COUNT II
## Constructive Trust
### (Plaintiffs against All Defendants)

98.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

99.    Plaintiffs and Defendants entered into the Agreement concerning the formation of a Collective Venture, Remilia, and an agent corporation, RemCo, that would be owned by the Founding Group members, and governed, managed and operated by them according to the terms described herein above.  Namely, Plaintiffs and Defendants agreed that once RemCo was formed, it would (a) act as the Collective Venture's agent to perform various administrative and logistical tasks, (b) contract on behalf of the Collective Venture, (c) help develop, deploy and exploit the Collective Venture's assets, intellectual property, and treasury, and (d) provide taxation compliance and benefits.

100.    Plaintiffs trusted Okhandiar with the task of forming RemCo as a corporation to act as the agent of the Collective Venture, and to distribute equity and shares as agreed with a written shareholders' agreement, and to establish the agreed-upon form of governance by an Executive Board comprised of at least two of the

Plaintiffs holding at least 50% of the voting power, and management and operation of the corporation that including Plaintiffs as salaried officers.

101.   By the nature and terms of the Agreements, Plaintiffs and Defendants were in a confidential relationship whereas the Founding Group trusted Okhandiar with certain of the Collective' Venture's operations, assets, and treasury.

102.   Plaintiffs reasonably relied on Okhandiar's promises and the terms of the Agreements, and continued to work on and provide ongoing contributions to the Collective Venture's NFT Projects.

103.   Okhandiar wrongfully and unilaterally formed RemCorp and RemIndustries, purportedly taking control of the Collective Venture's business, assets and treasury, while excluding and denying Plaintiffs their equity and directorship and managerial roles in the intended agent corporation, RemCo.

104.   As a direct and proximate result thereof, Plaintiff has suffered, and/or will suffer, substantial damages.

105.   To the extent Okhandiar, RemCorp and/or RemIndustries purport to own or control any of the Collective Venture's assets, funds or intellectual property, whether by assignment, appropriation or otherwise, Plaintiffs are entitled to the imposition of a constructive trust for their benefit over those assets, funds and intellectual property.

**COUNT III**
**Declaratory Judgments and Injunctions**
**(Plaintiffs against All Defendants)**

106.  Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

107.  Plaintiffs are entitled to each of the following declaratory judgments and injunctive relief pursuant to 6 *Del. C.* §§ 18-110, 18-111, 18-112, 18-205, 18-209, 18-216, & 18-802 (among others), and the Court is empowered to grant the declaratory judgments pursuant to 10 *Del. C.* § 6501, *et seq.*, that:

    a.    Under a construction of the Agreements, neither RemCorp nor RemIndustries are the intended agent-corporation known as RemCo, and that Okhandiar has failed to incorporate RemCo in the manner and with the owners and governance structure agreed by the Founding Group members and in compliance with the Agreements.

    b.    Plaintiffs, and each of them, are equity owners in RemCo, or whatever corporate entity of whatever form (including but not limited to RemCorp and RemIndustries), controls or owns the Collective Venture's assets, treasury, and intellectual property; and further that Plaintiffs are entitled to signatory key authority

39

on the digital wallet in which any of the Collective Venture's assets and treasury are held.

c.      Neither Okhandiar, RemCorp nor RemIndustries separately control or own any of the Collective Venture's assets, treasury or intellectual property.

d.      The Collective Venture has not assigned or transferred any of its assets, funds or intellectual property to Okhandiar, RemCorp or RemIndustries, and any such assignments are invalid and unenforceable for lack of mutual consent, lack of consideration, and/or having been obtained by fraud.

e.      To the extent Plaintiffs are found to be equity owners and/or directors of RemCorp or RemIndustries, that they are not liable for either of those company's past actions, omissions or contracts.

f.      To the extent any work for hire, intellectual property, or contributions are owned or have been assigned to either the Collective Venture or any corporate entity of any form (whether RemCo, RemCorp, RemIndustries, or otherwise), then to the extent a Founding Group member exits or terminates their relationship with the Collective Venture, then the Founding

40

Group member has a right to remove their lifetime contributions from the Collective Venture.

g.  That neither Okandiar, RemCorp, nor RemIndustries has any right to terminate the directorships, equity holdings, or employment positions with the Collective Venture or RemCo, except with Plaintiffs' vote and approval per their roles in the Collective Venture and RemCo's Executive Board.

108.  Plaintiffs are therefore entitled to injunctive relief requiring Okandiar to form RemCo in the form and with the ownership and governance structure agreed to by the parties, including the formation of a 3-member Executive Board with Plaintiffs holding at least 50% of the votes, the issuance of equity (stock or memberships as appropriate), and the delivery of an acceptable shareholders' or operating agreement as the case may be.

109.  Plaintiffs are also entitled to an injunction preventing Defendants and their agents from accessing, transferring, assigning, disposing of, or dissipating any of the Collective Venture's intellectual property, funds and assets without the Plaintiffs' consent and approval.

110.  Plaintiffs are further entitled to a declaratory judgment and injunction requiring Defendants and their agents to return the Collective Venture's intellectual property, assets and funds; or alternatively for the imposition of a constructive trust

for the Plaintiffs' benefit over any such intellectual property, funds, and assets that are not capable of being returned, including but not limited to, an order that Defendants transfer all Remilia funds, assets, and treasury and the proceeds therefrom into a bona fide multi-signature wallet and/or bank account to be jointly controlled only by the Collective Venture, a newly formed corporation, or RemCorp with each Plaintiff as a 20% owner and with equal ownership and governing rights as directors and managing officers

111.   An actual and ripe case and controversy exists between Plaintiffs and Defendants as to each of the foregoing issues and constructions of the Agreements. Plaintiffs have been and will continue to be adversely affected by Defendants' assertions of RemCorp's and/or RemIndustries' ownership and right to control of the Collective Venture's assets, funds and intellectual property.  To the extent Ohkandiar, Remcorp and/or RemIndustries assert ownership or control over any such assets, funds or intellectual property, Plaintiffs are further adversely affected by the Defendants' refusal to recognize them as equity owners, directors and officers of those owning and controlling entities.  Absent declaratory relief, Defendants will continue to exercise of control over the Collective Venture's assets, funds and intellectual property, which denies Plaintiffs their ownership rights and will continue to cause Plaintiffs direct and proximate harm, which may be inadequately compensable in monetary damages.

112.   Plaintiffs request equitable relief in the form of specific performance and/or injunctive relief, as described above and in their Prayer for Relief, with regard to each of the foregoing controversies.

## COUNT IV
### Breach of Collective Venture Agreements
### (Plaintiffs against Okhandiar)

113.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

114.   Plaintiffs and Defendant Okhandiar entered into a binding and enforceable contractual relationship to form the Collective Venture.

115.   The Founding Group created the Collective Venture as a digital art collective, whereas the Founding Group members would contribute their individual skills, time, intellectual property, effects, assets, and/or knowledge to create, mint, and advertise digital art for the mutual benefit of the Collective.

116.   Each Founding Group member would have a joint property interest in the digital art, assets, and funds that the Collective created.

117.   It was understood that each Founding Group member would have managerial authority within the Collective Venture such as decision-making involving investment opportunities, equity distributions, and disposition of treasury and assets.

118.   The Collective Venture would eventually formally incorporate an

43

entity, RemCo, which would, in turn, provide agency services for the Collective Venture. The Founding Group members would be co-founders and equity holders in RemCo, would have specific roles and voting power on the Executive Board, and would be salaried officers and employees of the corporation.

119. Pursuant to the Agreement, if a Founding Group member exits the Collective Venture, the member would exit with the lifetime of contributions, including any intellectual property, that the member had contributed to the Collective Member.

120. As such, it was understood that the Collective Venture would continue to own the intellectual property and other assets formed or derived from the Collective Venture, while the incorporated RemCo would merely act as its agent to perform administrative and logistical duties, contract, and help develop, deploy and exploit the Collective Venture's business, assets and treasury.

121. The contractual relationship was formed through several written and oral promises as described above. The Collective Venture memorialized some of the terms of the Collective Venture Agreement in written contracts and in other forms of writing, including but not limited to:

      a.      the Smith LOI in October 2021, and as it was later revised in summer 2022 with regard to his salary and compensation;

      b.      the Nispel LOI in October 2021;

44

c.     the original Duff LOI;

d.     the agreements with Roux;

e.     the NDAs; and

f.     the Duff Agreement to Negotiate, along with the attached NDA and Amended LOI, which were conditions precedent to the Agreement to Negotiate and which was signed by Duff both for his own benefit and the benefit of all Plaintiffs as shareholders of RemCo and who were also expecting the issuance of equity and a shareholders' agreement.

122.    The Plaintiffs each performed their obligations under the Collective Venture Agreements when they invested their time, skills, intellectual property, effects, assets, and/or knowledge to create, mint, and various NFT Projects, and also by agreeing to the NDAs and amended LOIs.

123.    Okhandiar breached the terms of the Collective Venture Agreements in the following ways:

a.     by unilaterally forming his own companies RemCorp and RemIndustries without the knowledge or consent of the Plaintiffs, and in contravention of the agreed forms of ownership, governance, and management for "RemCo" as agreed by the Founding Group members;

b.     by denying Plaintiffs their equity in RemCo (whether RemCorp

45

or RemIndustries);

c.      by asserting unilateral ownership and control over the Collective Venture's assets, treasury and intellectual property, and other assets and intellectual property derived therefrom;

d.      by failing to hold the Collective Venture's assets and funds in a multi-signature wallet and by removing an estimated $2.3 million worth of the Collective Venture's assets and treasury from the wallet to himself and to RemCorp and RemIndustries;

e.      by purporting to unilaterally terminate Plaintiffs from the Collective Venture when they had no authority to do so, and in response to Plaintiffs' demand to form RemCo as agreed, and to distribute equity and recognize Plaintiffs' roles and authority as directors and managing employees in RemCo, whether known as RemCorp, RemIndustries or otherwise;

f.      by terminating and denying Plaintiffs' access to their email accounts, social media accounts, and NFT Project software, data, and information;

g.      by failing and refusing to release payment of Plaintiffs' respective salaries, bonuses and commissions; and

h.      by failing to provide equity and a shareholders' agreement, and

in Duff's case, by purportedly agreeing to provide equity to others before him.

124.   As a direct and proximate result of Okhandiar's breaches of the Collective Venture Agreements, Plaintiffs have suffered substantial damages and losses.

## COUNT V
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Plaintiffs against Okhandiar)

125.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

126.   Plaintiffs and Okhandiar entered into the binding and enforceable Collective Venture Agreements as discussed above.

127.   The Collective Venture Agreements contain an implied covenant of good faith and fair dealing.  At the time Plaintiffs entered into the Collective Venture Agreements, Plaintiffs reasonably expected that each Founding Group Member would promote the interests of the Collective Venture above their own individual interests so long as they remained a member of the Collective Venture.

128.   By his actions, Okhandiar has frustrated and impeded the benefits of the Collective Venture Agreements that Plaintiffs expected to receive.  When Okhandiar unilaterally created RemCorp and RemIndustries, by which he purports to own 100% of the Collective Venture's assets, treasury and intellectual property,

he undermined, frustrated, impeded and destroyed the entire purpose of the Collective Venture and the Collective Venture Agreements, which was for the Founding Group members to (a) make contributions to the collective, (b) share equally in its profits, (c) share in the decisions regarding the disposition and distribution of the Collective venture's assets and treasury, and the governance and management of its business, and (d) be able to exit the Collective Venture with their own lifetime contributions to the Collective Venture.  As a result of Okhandiar's actions described above, Plaintiffs have not able to exercise joint property ownership of the Collective's digital art, assets, and funds, or exercise managerial authority within the Collective.  Moreover, the purpose of the Collective Venture Agreements was undermined when Okhandiar unilaterally terminated Plaintiffs from the Collective, even though he had no corporate or contractual authority to do so.

129.   As a direct and proximate result of Okhandiar's breaches of the implied covenant of good faith and fair dealing in the Collective Venture Agreements, Plaintiffs have suffered substantial damages and losses.

## COUNT VI
### Promissory Fraud
### (Plaintiffs against All Defendants)

130.  Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

131.   Okhandiar made numerous and various promises to Plaintiffs, on the

dates and in the manners previously alleged and as further described below, about the purpose and construction of the Collective Venture, the Collective Venture's assets, and the role of that RemCo would play as an administrative and logistical agent of the Collective Venture, including its formation, governance through an Executive Board, ownership equity, and Plaintiff's roles as managing officers.

132.    During conversations on the telephone, chat messages, and written agreements, in and around August 2021 to November 2022, Okhandiar made various promises to each Plaintiff, with the understanding that the Plaintiffs would all be aware of these promises, that they would all own equity in the Company, once formed.  These conversations, messages, and agreements include but not limited to:

    a.    Okhandiar telling Smith that he would be recognized as a co-founder with a significant stake in RemCo once it was formed;

    b.    Okhandiar telling Nispel that he would be a co-founder of the Company;

    c.    Okhandiar telling Duff they make good partners and that he is a co-founder and equity owner of RemCo in whatever form it would be created; and

    d.    Okhandiar telling Roux that when he would distribute equity in the Company, once it was formed, Roux would have "serious exposure" to equity.

49

133.    In July 2022, Okhandiar made false statements to Plaintiffs about the inclusion of Plaintiffs and other persons as holding signature keys on the Collective Venture's multi-signature wallet.

134.    In November 2022, Okhandiar made false statements to Plaintiffs about the existence and structure and Plaintiffs' ownership of and roles in RemCorp and RemIndustries.

135.    Okhandiar similarly made various promises as described above to each plaintiff that the intellectual Property was owned by the Collective Venture.

136.    Unbeknownst to Plaintiffs, Okhandiar had no intention of including Plaintiffs in the formation or ownership of the Company and instead intended to utilize the assets and funds Plaintiffs' generated for the Collective as funds for his own benefit to the exclusion of Plaintiffs.

137.    Plaintiffs, who knew Okhandiar through a community of digital artists and began collaborating as friends in 2020, reasonably believed Okhandiar, and reasonably relied upon his promises and assurances with regard to the Collective venture and RemCo.

138.    Plaintiffs would have never entered into the NDAs and LOIs, and would not have contributed their skill, intellectual property, and efforts to the Collective Venture had they known that Okhandiar would assert unilateral ownership and control over the Collective Venture's assets and intellectual property,

50

and further deny them their equity, compensation, and roles in the Collective Venture and agent corporation.

139.    Okhandiar made these fraudulent statements and misrepresentations intentionally and with the purpose of having Plaintiffs rely on them to their own detriment.

140.    To the extent RemCorp is an alter ego of Okhandiar, any promise made by RemCorp should be imputed onto Okhandiar.

141.    As a direct and proximate result of Defendants' fraudulent statements and misrepresentations, Plaintiffs have suffered substantial damages and losses.

### COUNT VII
### Negligent Misrepresentation
### (Plaintiffs against All Defendants)

142.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

143.    Based on Okhandiar's membership in the Collective Venture, he had a pecuniary duty to provide accurate information to Plaintiffs regarding the corporate structure, governance, ownership, and management of RemCo.  He also had a pecuniary duty to provide full and complete information to Plaintiffs about the identity of the signatory key holders on the Collective Venture's multisignature wallet.

144.    Okhandiar provided Plaintiffs with information about RemCo and the

signatories on the multisig wallet.

145.  Okhandiar failed to exercise reasonable care in obtaining or communicating the information, thereby causing Plaintiffs to believe and understand that they held ownership interests in RemCo (in whatever form it might exist), and that they had authority through their signature and private key positions on the multi-signature wallet to jointly control the Collective Venture's assets and treasury.

146.  As a direct and proximate result of Okhandiar's false statements, Plaintiffs have suffered harm caused by justifiable reliance upon the false information.

147.  Plaintiffs are without an adequate remedy at law.

## COUNT VIII
### Promissory Estoppel
### (Plaintiffs against All Defendants)

148.  Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

149.  Okhandiar made the false promises described above with the reasonable expectation that those promises would induce Plaintiffs' actions and forbearances, including but not limited to, their contributions of their own skill, effort, intellectual property, and funds to the Collective Venture.

150.  Plaintiffs placed trust in and reasonably relied upon Okhandiar's promises to their own detriment.

151. Okhandiar's promises are binding upon him, RemCorp and RemIndustries because injustice to Plaintiffs from the loss of their rights, financial well-being, and property can only be avoided by enforcement of the promises that the assets, treasury and funds are owned jointly by the Founding Group members as part of the Collective Venture, and that they are equity owners, directors, and managing employees of the company (whether RemCo or any other entity) that purports to own those assets, treasury and funds.

## COUNT IX
## Equitable Estoppel
## (Plaintiffs against All Defendants)

152. Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

153. Defendants conduct and statements described above amount to false representations and concealments of material facts that were intended and calculated to convey to Plaintiffs the understandings they justifiably had about the nature of and their roles in the Collective Venture and RemCo.

154. Defendants prior promises and statements are inconsistent with the positions that Defendants now assert, namely that Plaintiffs do not have any ownership interest in the Collective Venture, RemCorp, RemIndustries, and that all of the Remilia-related assets and funds, and all assets, funds and intellectual property related to the NFT Projects are owned exclusively by him and RemCorp and

RemIndustries.

155.    Based on the misrepresentations described above, the fact that Okhandiar created and controlled the multi-signature wallet, and the fact that he was trusted to form RemCo, which he purports to have created as RemCorp and/or RemIndustries, Defendants had actual and constructive knowledge of the true facts and the Plaintiffs' lack of knowledge, either actual or constructive, of the real facts and the means of discovering the truth until after Defendants had seized the Collective Venture's funds and assets.

156.    Defendants intended and expected that Plaintiffs would rely upon, act upon and be influenced by their good faith reliance on Defendants' misrepresentations and concealments.

157.    Plaintiffs did so act and forbear from acting, and were thereby affected to their detriment, by their reliance upon Defendants' promises and misrepresentations, such that they would not have contributed their skill, effort, time, funds, and intellectual property to the Collective Venture but for Defendants' prior inconsistent statements and promises.

158.    As a result, Defendants should be equitably estopped from asserting that Plaintiffs are not co-owners of the Collective Venture's assets, funds and intellectual property.   Defendants should be further equitably estopped from asserting that Plaintiffs are not equity owners, directors, and managerial officers of

RemCo, in whatever form that company will or does exist. Defendants should also be equitably estopped from asserting that they have the right to unilaterally own or control any of the Collective Venture's assets, funds or intellectual property, including but not limited to all Remilia art, NFTs, merchandise, or any other asset of value related to the NFT Projects. Defendants should also be estopped from asserting that Plaintiffs have assigned any of their interests or intellectual property in the Collective Venture or related to the NFT Projects to Okhandiar, Remcorp, or RemIndustries. Furthermore, Defendants should be estopped from asserting that Defendants are independent contractors of the Collective Venture or RemCo (in whatever form it may or does exists), and also estopped from asserting that they possess the authority or right to terminate Plaintiffs' ownership or employment roles with the Collective Venture, RemCo, Remcorp, or RemIndustries.

159.   Plaintiffs are without an adequate remedy at law.

## COUNT X
### Conversion
### (Plaintiffs against All Defendants)

160.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

161.   Plaintiffs, through their contributions to and membership in the Collective, own the assets and funds that were generated from creating and developing the various NFTs and NFT Projects. These include both the

artwork/NFTs and the intellectual property rights and funds generated from the sale of the Collective Venture's assets.

162.   Defendants have wrongfully exercised dominion without excuse or justification over property of the Collective Venture and Plaintiffs' rights to their portions of the Collective Venture's funds and intellectual property by transferring the assets and funds to out of the on-chain multi-signature wallet to Okhandiar's personal crypto wallet and RemCorp's treasury, and by seizing control of the Collective's NFT's and other artistic designs.

163.   As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.

## COUNT XI
## Unjust Enrichment
### (Plaintiffs against All Defendants)

164.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

165.   Defendants, for their own personal benefit, have knowingly taken and accepted the contributions and benefits Plaintiffs have made to the Collective Venture and RemCo, or to RemCorp or RemIndustries as the case may be.

166.   Unless Defendants return and disgorge the assets and funds that belong to the Collective Venture, or form and formalize RemCo's corporate structure to include Plaintiffs as equity owners, shareholders, and directors, Defendants will be

unjustly enriched to Plaintiffs' substantial detriment.

167.   Defendants lacked any substantial justification for their acceptance, taking, and withholding of the benefits provided by Plaintiffs.

168.   As a direct and proximate result thereof, Plaintiffs have suffered harm. Plaintiffs lack an otherwise adequate remedy at law, and are entitled to return of the contributions or equivalent value for those contributions and benefits provided to the Collective Venture and RemCo in whatever form it exists.

## COUNT XII
### Tortious Interference with Contract Relations
### (Plaintiffs against RemCorp and RemIndustries)

169.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.  Plaintiffs allege this Count in the alternative and only to the extent that RemCorp and/or RemIndustries are found not to be an alter ego of Okhandiar, and not merely the agents of the Collective Venture.

170.   Plaintiffs and Okhandiar entered into the Collective Venture Agreements described above.

171.   RemCorp and RemIndustries—which were supposed to have been formed to act as agents of the Collective Venture—knew about the Collective Venture Agreements because Okhandiar is their sole member and manager, who is also a member of the Founding Group of the Collective Venture.

172.   When RemCorp and/or RemIndustries converted, misappropriated,

and/or held Plaintiffs' rights to the ownership of the Collective Venture's intellectual property, funds, or other assets, they necessarily interfered with and disrupted the Collective Venture Agreements between Plaintiffs and Okhandiar, and between the Collective Venture and its investors and clients, which acts of interference lack any business justification.

173.   As a result of RemCorp's and RemIndustries' acts of interference with the Collective Venture Agreements and the agreements between the Collective Venture and its investors and customers, Plaintiffs suffered substantial damages and losses.

## COUNT XIII
### Tortious Interference with Prospective Economic Advantage
### (Plaintiffs against RemCorp)

174.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.  Plaintiffs allege this Count in the alternative and only to the extent that RemCorp and/or RemIndustries are found not to be an alter ego of Okhandiar, and not merely the agents of the Collective Venture.

175.   The Collective Venture had at least the reasonable probability of completing and profiting by the many NFT Projects that it was and is continuing to develop, exploit and monetize.  RemCorp and RemIndustries have also interfered with the investment by third parties in the Collective Venture and RemCo.

176.   RemCorp   and   RemIndustries   intentionally   interfered   with   the

Collective Venture's development and deployment of the ongoing NFT Projects, including but not limited to Bonkler, because it purports to hold ownership of the Collective Venture's art and intellectual property and other assets, when it has no ownership interests or agency to do so.  RemCorp and RemIndustries have also intentionally interfered with the Collective Venture's opportunities when they terminated Plaintiffs access to their emails, software, and social media accounts and purported to terminate Plaintiffs' relationships with the Collective Venture and its customers and investors.

177.  As a direct and proximate result thereof, Plaintiffs have suffered substantial damages and losses.

## COUNT XIV
### Trade Libel
### (Plaintiffs against All Defendants)

178.  Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

179.  From September 11, 2023, through at least the date of this Complaint, Okhandiar has made various false and libelous statements in writing on the social media website X (formerly known as Twitter) wrongfully stating that Plaintiffs conspired to and did commit theft and extortion.

180.  The following are only a few examples of some of the false and libelous statements describing Plaintiffs as criminals that Okhandiar has published and

disseminated directly and through employees to tens of thousands of persons through X alone:

- Accusing Plaintiffs of "stealing $1 million from Remilia," and having "attacked the entire Remilia community";

- Accusing Plaintiffs of transferring Remilia funds directly to their personal wallets;

- Encouraging other Remilia employees and representatives to make a posts and re-post false and defamatory statements accusing Plaintiffs of stealing company property worth in excess of $1 million, conspiring to extort Remilia, committing "theft and conspiracy to extort," among other "serious crimes;" and

- Encouraging other Remilia employees and representatives to make a posts and re-post statements that Plaintiffs are guilty of "fundamentally criminal acts" of which "[t]here is absolutely zero room for interpretation," that Plaintiffs "had no intent to continue Remilia operations," that instead "they were going to gut the treasury, take their cut, and run this company completely into the ground, taking down all the projects with them."

*See* **Exhibit N**.

181.    In addition, Okhandiar has published written and knowingly false

statements, and encouraged others to do the same in their own words or by re-posting his statements, to the effect that Duff secretly coded a backdoor into the Bonkler project by implementing two contracts rather than one, with the nefarious and conspired purpose of diverting funds to his personal wallet and maintaining control over the operation of the Bonkler project. *See* **Exhibit O**. Okhandiar has also made the false and libelous statements that he instructed Duff to design the Bonkler code to direct commissions into the Remilia general treasury wallet, but that Duff purposely ignored and refused to follow those instructions. *Id.* These false statements have been published and re-published by Remilia employees in written posts and audio streams and recordings viewed by more than 25,000 X users. *See* **Exhibit P**.

182.   In truth, the Founding Group agreed that the Bonkler project would be built upon an adapted copy, or fork, of the code of another project, NounsDAO, that used two smart contracts. Duff has maintained control of the Bonkler smart contracts since Bonkler's launch, in accordance with Remilia's normal business operations, to facilitate the execution of Bonkler auctions. Duff has only transferred ownership of the Bonkler contracts in a limited nature to allow Bonkler to be listed on OpenSea, an NFT marketplace. *See* **Exhibit Q**. The proceeds of Bonkler have not been stolen or misappropriated by Plaintiffs, and the funds remain in the same wallet into which they have always been directed, as agreed by Founding Group.

61

These false statements made by Okhandiar and Remilia employees have harmed and will continue to harm the Plaintiffs' business, trade, profession, particularly Duff's profession in the programming, project management, and cryptocurrency industries.

183.    Okhandiar has also made or adopted various false and libelous statements in writing stating to the effect that Plaintiffs were not involved in the Collective's decision making or in the creation of the NFT Projects.  The following are only a few examples of some of these false statements that Okhandiar has made and published:

- That Plaintiffs were at the "bottom of the [Remilia] hierarchy" with no one directly reporting to them;

- Fabricating a false organizational chart with each Plaintiff at the bottom of the organization in incorrect positions and roles;

- Claiming that Remilia has no co-founders, and particularly that the Plaintiffs had no role in co-founding Remilia and are not equity owners of Collective Venture's business; and

- Claiming that Plaintiffs never joined any work platforms, and had no understanding of operations.

*See* **Exhibit R**.

184.    Okhandiar also made and published the following false and libelous statements about Plaintiffs' work on the NFT Projects and the events giving rise to

62

this Action:

- Wrongfully blaming failures of various NFT Projects on Plaintiffs and accusing Plaintiffs of sabotaging several Remilia operations for months;

- Claiming that Plaintiffs refused to engage in private resolution of this dispute; and

- Claiming that Plaintiffs demanded and "attempted to extort" stablecoins, Etherium, all the NFT reserves, all IP, and R&D from Remilia.

*See* **Exhibit S**.

185. Okhandiar is also encouraging his employees, contractors, and agents of RemCorp to make similar false and libelous statements about Plaintiffs on X. *See* **Exhibit T**.

186. The Collective Venture's fan base and online community has viewed, "liked," re-shared, and commented to many of Okhandiar's written statements and RemCorp's purported employees', contractors' and agents' written libelous statements.

187. Okhandiar intended the statements to disgrace, lower, and exclude Plaintiffs in the NFT and cryptocurrency communities and customers by bringing a campaign to confuse and deceive them about Plaintiffs' profession. These statements

have injured and continue to injure Plaintiffs' trade because the statements diminish Plaintiffs' trade, and thus evoking unfair competition as it causes customers and the community to refrain from supporting them. Morover, the statements continue to harm Plaintiffs as Okhandiar is intimidating other Remilia employees to make false and libelous statements. These statements have similarly injured and continue to injure the reputation of the Collective Venture of which Plaintiffs are the co-founding members and hold individual financial interests. The statements deter third parties, including consumers of the Projects from purchasing them or wanting to support Plaintiffs creations.

188.   As a proximate result of Defendants' false and libelous statements, Plaintiffs have suffered and will continue to suffer substantial losses and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    That judgment be entered in each of the Plaintiffs' favors, and against Defendants jointly and severally, on each of the Counts.

2.    For an declaratory judgment and injunction over Defendants, and each of the agents, that:

    a.    Under a construction of the Agreements, neither RemCorp nor RemIndustries are the intended agent-corporation known as RemCo, and that Okhandiar has failed to incorporate RemCo in

the manner and with the owners and governance structure
agreed by the Founding Group members and in compliance
with the Agreements.

b.     Plaintiffs, and each of them, are equity owners in RemCo, or
whatever corporate entity of whatever form (including but not
limited to RemCorp and RemIndustries), controls or owns the
Collective Venture's assets, treasury, and intellectual property;
and further that Plaintiffs are entitled to signatory key authority
on the digital wallet in which any of the Collective Venture's
assets and treasury are held; and that they be issued shares or
membership units in RemCo in whatever form in which that
entity may or does exist.

c.     Neither Okhandiar, RemCorp nor RemIndustries separately
control or own any of the Collective Venture's assets, treasury
or intellectual property.

d.     The Collective Venture has not assigned or transferred any of
its assets, funds or intellectual property to Okhandiar, RemCorp
or RemIndustries, and any such assignments are invalid and
unenforceable for lack of mutual consent, lack of consideration,
and/or having been obtained by fraud.

e.    To the extent Plaintiffs are found to be equity owners and/or directors of RemCorp or RemIndustries, that they are not liable for either of those company's past actions, omissions or contracts.

f.    To the extent any work for hire, intellectual property, or contributions are owned or have been assigned to either the Collective Venture or any corporate entity of any form (whether RemCo, RemCorp, RemIndustries, or otherwise), then to the extent a Founding Group member exits or terminates their relationship with the Collective Venture, then the Founding Group member has a right to remove their lifetime contributions from the Collective Venture.

g.    That neither Okhandiar, RemCorp, nor RemIndustries has any right to terminate the directorships, equity holdings, or employment positions with the Collective Venture or RemCo, except with Plaintiffs' vote and approval per their roles in the Collective Venture and RemCo's Executive Board.

3.    For an injunction preventing Defendants and their agents from accessing, transferring, assigning, disposing of, or dissipating any of the Collective Venture's intellectual property, funds and assets without the Plaintiffs' consent and

approval.

4.      For a declaratory judgment and injunction requiring Defendants and their agents to return the Collective Venture's intellectual property, assets and funds; or alternatively for the imposition of a constructive trust for the Plaintiffs' benefit over any such intellectual property, funds, and assets that are not capable of being returned, including but not limited to, an order that Defendants transfer all Remilia funds, assets, and treasury and the proceeds therefrom into a bona fide multi-signature wallet and/or bank account to be jointly controlled only by the Collective Venture, a newly formed corporation, or RemCorp with each Plaintiff as a 20% owner and with equal ownership and governing rights as directors and managing officers.

5.      For a Constructive Trust to be created for the benefit of the Plaintiffs over the assets, funds and intellectual property that Defendants have misappropriated, embezzled, and converted to their own possession or control.

6.      For compensatory damages, including actual, incidental, consequential, statutory, and all other permissible forms of damage in the amounts to be proven at trial.

7.      For an award of attorneys' fees, costs, expenses, and disbursements in prosecuting this action to the extent permitted by applicable law, contract or equity.

8.      For pre- and post-judgment interest as permitted by law or contract.

9.    For all such other and further relief as this Court deems just and proper.

Dated: September 22, 2023    **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

-and-

Jonathan P. Hersey (*pro hac vice*
forthcoming)
Lea E. Gierut (*pro hac vice* forthcoming)
K&L GATES LLP
1 Park Plaza, Twelfth Floor
Irvine, California 92614
Telephone: (949) 253-0900
jonathan.hersey@klgates.com
lea.gierut@klgates.com

*Counsel for Plaintiffs*

EFiled: Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

# Exhibit A



## Remilia Corporation Offer: Letter of Intent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Milady Sonora,

I am honored to invite you to join Remilia Corporation as **Lead Artist** reporting to Executive Creative Director, Wretched Worm.

As Remilia Corporation (hereafter, "Remilia") has not fully incorporated or finalized its corporate infrastructure, this letter of intent is provided in place of an employment agreement as a written promise of the offered role and its compensation and expectations.

## Compensation

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

$60,000.00 annual salary and up to $25,000.00 annual incentive bonus in a USD pegged cryptocurrency.

**Incentive Bonus:** Bonuses are distributed quarterly proportional to our progress towards our annual revenue goals. Revenue goals are determined by the Executive Board in Q1 and revisited each quarter. *e.g. If in Q1 we achieve 10% of our target revenue, you will receive 10% of your bonus; if in Q2, we hit 50% of our target revenue, you will receive the additional 40% of your total bonus. If we fail to meet 100% of our goal in Q4, you will not receive the remainder bonus.*

**Payment currency:** To avoid market volatility, payment will be distributed in a stable cryptocurrency pegged to the USD, such as DAI.

**Salary distribution:** Workflow is being setup now, but salary will likely either be on a bi-weekly basis or a steady stream directly to a cryptocurrency wallet address.



___/___
Initials

remilia.org



## Expectations

**************

**Role**: Dedicate full-time effort towards the standard roles and functions of a **Lead Artist.**

**Exclusivity**: You are expected to commit full-time exclusively for Remilia - you are expected to not moonlight any second job. Side investments are okay but limit any side hustles to what won't occupy your working time; *e.g. disengaged angel investments.*

**Commitment**: As a co-founder with a significant stake in Remilia, you should make a good faith effort to introduce any new enterprises and opportunities into Remilia where relevant as if it were personal investments, and not expend significant time pursuing interests that do not in some way have a path to feed back into Remilia, and if a path exists, make a best effort to develop it towards Remilia.


## Note on DAO Governance

*************************

To avoid any misconceptions with the "DAO" designation, I want to make clear Remilia does intend to maintain a traditional corporate pyramid heirarchy. Formal governance maintained on top-level DAO infrastructure, such as treasury multisigs, is performed exclusively by the 3 co-founders (hereafter, "Executive Board"), in a 1/4 vote structure, with the CEO holding 2 votes to maintain equal or controlling interest and/or executive veto. The Executive Board managing strategic and tactical operations with the CEO retaining equal or controlling interest and/or executive veto is intended to remain throughout any DAO infrastructure developed moving forward. Other subsidiary DAO's may be initiated to manage departments or teams in an unrelated structure.

The structure of the organization as a DAO and how shares will factor in, likely either as profit-sharing or ownership interest tied to the treasury's valuation, is still being formalized, but you will be compensated fairly according to your role in the starting team.



___/___
Initials

remilia.org



## Remilia Collective Co-operative

*************************************

**Remilia Collective Agency Relationship:** Membership into Remilia Collective, an NFT art collective which Remilia represents in an agency relationship, will be distinguished by a Remilia Collective Member NFT, and include all salaried employees of Remilia. Remilia Collective intends to operate a collective co-operative fund sharing an interest fairly distributed between its members, with a flat contribution from artist's sales paired with a Remilia Corp match. All members can exit the Collective and pull their lifetime contributions to the co-operative, though as a Remilia employee, it would require severing your employment.

**Agent Terms:** While a member of Remilia Collective, any art or design work produced, minted or monetized with NFT technology, independently of Remilia directed or coordinated ventures, delivers rights for sale, distribution and representation to Remilia as formal agents, with a minimum 10% fee on sales and royalties to the Remilia Collective co-operative fund and minimum 30% fee to the Remilia. Further fees towards Remilia may be negotiated according to their contribution as agents. Work produced under Remilia direction or as a Remilia coordinated venture is not considered independent and would fall under Remilia according to Remilia's own compensation and incentive structure.

## Terms & Restrictions

**********************

**Intellectual Property & Ownership Rights:** Remilia intends to be a general-purpose software development company in the Decentralized Finance space, specifically around non-fungible, semi-fungible token technology. As an employee of Remilia and member of Remilia Collective, all work performed under this domain, including software, patents, products, art and intellectual property, as well as any work performed under Remilia direction or with Remilia resources, and any independent artistic or design related work monetized by blockchain technology, is understood to be owned by Remilia



___/___
Initials

remilia.org



and carried under the Remilia brand except by prior notice and approval from the
Executive Board.


~~~~~~~~~~~~~~~


Welcome to Remilia Corporation.


Yours truly,

Charlemagne Fang

CEO @ Remilia Corporation

charlie.fang@remilia.org




Witnessed and agreed:

Milady Sonora

Signature:     _____

Date:          _____



___/___
Initials

# Exhibit B



## Remilia Corporation Offer: Letter of Intent

**************************************************

Yojimbo King,

I am honored to invite you to join Remilia Corporation as **co-founder & Chief Operating Officer (COO)** alongside the two other co-founders, myself, Charlie Fang, as Chief Executive Officer (CEO), and Wretched Worm, Executive Creative Director (ECD).

As Remilia Corporation (hereafter, "Remilia") has not fully incorporated or finalized its corporate infrastructure, this letter of intent is provided in place of an employment agreement as a written promise of the offered role and its compensation and expectations.

### Compensation

**************

$125,000.00 annual salary and up to $125,000.00 annual incentive bonus in a USD pegged cryptocurrency.

**Incentive Bonus:** Bonuses are distributed quarterly proportional to our progress towards our annual revenue goals. Revenue goals are determined by the Executive Board in Q1 and revisited each quarter. *e.g. If in Q1 we achieve 10% of our target revenue, you will receive 10% of your bonus; if in Q2, we hit 50% of our target revenue, you will receive the additional 40% of your total bonus. If we fail to meet 100% of our goal in Q4, you will not receive the remainder bonus.*

**Payment currency:** To avoid market volatility, payment will be distributed in a stable cryptocurrency pegged to the USD, such as DAI.

**Salary distribution:** Workflow is being setup now, but salary will likely either be on a bi-weekly basis or a steady stream directly to a cryptocurrency wallet address.



 y / k 
Initials

remilia.org



## Expectations

**************

**Role**: Dedicate full-time effort towards the standard roles and functions of a **Chief Operating Officer,** reporting directly to **CEO.**

**Exclusivity**: You are expected to commit full-time exclusively for Remilia - you are expected to not moonlight any second job. Side investments are okay but limit any side hustles to what won't occupy your working time; *e.g. disengaged angel investments.*

**Commitment**: As a co-founder with a significant stake in Remilia, you should make a good faith effort to introduce any new enterprises and opportunities into Remilia where relevant as if it were personal investments, and not expend significant time pursuing interests that do not in some way have a path to feed back into Remilia, and if a path exists, make a best effort to develop it towards Remilia.

## Note on DAO Governance

************************

To avoid any misconceptions with the "DAO" designation, I want to make clear Remilia does intend to maintain a traditional corporate pyramid heirarchy. Formal governance maintained on top-level DAO infrastructure, such as treasury multisigs, is performed exclusively by the 3 co-founders (hereafter, "Executive Board"), in a 1/4 vote structure, with the CEO holding 2 votes to maintain equal or controlling interest and/or executive veto. The Executive Board managing strategic and tactical operations with the CEO retaining equal or controlling interest and/or executive veto is intended to remain throughout any DAO infrastructure developed moving forward. Other subsidiary DAO's may be initiated to manage departments or teams in an unrelated structure.

The structure of the organization as a DAO and how shares will factor in, likely either as profit-sharing or ownership interest tied to the treasury's valuation, is



<u>y /k</u>
Initials

remilia.org



still being formalized, but you will be compensated fairly according to your role in the starting team.

## Remilia Collective Co-operative

***********************************

**Remilia Collective Agency Relationship:** Membership into Remilia Collective, an NFT art collective which Remilia represents in an agency relationship, will be distinguished by a Remilia Collective Member NFT, and include all salaried employees of Remilia. Remilia Collective intends to operate a collective co-operative fund sharing an interest fairly distributed between its members, with a flat contribution from artist's sales paired with a Remilia Corp match. All members can exit the Collective and pull their lifetime contributions to the co-operative, though as a Remilia employee, it would require severing your employment.

**Agent Terms:** While a member of Remilia Collective, any art or design work produced, minted or monetized with NFT technology, independently of Remilia directed or coordinated ventures, delivers rights for sale, distribution and representation to Remilia as formal agents, with a minimum 10% fee on sales and royalties to the Remilia Collective co-operative fund and minimum 30% fee to the Remilia. Further fees towards Remilia may be negotiated according to their contribution as agents. Work produced under Remilia direction or as a Remilia coordinated venture is not considered independent and would fall under Remilia according to Remilia's own compensation and incentive structure.

## Terms & Restrictions

***********************

**Intellectual Property & Ownership Rights:** Remilia intends to be a general-purpose software development company in the Decentralized Finance space, specifically around non-fungible, semi-fungible token technology. As an employee of Remilia and member of Remilia Collective, all work performed under this domain, including software, patents, products, art and intellectual property, as well as any work performed under



remilia.org

y / k
Initials



Remilia direction or with Remilia resources, and any independent artistic or design related work monetized by blockchain technology, is understood to be owned by Remilia and carried under the Remilia brand except by prior notice and approval from the Executive Board.

~~~~~~~~~~~~~~~

Welcome to Remilia Corporation.


Yours truly,

Charlemagne Fang

CEO @ Remilia Corporation

charlie.fang@remilia.org




Witnessed and agreed:

Yojimbo King

Signature: ✓_____

Date:      _____ 10/19/21




Initials

# Exhibit C

Message from Rohit Okhandiar to Maxwell Roux

dated December 13, 2021



# Exhibit D



Remilia Corporation Offer: Letter of Intent

*************************************************

CCCAA,

I am honored to invite you to join Remilia Corporation as **Smart Contract Developer** reporting to the **Lead Developer, Rahab**.

As Remilia Corporation (hereafter, "Remilia") has not fully incorporated or finalized its corporate infrastructure, this letter of intent is provided in place of an employment agreement as a written promise of the offered role and its compensation and expectations.

Compensation

**************

$70,000.00 annual salary and up to **$30,000.00** annual incentive bonus in a USD pegged cryptocurrency, for a total package of **$100,000.00**.

**Incentive Bonus:** Bonuses are distributed quarterly proportional to our progress towards our annual revenue goals. Revenue goals are determined by the Executive Board in Q1 and revisited each quarter. *e.g. If in Q1 we achieve 10% of our target revenue, you will receive 10% of your bonus; if in Q2, we hit 50% of our target revenue, you will receive the additional 40% of your total bonus. If we fail to meet 100% of our goal in Q4, you will not receive the remainder bonus.*

**Payment currency:** To avoid market volatility, payment will be distributed in a stable cryptocurrency pegged to the USD, such as DAI.

**Salary distribution:** Workflow is being setup now, but salary will likely either be on a bi-weekly basis or a steady stream directly to a cryptocurrency wallet address.



___/___
Initials

remilia.org



## Expectations

**************

**Role**: Dedicate full-time effort towards the standard roles and functions of a **Smart Contract Developer.**

**Exclusivity**: You are expected to commit full-time exclusively for Remilia - you are expected to not moonlight any second job. Side investments are okay but limit any side hustles to what won't occupy your working time; *e.g. disengaged angel investments.*

**Commitment**: As a co-founder with a significant stake in Remilia, you should make a good faith effort to introduce any new enterprises and opportunities into Remilia where relevant as if it were personal investments, and not expend significant time pursuing interests that do not in some way have a path to feed back into Remilia, and if a path exists, make a best effort to develop it towards Remilia.

## Note on DAO Governance

*************************

To avoid any misconceptions with the "DAO" designation, I want to make clear Remilia does intend to maintain a traditional corporate pyramid heirarchy. Formal governance maintained on top-level DAO infrastructure, such as treasury multisigs, is performed exclusively by the 3 co-founders (hereafter, "Executive Board"), in a 1/4 vote structure, with the CEO holding 2 votes to maintain equal or controlling interest and/or executive veto. The Executive Board managing strategic and tactical operations with the CEO retaining equal or controlling interest and/or executive veto is intended to remain throughout any DAO infrastructure developed moving forward. Other subsidiary DAO's may be initiated to manage departments or teams in an unrelated structure.

The structure of the organization as a DAO and how shares will factor in, likely either as profit-sharing or ownership interest tied to the treasury's valuation, is still being formalized, but you will be compensated fairly according to your role in the starting team.

___/___
Initials



remilia.org



Remilia Collective Co-operative

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Remilia Collective Agency Relationship:** Membership into Remilia Collective, an NFT art collective which Remilia represents in an agency relationship, will be distinguished by a Remilia Collective Member NFT, and include all salaried employees of Remilia. Remilia Collective intends to operate a collective co-operative fund sharing an interest fairly distributed between its members, with a flat contribution from artist's sales paired with a Remilia Corp match. All members can exit the Collective and pull their lifetime contributions to the co-operative, though as a Remilia employee, it would require severing your employment.

**Agent Terms:** While a member of Remilia Collective, any art or design work produced, minted or monetized with NFT technology, independently of Remilia directed or coordinated ventures, delivers rights for sale, distribution and representation to Remilia as formal agents, with a minimum 10% fee on sales and royalties to the Remilia Collective co-operative fund and minimum 30% fee to the Remilia. Further fees towards Remilia may be negotiated according to their contribution as agents. Work produced under Remilia direction or as a Remilia coordinated venture is not considered independent and would fall under Remilia according to Remilia's own compensation and incentive structure.

Terms & Restrictions

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Intellectual Property & Ownership Rights:** Remilia intends to be a general-purpose software development company in the Decentralized Finance space, specifically around non-fungible, semi-fungible token technology. As an employee of Remilia and member of Remilia Collective, all work performed under this domain, including software, patents, products, art and intellectual property, as well as any work performed under Remilia direction or with Remilia resources, and any independent artistic or design related work monetized by blockchain technology, is understood to be owned by Remilia



___/___
Initials

remilia.org



and carried under the Remilia brand except by prior notice and approval from the Executive Board.

~~~~~~~~~~~~~~~

Welcome to Remilia Corporation.

Yours truly,

Charlemagne Fang

CEO @ Remilia Corporation

charlie.fang@remilia.org

Witnessed and agreed:

CCCAA

Signature:    _____

Date:         _____



remilia.org

___/___
Initials

# Exhibit E

Account creation
Jul 26, 2020, 12:24:34 AM
124.197.21.93 (New Zealand)



# Exhibit F

Messages between Rohit Okhandiar and Bruno

Nispel dated September 2021 (Part 1/4)



Messages between Rohit Okhandiar and Bruno

Nispel dated September 2021 (Part 2/4)



Messages between Rohit Okhandiar and Bruno
Nispel dated September 2021 (Part 3/4)



Messages between Rohit Okhandiar and Bruno

Nispel dated September 2021 (Part 4/4)



# Exhibit G







# Exhibit H

# STATE OF DELAWARE
## CERTIFICATE OF FORMATION
## OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1.    The name of the limited liability company is  Remilia Corporation LLC
_____ .

2.    The Registered Office of the limited liability company in the State of Delaware is located at  611 South DuPont Highway Suite 102 _____(street), in the City of  Dover _____, Zip Code  19901 _____. The name of the Registered Agent at such address upon whom process against this limited liability company may be served  is  ZenBusiness Inc _____
_____ .

By: /s/ Rohit Okhandiar _____
                        Authorized Person

Name: Rohit Okhandiar _____
                        Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:24 AM 07/05/2022
FILED 10:24 AM 07/05/2022
SR 20222900721 - File Number 6894024

# Exhibit I

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:15 AM 10/14/2022
FILED 11:15 AM 10/14/2022
SR 20223772492 - File Number 7084218

**STATE *of* DELAWARE**
**CERTIFICATE *of* FORMATION**
**A LIMITED LIABILITY COMPANY**

**ARTICLE I.**

The name of this limited liability company is REMILIA INDUSTRIES LLC.

**ARTICLE II.**

Its registered office in the State of Delaware is to be located at 651 N. Broad St., Suite 201, Middletown DE 19709. The registered agent in charge thereof is LEGALINC CORPORATE SERVICES INC..

**ARTICLE III.**

The period of duration of the limited liability company shall be perpetual.

**ARTICLE IV.**

The purpose of the limited liability company is to engage in any lawful act or activity for which limited liability companies may be organized under the Delaware Limited Liability Company Act.

**ARTICLE V.**

The name and address of each initial member of the limited liability company is:

Rohit Okhandiar - 651 N BROAD ST, STE 205 #9409, MIDDLETOWN, DELAWARE 19709

**I, the undersigned,** for the purpose of forming a limited liability company under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand and executed this Certificate of Formation on the date below.

**Dated:** October 14, 2022

*Lovette Dobson*

Lovette Dobson, Organizer

# Exhibit J

Remilia Corporation Proudly Presents!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AGREEMENT TO NEGOTIATE

THIS AGREEMENT is made on the date of the last signature below.

BETWEEN Krishna Okhandiar ("Party A");

AND     John Duff ("Party B")

(together, the "Parties")

BACKGROUND

Party A and Party B intend to come to an agreement on an initial shareholding distribution for Remilia Corporation LLC (the "Company"), with a view to produce and sign a shareholders' agreement.

The Parties intend to engage a Third-Party Consultant to advise them in the appropriate terms of such agreement, and to facilitate any discussion or negotiation in advance of its creation.

This Agreement sets out terms upon which these discussions and negotiations will proceed, and establishes the rights and warranties of the Parties.

ACKNOWLEDGEMENTS AND undertakings OF the PARTIES

Both Parties agree to engage and attend the services of a Third-Party Consultant in good faith, with a view to amicably distribute shareholding pursuant to a mutually participatory negotiation.

Both Parties agree to be bound by the decision of any court of arbitration to which the parties bring any dispute under Clause 2 of this Agreement;

Both Parties acknowledge:

That each retains the right to seek the advice of independent legal counsel in this matter; and

That each retains the right to bring the share distribution negotiations to an arbitration court, but not before exhausting the possibility of negotiation and mediation as described in Clause 2 of this Agreement.

Party A agrees:

That unless otherwise agreed by consent of both Parties, the shareholding allotment of Party B will be agreed upon in writing before any further shares are issued or allotted, including to other founders, investors, or employees of the Company.

Party B agrees:

To sign and comply with the terms of the Non-Disclosure Agreement dated December 12, 2022 attached to this Agreement and marked Exhibit A; and

To sign and comply with the terms of the Letter of Intent dated March 15, 2022 attached to this Agreement and marked Exhibit B.

## DISPUTE RESOLUTION

The parties agree that the dispute resolution procedures of this Clause 2 shall be the exclusive mechanism to resolve disputes arising under this Agreement.

The parties agree to endeavor to settle any dispute arising in relation to any matter under this Agreement by negotiation facilitated by the Third-Party Consultant.

If the dispute is not able to be settled by good faith negotiation facilitated by the Third-Party Consultant, the parties must bring the matter to commercial mediation administered by an accredited mediator, and attended solely by the Parties to this agreement.

If the mediation is not completed within 4 weeks, then either party may commence arbitration proceedings relating to the dispute as they see fit.

To the extent reasonably possibly, participation and representation in any arbitration proceedings commenced under this agreement will be confined to the Parties to this Agreement, and not to other shareholders actual or prospective.

The costs of any mediation or arbitration shall be borne equally by the parties.

## OTHER AGREEMENTS

Where they exist, any agreements between the parties will continue to apply to this Agreement and shall remain in full force and effect and are not affected by anything in this Agreement.

## COMMENCEMENT AND SIGNATURE

The agreement in this Agreement will remain in effect until a Shareholders' Agreement has been produced and signed, or until the parties terminate this agreement by mutual consent.

Remilia Corporation                                                                    3

SEVERANCE AND VALIDITY

If any provision of this Agreement is or becomes illegal, invalid, or unenforceable in any respect
under the relevant law, it shall be deemed to be severed from this Agreement, and the Parties shall use
all reasonable endeavours to replace such provision with one having an effect as close as possible to
the deficient provision. The remaining provisions will remain in full force in that jurisdiction and
all provisions will continue in full force in any other jurisdiction.

The parties have signed this Agreement on the date(s) below:

PARTY A                                              PARTY B

Signature:                                           Signature:

X _John Duff_                                        X _____

Date: _12/28/22_                                     Date: _12/28/22_

EXHIBIT A:

Non-Disclosure Agreement

Remilia Corporation Proudly Presents!

*************************************************

CONFIDENTIALITY AND NON-DISCLOSURE UNDERTAKING

THIS CONFIDENTIALITY AND NON-DISCLOSURE UNDERTAKING (the "Undertaking"), dated as of DEC 28 2022, by and between John Duff (the "Recipient"), and REMILIA CORPORATION LLC, a corporation formed and incorporated under the laws of the State of Delaware (the "Discloser").

1.    BACKGROUND

A.    The Discloser wishes to engage the Recipient to perform certain services (collectively, the "Services") for the purpose of creating and developing software, merchandise and related properties;

A.    In connection with the performance by the Recipient of the Services for and in collaboration with the Discloser, the Recipient may receive or have access to certain information relating to the business of the Discloser that is non-public, confidential or proprietary in nature, the disclosure of which may be detrimental to the best interests of the Discloser; and

A.    The Discloser is willing to provide such information (as defined below) to Recipient, subject only to the terms and conditions of this Undertaking.

FOR VALUE RECEIVED, and in consideration of the foregoing premises the Recipient agrees and undertakes as follows:

2. DEFINITIONS

In this Undertaking, the following terms have the following meanings:

a.    "Confidential Information" means all information, business strategies, plans, ongoing discussions and commitments, data, documents, agreements, files and other materials in whatever form (including, without limitation, in written, oral, visual or electronic or digital form in or on any media or platform), which is disclosed or otherwise furnished by the Discloser to the

Recipient, or created, owned or controlled by the Discloser, whether or not such information is marked confidential, that relates directly or indirectly to the Discloser's business, products, services, suppliers, and trade secrets, overall strategy, or personal information relating to anonymous or other individuals, including, without limitation:

(i) Intellectual Property;

(ii) any information said, posted or written in project-related chat groups, or other information or communications related to the Discloser, including Private Messages between Recipient and the Discloser's team members.

(iii) all or any portion of analysis, notations, plans, compilations, reports, forecasts, studies, samples, statistics, summaries, interpretations and other documents created, developed, prepared, received, obtained, or generated or derived from such information, data, documents, agreements, files or other materials by the Recipient in connection with the Services; and

(iv) other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used;

(v) The term "Confidential Information" shall not include any information described above which (i) is or becomes generally available to the public or is a matter of public record other than as a result of improper disclosure by the Recipient or its representatives; (ii) is or becomes available to the Recipient or its representatives from a source other than the Discloser; (iii) was known by, or was available to the Recipient or its representatives prior to the time of disclosure by the Discloser; (iv) has been authorized by the Discloser in writing to be disseminated; (v) is required to be disclosed in any report, statement or testimony submitted to any municipal, state or federal regulatory body having jurisdiction; (vi) is required to be disclosed in connection with any litigation, or legal process, discovery request, court proceeding or arbitration proceeding in which the Recipient or its representatives are a litigant or other participant; or (vii) is required to be disclosed pursuant to any applicable law, order, regulation or rule, including without limitation, court orders or orders issued by a governmental agency.

a.  "Copies" means copies or records of any Confidential Information in whatever form, including without limitation, copy and pasted text or images, screenshots from desktop, tablet or mobile devices, notations, extracts, analysis, studies, plans, compilations or any other way of representing, recording or recalling information which contains, reflects, or is derived or generated from Confidential Information; and

a.  "Intellectual Property" means Confidential Information, copyright works, trademarks, industrial designs, design rights, inventions (whether patentable or not), unpublished patent applications,

inventive ideas, discoveries, innovations, developments, or improvements thereto, or any other intellectual property rights relating to any of the foregoing, whether registered or non-registered, whether or not reduced to written form or practice, within the scope of the Discloser's business activities and the Services rendered.

Other terms not specifically defined in this Section 1 shall have the meanings given to them elsewhere in this Undertaking.

### 3. RESTRICTIONS ON CONFIDENTIAL INFORMATION

a.  All Confidential Information shall be received and held by the Recipient and its employees, agents, affiliates and representatives on a strictly confidential basis;
b.  The Recipient shall maintain the absolute confidentiality of the Confidential Information and shall not disclose to any party (except on a 'need to know basis'), or as may be necessary to perform the Services;
c.  not copy, scrape, extract, photocopy, store, copy and paste, or share, like, post or tweet screenshots from desktop, tablet or mobile devices, or otherwise reproduce, without the prior express written permission of the Discloser, any of the Confidential Information.

### 4. USE OF CONFIDENTIAL INFORMATION

The Recipient shall not use or disclose the Confidential Information or any part thereof to any person, association, corporation, including any media outlet or representative, or any other person or entity except:

a.  in accordance with the terms of this Undertaking;
b.  as the Discloser may hereafter agree in writing; or
c.  in accordance with the legitimate business interests of Remilia Corporation LLC, and while fulfilling the recipient's obligations with regard to their Services.

### 5. PROPRIETARY OWNERSHIP OF INTELLECTUAL PROPERTY

The Recipient acknowledges and agrees that:

a.  all rights, title and interest in any Intellectual Property, and any improvements thereto, that the Recipient conceives, develops, invents, authors, creates or contributes to the creation or improvement of, in whole or in part, related to the Recipient's services during the term of the Recipient's services are, will be and shall remain the exclusive property of the Discloser; and
b.  the Recipient shall have no interest in any Intellectual Property, and any other form of intellectual property, notwithstanding that the Recipient may have conceived, developed, authored, created or contributed to the creation or improvement of the same, solely or jointly with others at any time related to the Recipient's services during the term of the Recipient's services.

## 6. PROTECTION OF CONFIDENTIAL INFORMATION

The Recipient shall take all reasonable and necessary steps and measures to protect against the unauthorized use or disclosure of the Confidential Information.

## 7. NON-DISPARAGEMENT

The Recipient agree not to disparage the Discloser, including their respective officers, directors, employees, affiliates, or members (collectively, the "Protected Parties"). The Recipient agrees to refrain from making, whether verbally or in writing, and whether through any format including but not limited to social media, including but not limited to, Google, Discord, Twitter, Telegram, Instagram, Facebook, Reddit, 4chan, Twitch, YouTube, Tik Tok, Snapchat, any disparaging, defamatory or slanderous comments, references or characterizations concerning the Protected Parties. The Recipient further agrees that the Recipient shall not provide any personal information regarding any Protected Parties, or make any statements or take any action that would cause the Protected Parties embarrassment or humiliation or otherwise cause or contribute to their being held in disrepute. The Recipient understands that nothing in this Undertaking is intended to prevent the Recipient from making truthful statements in any legal proceeding or as otherwise required by law, or from reporting possible violations of federal law or regulation to a governmental agency or entity.

## 8. RETURN OF CONFIDENTIAL INFORMATION

Upon the request of the Discloser, the Recipient shall, within seven (7) days of such request from the Discloser, either destroy and delete from any server, device or platform, all Confidential Information or return to the Discloser all Confidential Information, including all Copies thereof, as requested.

## 9. EQUITABLE RELIEF AND DAMAGES

The Recipient acknowledges that the unauthorized disclosure or use of the Confidential Information could cause irreparable harm and significant injury to Discloser that may be difficult to ascertain. Accordingly, the Discloser shall have the right to seek an immediate injunction enjoining any breach of this Undertaking, in addition to all other remedies to which it may be entitled including money damages, legal fees, and/or other applicable remedies.

## 10. MISCELLANEOUS

This Undertaking shall be binding on the successors, executors and assigns of the Recipient. This Undertaking constitutes the entire agreement of the parties with respect to the subject matter in this Undertaking and supersedes all prior oral or written agreements or understandings with respect to that subject matter. This Undertaking shall only be modified in writing by document signed by both parties.

## 11. DURATION OF THE OBLIGATIONS OF THE RECIPIENT

Remilia Corporation                                                                                          8

Subject to any agreement to the contrary among the parties, the obligations of the Recipient hereunder shall survive the provision of the Services and the cessation of discussions among the parties and shall continue for a period of five (5) years.

## 12. GOVERNING LAW

This Undertaking shall be governed by the laws of the State of Delaware and of the United Sates of America applicable in Delaware.

## 13. DELIVERY

This Undertaking may be executed and delivered in digital or electronic (i.e. .pdf) format which shall be effective as delivery.

[SIGNATURE PAGE FOLLOWS]

Remilia Corporation    9

THE UNDERSIGNED has executed this Undertaking as of the day and year first above written, in their personal capacity as well as on behalf of any company, partnership or entity which he operates, manages or controls or with which they are otherwise affiliated or employed.

DATED as of the date first written above.

X _____          X _____
(Signature of the Recipient)                 (Signature of the Discloser)
THE RECIPIENT                                REMILIA CORPORATION REPRESENTATIVE


IDENTIFICATION OF THE RECIPIENT

Name(s):           _____

                   _____

                   _____

Mailing Address:   _____

                   _____

Email:             _____

Website(s):        _____

                   _____

Social Media Links*: _____

                   _____

                   _____

                   _____

(*Discord, Twitter, Telegram, Instagram, Facebook, Reddit, Twitch, YouTube, TikTok, etc.)

Remilia Corporation                                                                                    10

EXHIBIT B: Letter of Intent

**Remilia Corporation Proudly Presents to You!**
**Amended Letter of Intent**

*************************************************

CCCAA,

I am honored to present the details of your role at Remilia Corporation as a Director of Software Development.

Note: Remilia Corporation (hereafter, "Remilia", "the Company") is an incorporated entity in the state of Delaware, USA, with company number [6894024]. As of the date of signing, this Amended Letter of Intent supersedes and replaces any prior Letter of Intent under which work has heretofore been conducted. This Amended Letter of Intent is provided in place of an employment agreement as a written amendment to the details of your role's compensation and expectations.

**Compensation**
****************

**Salary:** $100,000.00 annual salary

**Payment currency:** To maintain funds in decentralized finance and avoid market volatility, payment will be distributed in a stable cryptocurrency pegged to the USD, such as DAI or USDC.

**Salary distribution:** Salary is currently provided on a bi-weekly basis directly to a provided cryptocurrency wallet address, subject to adjustment.

**Expectations**
****************

**Role:** Dedicate full-time effort towards the standard roles and functions of a Director of Software Development, reporting directly to the CEO.

**Exclusivity:** You are expected to commit full-time exclusively for Remilia - you are expected to not moonlight any second job without prior approval from your reporting manager.

**Commitment:** As a key employee of Remilia, you should make a good faith effort to introduce any new enterprises and opportunities into Remilia where relevant, and pursue interests and opportunities that have a path to feed back into Remilia, and if a path exists, make a best effort to develop it towards Remilia.

**Terms & Restrictions**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Intellectual Property & Ownership Rights.** Remilia is a general-purpose software development company. All intellectual property created in the course of fulfilling the obligations included in the Role and Commitment sections above, as well as intellectual property created using Remilia resources, are the absolute property of Remilia, and by operating under this Letter of Intent as an employee, you agree to vest all such intellectual property in Remilia         . For the purposes hereinabove, the CEO of Remilia is granted the power to sign and execute any instruments necessary to vest such intellectual property in Remilia.


Enjoy your time with Remilia Corporation.


Yours truly,


Charlemagne Fang
CEO @ Remilia Corporation
charlie.fang@remilia.org


Witnessed and agreed:    _John Duff_


Signature: _John Duff_

Date: __DEC 28 2022__

# Exhibit K

## Ledger of Unauthorized Transactions into Personal Accounts

| Transaction | Date | From | To | Token | Est. Value |
|---|---|---|---|---|---|
| https://etherscan.io/tx/0x99ada47ae85d723f64ae736013ffe6d551f19db7603ff1c2568bcdd1d5a197f8 | 03/03/22 19:24:29 | remcoHot 0xb520...4778 | 0x0bf1...ea46 ? (coinbase dummy) | <DAI> | $15,000.00 |
| https://etherscan.io/tx/0x60c09f62cf24bf2436649774f8a348dae3a83ce306430b10f7e68d8b4b269f9f | 05/17/22 17:38:50 | remcoHot 0xb520...4778 | 0x5921...495f (coinbase dummy) | <USDC> | $35,000.00 |
| https://etherscan.io/tx/0x964cfee28c67d1b5077fd2cf3378d0cfda6b3b30dce08df6466b9b3cf8d312f4 | 06/21/22 5:57:19 | remcoMulti 0xcf3e...b9b4 | 0x3fad...5387 charlSunmaid | <USDC> | $15,000.00 |
| https://etherscan.io/tx/0x244a3f1cb28e703dbb1daf51c881338251c83109426c7a5a8a4ccbe082e7ce15 | 07/25/22 17:39:36 | remcoMulti 0xcf3e...b9b4 | 0x3fad...5387 charlSunmaid | <USDC> | $40,000.00 |
| https://etherscan.io/tx/0xf633c549b4234f33c9e7698b7d3f81669b8c590fdde77a1124aaeb7a1688e153 | 09/02/22 1:04:32 | remcoHot 0xb520...4778 | 0x2007...7d56 (coinbase dummy) | <USDC> | $20,000.00 |
| https://etherscan.io/tx/0xa12d01ac83cfc9c2723043bcc42e85ada4d9e141a46bc42d20e427841f7f8155 | 12/11/22 2:47:11 | remcoMulti 0xcf3e...b9b4 | 0x3fad...5387 charlSunmaid | <USDC> | $99,770.53 |
| https://etherscan.io/tx/0xee2cdda48dd7c4642cf6ba5cf4b80ed1876af2a415cba9ccc08be9ef4c29ba17 | 03/11/23 9:24:23 | remcoHot 0xb520...4778 | 0x3fad...5387 charlSunmaid | <USDC> | $20,715.18 |
| https://etherscan.io/tx/0x2a49986757d6e3355bd86543a20fd3a6b8598e7f38792417890c4b61a55db738 | 03/22/23 6:46:11 | remcoMulti 0xcf3e...b9b4 | 0x3fad...5387 charlSunmaid | <USDT> | $85,000.00 |
| https://etherscan.io/tx/0x2a60b1e15ba00eaa0c402d5c07e0b0165a5ba81241637725649ea7f1b9e98ea9 | 05/04/23 5:40:47 | remcoHot 0xb520...4778 | 0x1d68...9490 ? (coinbase dummy) | <USDT> | $200,000.00 |

## Destination Wallet Descriptions

| Recipient | Est. Value | Comment |
| --- | --- | --- |
| 0x3fad44f892b986263ac69db971db8da172185387 | 260485 USD | charlSunmaid |
| 0x1d68de86af5f7cfccec5c4288a6f2d569ffc9490 | 200000 USD | (coinbase dummy) |
| 0x59215c51069a36d1b30b18b0be4091df2259495f | 35000 USD | (coinbase dummy) |
| 0x2007cea592b816f925b880c2f1e6cf53bed17d56 | 20000 USD | (coinbase dummy) |
| 0x0bf1f385f08d6bebf0f9765b6c40cd7b37c4ea46 | 15000 USD | (coinbase dummy) |

EFiled:  Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

# Exhibit M

9:51

← **Post**

 ♡ **Charlotte Fang** 🐉 **Crown Prince**
@CharlotteFang77

After this event I'll be moving the treasury funds from crypto into the fiat business bank accounts. I think a significant part of the greed and entitlement generated here is rooted in low level team having visibility on funds they normally would never have in a company.

5:28 PM · 9/11/23 from Earth · **10.3K** Views

**7** Reposts  **3** Quotes  **132** Likes  **9** Bookmarks

# Exhibit N


 ♡ **Charlotte Fang**  **Crown Prince**
@CharlotteFang77                                    •••

Good morning. A developer who worked on Bonkler took steps that allowed him to divert ~$1MM USD in Remilia's generated fees.

The Bonkler reserves, main contract and NFTs are safe; only Remilia's revenue from Bonkler was compromised.

We've temporarily paused Bonkler's daily mint and will revive it with the completion of the planned v2 upgrade that also enables Bonkler-collateralized loans and treasury deployment.

All Remilia NFTs, metadata and domains remain secure. This does not affect the sanctity of existing Bonklers.

The developer also seized codebases and coordinated with two others on the team in an attempt to seize control of our social media, followed by demands for a significant portion of our treasury, including the NFT reserves.

However, some serious miscalculations were made—we easily identified the individuals

 Post your reply

9:22

The rest of the official social media remains valid (@YayoCorp, @BonklerNFT, ig: remiliaco, ig: milady.maker, sc: remiliaco)

Needless to say those who threatened the blessed kingdom of Remilia for mere financial gain will face a dramatic and just retribution without sympathy.

By targeting Remilia's reserves, they attacked not just Remilia and the vision, but every one of you who has placed your faith in us.

They sought money for themselves, but in exchange would have unraveled everything we've built, and destroyed the untold value entrusted in Remilia. As such, this was violence not simply on my team, but on my world and my people.

For such viciousness, I can give no quarter—the individuals involved have been terminated from Remilia Corporation, and will now be dealt with through the heavy hand of the law.



Post your reply

Case 1:23-cv-01055-GBW    Document 1-1    Filed 09/12/23    Page 124 of 166 PageID #: 123

 ♡ **Charlotte Fang**  **Crown Prince**
@CharlotteFang77

The fact that I refused the threats and challenged them to court, first privately then publicly, alone demonstrates who stands with truth. If they had any interest in actually preserving the community they want ownership over, and believed their claims had any legs to stand on, they would cease FUD immediately, return all the seized property and let this be resolved legally in private.

BTW, idk why lie about the chain but the transaction where the developer transferred ownership over the Bonkler secondary contract controlling the funds to his personal wallet is here, same week as the other illegal activities listed in the lawsuit:
etherscan.io/tx/0xa49b6d863...

twitter.com/Milady_Sonoro/...

4:02 PM · 9/12/23 from Earth · **2,353** Views

**9** Reposts  **44** Likes  **2** Bookmarks

individuals pertaining to this case all sent their doxxed names in the extortion letter and the case is public information, they doxxed themselves first, while carrying out a crime no less which itself is absurd and hilarious.

Charlotte Fang has always been the sole owner of Remilia Corporation. The Remilia Collective is a separate terminology which denotes the collection of creators and artists in a nonbusiness capacity. At no point has this organization ever been part of a committee, council, board, or any kind of leadership beyond Fang's sole authority. Furthermore, in an artistic capacity, Fang is chiefly the force behind Remilia's momentum as both a business entity and cultural force. His curation and direction is what makes us successful.

Post-authorship is a terminology used in context of creators paywalling content or making the proliferation of media, content, information, or memes restricted through copyright. It also critiques attaching ego to creation and employing scarcity mindset towards your own creations. Post-authorship is the state of allowing your own creations to be regurgitated or subsumed into other creations to accelerate the evolution of an idea or art, and it is crucial to memes and memetic spread. Post-authorship as a concept is not contradicted by Remilia taking steps to protect financial assets and branding which is used to uphold the integrity and success of the company, which itself exists to create larger projects over time which are designed towards helping save the internet and therefore society as a whole from various pending disasters, such as the looming dissipation of information through poor data storage, the disruption of free speech, and the encroachment of refinement monopolization from large companies, to name a few.

I am not at liberty to discuss Remilia's developments or business with VC funding at this time, I cannot confirm or deny.

The individuals committing theft and conspiracy to extort attached their full legal doxxed names to a demand letter after having committed serious crimes because ?????????????
No actually, we don't know and we'd like to.

We believe that the individuals named within the extortion letter had seriously mislead their own legal counsel to both the nature of their employment in Remilia and their own actions.

4:48 PM · Sep 11, 2023 · **15.8K** Views

Q 9            ⇄ 37            ♡ 180            🔖 61            ⬆

**blockchainblaze** ✔ @highwaybicycle · Sep 12
By my estimation, charlotte's decision to sue for the recovery of $3 million in funds from former team members, has at this time resulted in the loss of 5000 eth or about $7 million of erasure from the Milady Maker market cap (not including Remilio). This observation will seem... Show more

○ 4          ↱ 1          ♡ 10          ᵢₗᵢ 2,143          ⬆

**Scorched Earth Policy** @Scearpo · Sep 12
This is asinine. What would the losses have been if he just rolled over and allowed his company to be destroyed? What was your analysis when we had a world ending cancel last year and came back as a Top 3 NFT? Judging losses on a Day 1 volatility? Lol, lmao.

○ 1          ↱ 2          ♡ 19          ᵢₗᵢ 749          ⬆

**blockchainblaze** ✔ @highwaybicycle · Sep 12
Write it off as a severance bonus and don't fuck with people's bags? Idk

○ 1          ↱          ♡          ᵢₗᵢ 231          ⬆

**Scorched Earth Policy**
@Scearpo

Tell that to the perpetrators who tried to rug everyone. Everything you say is complete nonsense I'd write off as ignorance but tbh you seem extremely disingenuous. Have a nice life.

5:04 PM · Sep 12, 2023 · **139** Views

○          ↱          ♡ 6          🔖          ⬆



**Scorched Earth Policy**
@Scearpo

You haven't addressed that Charlotte Fang is the artist behind Remilia. He is the only person in Remilia to properly canonize our work, create context and meaning to give it cultural relevance, and all the work Remilia has produced is directly due to his vision, curation, direction, and initiative. Every single fashion asset Milady Maker uses was directly handed to Sprite by Charles, and Sprite in fact only produced 1/3rd of all the assets. Charles used the same degree of curation and direction in projects such as Remilio and Bonkler, Bonkler's auctioncore model was discussed and planned by him two years ago before Remilia even existed.

"Artists are always right" is a childish generalization which first isn't true, and second doesn't acknowledge the primary difference between an actual artist versus someone who just illustrates or produces media. An artist is more than just rote creation of content, an artist uses cultural context to create meaningful work which transcends feeling into a metaphysical state and provides a direct reflection of the society and environment in which the art was produced. Sprite was a contractor who was guided into upholding a persona Charlotte Fang gave him, one which only existed after the cancel as a response to piss poor TL presence. He was essentially a mascot who got paid more than even Charlotte Fang did.

The actions of the people in the legal complaint were fundamentally criminal acts. There is absolutely zero room for interpretation, you are defending someone who betrayed all of his friends. You are defending people who had no intent to continue Remilia operations, they were going to gut the treasury, take their cut, and run this company completely into the ground, taking down all the projects with them. I find you to be a disingenuous opp peddling a crude obvious disinfo campaign at worst, at best just being largely ignorant.

2:59 PM · Sep 11, 2023 · **15.8K** Views

# Exhibit O

4. The developer had no right to maintain ownership over the Bonkler contract, disobeyed the order to transfer ownership to the standard 0xB52 personal wallet before launch, as is the policy for all our releases, and did so without me realizing because. he did not disclose the existence of a second contract that actually held control over our revenue which was always ordered to be directed to the 0xB52 wallet. It would be incredible to see them try and make this hold up court.

# Exhibit P

**vers and lukas (podcast)** ✔ @versandlukas · 11h

MILADY BONUS PODCAST

Lukas talks about his highest-stake podcast of all time: the speech he gave at @CharlotteFang77's wedding. Milk (Lukas' manager) joins to give us the scoop on the upcoming Remilia Quarterly project



2:06 / 59:47

○ 5       ↻ 11       ♡ 63       �\|\| 9,288       ⬆️

**vers and lukas (podcast)** ✔ @versandlukas · 11h       ...

Charlie told us to upload the episode at 1.5x speed like the clips are because he hates low information density. Vers pushed back – "if they want to speed it up they can just change the video's playback speed??"

Is Charlie delusional??

| Yes, 1.0x is best |
|---|

| No, 1.5x is way better |
|---|

147 votes · 12 hours left

○ 2       ↻       ♡ 4       \|\| 900       ⬆️



**vers and lukas (podcast)** @versandlukas · 21h

Bonus sad clip, the milady coup is rumored to have been planned in the midst of charlie's wedding 🏠



**We're**

1:01                                                    6:4



 **vers and lukas (podcast)** ✔ @versandlukas · 21h

Lukas tells his experience attending charlie's wedding

12:51

○ 15          �17 23          ♡ 134          ᵢlᵢ 26K          ↑

# Exhibit Q

timestamp, military time EST timezone 04-20-23 19:50



**Wonyoung Jang** 13:42

Can you transfer contract <mark>ownership</mark> to remiliacollective.eth before first NFT is minted so that opensea recognizes it as collection owner



**Wonyoung Jang** 15:18



Wonyoung Jang 17.04.2023 15:18:32

@ika_t can you make this the nft meta descriptino on all bonklers

Bonkler is a World Fair for the Internet. Bonkler is the auction that runs forever, higher & higher, with you & me, together. Bonkler is a Grand New Experimental Financial Adventure from your friends at the genius avant art collective, Remilia Corporation.

**ika** 16:35

In reply to this message

done

# Exhibit R

9:15

11



♡ **Charlotte Fang**  **Cr...**
20.6K posts

## Posts     Replies     Media     Likes



♡ **Charlotte Fang**  **Crown Prince** · 2h

Its true Remilia has a ~30 person team, not including our dev roster, as I invest into verticals to expand influence in fashion, lit & music. 3 involved were at bottom of the hierarchy, as individual contributors with no direct reports before termination. Threatened my whole team

>  +₊⊹♡**raven**⊹♡₊+˚•᎒•᎒•？𝔅𝔑𝔊☆ 彡 · 5h
>
> i'm going to say something some of you may disagree and potentially resent me for and it's ok but this is how i feel honestly.
>
> the remilia situation at hand ... Show more

💬 3     🔁 8     ♡ 148     ılı 11K     ⬆



♡ **Charlotte Fang**  **Crown Prince** · 2h

Reason they had access levels they did to take the actions they did—or enjoy the very generous wages they did, compared to their experience/responsibilities—is I hired them as irl friends & wrongly assumed that meant loyalty & trustworthiness, not envy & entitlement. My mistake.

💬 4     🔁 8     ♡ 89      ılı 2,412     ⬆



♡ **Charlotte Fang** 🐉 Crown P... ···
@CharlotteFang77

they're confusing the guys in the mickey mouse costume for the men in walt disney's office. social media interns do not make a company



10:38 PM · 9/11/23 from Earth · **384** Views

**8** Retweets  **1** Quote  **20** Likes  **1** Bookmark



Tweet your reply



Chief of Staff
Charlie Fang
CEO
HR and Accounting
Michael D.
Operations & Marketing Director, YAYO Lead
Yuyu J.
Fashion Director
Leopold D.
Head PMO and Systems Administrator, Remilia Quarterly Lead
Masha K.
HR and Accounting, Remilia Agency Lead
Marketing
YAYO
Remilia Atelier
Remilia Quarterly
PMO
Remilia Agency
Gabriella N.
Social Media Marketing (Milady)
Cory K.
Assistant Project Manager (YAYO)
Raven M.
Lead Designer/Events
Oriol V.
Lead Designer
Tim C.
Lead Project Manager
Jennifer L.
Scout
Yoju B.
Social Media Marketing (Bonkler)
Cameron G.
Community Moderator (YAYO)
Lucy L.
Digital Marketing
Alison P.
Consultant
Nancy
Lead Project Manager
Alyssa L.
Booking Agent
Hannah S.
Social Media Marketing (Remilia)
Eliot
Social Media Marketing (YAYO Twitter)
Nikita N.
Assistant Designer, Influencer Marketing
Anna S.
Assistant Editor
John D.
Architect
Lucia C.
Lead Designer
Milady S.
Designer
Kerry H.
Concept Artist
Haf P.
Community Moderator (Milady)
Community Moderator (Milady)
Assistant Designer
Reginald P.
Social Media Marketing (Remilio)
Analyst

2. The core teams working on Milady and Remilio were very happily and generously compensated with a cut of the revenue, about 6 figs each for about 1 month work. The 3 named in the suit happily accepted. They were made offers to join Remilia on an on-going basis in regular roles normal to a company, such as designer, illustrator, developer, etc. Not everyone accepted. The 3 happily accepted. Sprite has never raised a concern about wanting additional compensation or equity and never negotiated equity at that time or ever.

3. The lawsuit was filed due to the seizure of corporate property immediately preceding the exorbitant demand to transfer all of Remilia's stablecoin and NFT treasury into an entity split evenly under 5 way control. They threatened to go public first and refused to accommodate the cease and desist or engage private arbitration. I took the action to freeze Bonkler to protect the community interest.

4. The developer had no right to maintain ownership over the Bonkler contract, disobeyed the order to transfer ownership to the standard 0xB52 personal wallet before launch, as is the policy for all our releases, and did so without me realizing because. he did not disclose the existence of a second contract that actually held control over our revenue which was always ordered to be directed to the 0xB52 wallet. It would be incredible to see them try and make this hold up court.

5. Jimbo was actually once delivered a letter of intent of co-founder, shown there, but rejected due to the full-time commitment. He never took on the role or received the wages entailed

5. Jimbo was actually once delivered a letter of intent of co-founder, shown there, but rejected due to the full-time commitment. He never took on the role or received the wages entailed, received any company email or joined in any work platforms. The letter also explicitly stated that any equity is not being promised at this time and would be determined later after I fleshed out my team and infrastructure. This never happened since he rejected the role, and was only thereafter retained on the occasional project-basis. It would be incredible to see them try and make this hold up court.

# Exhibit S

2. The core teams working on Milady and Remilio were very happily and generously compensated with a cut of the revenue, about 6 figs each for about 1 month work. The 3 named in the suit happily accepted. They were made offers to join Remilia on an on-going basis in regular roles normal to a company, such as designer, illustrator, developer, etc. Not everyone accepted. The 3 happily accepted. Sprite has never raised a concern about wanting additional compensation or equity and never negotiated equity at that time or ever.

3. The lawsuit was filed due to the seizure of corporate property immediately preceding the exorbitant demand to transfer all of Remilia's stablecoin and NFT treasury into an entity split evenly under 5 way control. They threatened to go public first and refused to accommodate the cease and desist or engage private arbitration. I took the action to freeze Bonkler to protect the community interest.

4. The developer had no right to maintain ownership over the Bonkler contract, disobeyed the order to transfer ownership to the standard 0xB52 personal wallet before launch, as is the policy for all our releases, and did so without me realizing because. he did not disclose the existence of a second contract that actually held control over our revenue which was always ordered to be directed to the 0xB52 wallet. It would be incredible to see them try and make this hold up court.

5. Jimbo was actually once delivered a letter of intent of co-founder, shown there, but rejected due to the full-time commitment. He never took on the role or received the wages entailed



**cyberbabyangel.eth** @bby_angel_sera · 18h    ···

how can anyone have equity in milady when it's under the viral public
license?

💬 2          ↻          ♡ 4              ᵢₗᵢ 381                ⬆



**♡ Charlotte Fang 👑 Crown Prince**    ···
@CharlotteFang77

Can't. Their demand wasn't for Milady IP (effectively public domain), it
was primarily for Remilia's stablecoin/eth/fumo treasury,
Milady/Remilio/etc NFT reserves, and the software IP, namely Remichat
R&D.

2:03 AM · Sep 13, 2023 · **221** Views

16:30

# Post

 **Mark Zuckerberg** @realmarkzucc · 6h
I hope anyone takes over treasury besides
@CharlotteFang77 because I still haven't been
paid for the art I made for milady.

💬 5          ⟲ 2          ♡ 6          ‖ 592          ⬆

 ♡ **Charlotte Fang** 🐸 **Crown Prince**
@CharlotteFang77

Is this a serious post or troll? I'm not familiar
what work you've done, but there was internal
sabotage in last few months including
specifically on the delivery of Milady 3D, which
it seems you touched on, so wouldn't be
surprised. If serious, DM me & I'll direct you to
our accountant.

12:31 · 12/09/2023 from Earth · **522** Views

**1** Quote **7** Likes

💬          ⟲          ♡          🔖          ⬆

Post your reply

# Exhibit T



🍲 **Soupchat** 🍲

Yeah like "ive been in hot pot and remilia for as long as sprite has if not longer, I am an artist and my art in the original netspi show, Ive known and followed charlie for years. what theyre claiming and doing is insane. they are not remilia" etc

👍 1    ❤️ 1

your own honest thoughts but that jist

Dont post now but for later

I think a few statements tomorrow should help make clear remilia is not just milady

sprite and jimbo etc are demanding ownership over all of remilia but making people think its just about milady

                                    🤍➕

❤️ 1

🤍 Charlotte Fang 🧝 Crown Prince · 9:01 PM

also that Im the one acting greedy and exploiting artists, when theyre the ones trying to rugpull everyone while all the money and brand Im trying to protect goes into platforming art and the culture

 1

➤ Replying to growltiger the pirate cat (Charlie Fang SUPERFAN)

i can make one if u want me too



sam u should just get mad and say your peace. go on sprites page and yell at his post

 ♡ Charlotte Fang  Crown Prince · 9:03 PM



EFiled:  Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Maxwell Roux, John Duff III, Henry
Smith, and Bruno Nispel,

      Plaintiffs,

    v.

Krishna Okhandiar, a/k/a Rohit
Okhandiar, Charlotte Fang, Charlie
Fang, Wonyoung Jang, Miya, Xinma33,
MissJo, and Sonya; Remilia
Corporation LLC, a Delaware limited
liability company; Remilia Industries
LLC, a Delaware limited liability
company,

      Defendants.

C.A. No.

### VERIFICATION

STATE OF NEW YORK     )
               ) SS.
COUNTY OF KINGS      )

    I, Bruno Nispel, Plaintiff in the above-referenced matter, having been duly

sworn, do hereby depose and say that I have read the foregoing Verified Complaint

and that the statements set forth therein are, to the best of my knowledge, information,

and belief, true and correct.

Bruno Nispel

Date

SWORN AND SUBSCRIBED TO BEFORE ME this 21ˢᵗ day of September, 2023.

Notary Public: _____

My commission expires: _____



EFiled:  Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Maxwell Roux, John Duff III, Henry Smith, and Bruno Nispel,<br><br>        Plaintiffs,<br><br>    v.<br><br>Krishna Okhandiar, a/k/a Rohit Okhandiar, Charlotte Fang, Charlie Fang, Wonyoung Jang, Miya, Xinma33, MissJo, and Sonya; Remilia Corporation LLC, a Delaware limited liability company; Remilia Industries LLC, a Delaware limited liability company,<br><br>        Defendants. | C.A. No. |

## VERIFICATION

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) SS. | |
| COUNTY OF NEW YORK | ) | |

I, Henry Smith, Plaintiff in the above-referenced matter, having been duly sworn, do hereby depose and say that I have read the foregoing Verified Complaint and that the statements set forth therein are, to the best of my knowledge, information, and belief, true and correct.

_____

Henry Smith

_09 / 21 / 2023_
Date

SWORN AND SUBSCRIBED TO BEFORE ME this *21* day of September, 2023.

Notary Public: _____

My commission expires: _10/26/2026_

JACK CHOW
Notary Public - State of New York
No. 01CH6015416
Qualified in New York County
Commission Expires October 26, *2026*

2

EFiled:  Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Maxwell Roux, John Duff III, Henry
Smith, and Bruno Nispel,

        Plaintiffs,

    v.

Krishna Okhandiar, a/k/a Rohit
Okhandiar, Charlotte Fang, Charlie
Fang, Wonyoung Jang, Miya, Xinma33,
MissJo, and Sonya; Remilia
Corporation LLC, a Delaware limited
liability company; Remilia Industries
LLC, a Delaware limited liability
company,

        Defendants.

C.A. No.

## VERIFICATION

STATE OF NEW YORK      )
                   ) SS.
COUNTY OF NEW YORK   )

    I, John Duff III, Plaintiff in the above-referenced matter, having been duly

sworn, do hereby depose and say that I have read the foregoing Verified Complaint

and that the statements set forth therein are, to the best of my knowledge,

information, and belief, true and correct.

*[signature: John Duff III]*

John Duff III

9/21/2023

Date

SWORN AND SUBSCRIBED TO BEFORE ME this _21_ day of September, 2023.

Notary Public: _____

My commission expires: _10/26/2026_

JACK CHOW
Notary Public - State of New York
No. 01CH6015416
Qualified in New York County
Commission Expires October 26, _2026_

2

EFiled: Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Maxwell Roux, John Duff III, Henry Smith, and Bruno Nispel, | |
| Plaintiffs, | C.A. No. |
| v. | |
| Krishna Okhandiar, a/k/a Rohit Okhandiar, Charlotte Fang, Charlie Fang, Wonyoung Jang, Miya, Xinma33, MissJo, and Sonya; Remilia Corporation LLC, a Delaware limited liability company; Remilia Industries LLC, a Delaware limited liability company, | |
| Defendants. | |

## **VERIFICATION**

STATE OF MONTANA      )
                                ) SS.
COUNTY OF CASCADE      )

I, Maxwell Roux, Plaintiff in the above-referenced matter, having been duly

sworn, do hereby depose and say that I have read the foregoing Verified Complaint

and that the statements set forth therein are, to the best of my knowledge, information,

and belief, true and correct.

_____
Maxwell Roux

_____
09-21-2023
Date

SWORN AND SUBSCRIBED TO BEFORE ME this _2⁴_ day of September, 2023.

Notary Public: _Jerry S Burley_

My commission expires: _8/26/2025_

> **JERRY S BURLEY**
> **NOTARY PUBLIC for the**
> **State of Montana**
> **Residing at Columbia Falls, Montana**
> **My Commission Expires**
> **August 20, 2025**

2

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

EFiled: Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

The information contained herein is for the use by the Court for statistical and administrative purposes
in this document shall be deemed binding for purposes of the merits of the case.

1. Case caption:

MAXWELL ROUX, JOHN DUFF III, HENRY SMITH, and BRUNO NISPEL v. KRISHNA OKHANDIAR (a/k/a
Rohit Okhandiar, Charlotte Fang, Charlie Fang, Wonyoung Jang, Miya, Xinma33, MissJo, and Sonya); REMILIA
CORPORATION LLC, a Delaware limited liability company; REMILIA INDUSTRIES LLC, a Delaware limited
liability company.

2. Date filed: September 22, 2023

3. Name and address of counsel for plaintiff(s):

K&L GATES LLP
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 N. King Street, Suite 901,
Wilmington, DE 19801

4. Short statement and nature of claim(s) asserted:

 This is an action for breach of the fiduciary duty, declaratory judgment, promissory fraud and tortious interference.

5. Substantive field of law involved (check one):
_____Administrative law            _____Labor law                  _____Trusts, Wills and Estates
_____Commercial law                _____Real Property              _____Consent trust petitions
_____Constitutional law            _____348 Deed Restriction       _____Partition
__X__Corporation law               _____Zoning                     _____Rapid Arbitration (Rules 96,97)
_____Trade secrets/trade mark/or other intellectual property        _____Other

6. Identify any related cases, including any Register of Wills matter.  This question is intended to promote
jurisdiction efficiency by assigning cases involving similar parties or issues to a single judicial officer.  By signing
this form, an attorney represents that the attorney has done reasonable diligence sufficient to respond to this
question.

7. State all bases for the court's exercise of subject matter jurisdiction by citing to the relevant statute.  Specify if
8 *Del. C.* § 111, 6 *Del. C.* § 17-111, or 6 *Del. C.* § 18-111.  State if the case seeks monetary relief, even if
secondarily or in the alternative, under a merger agreement, asset purchase agreement, or equity purchase
agreement.

 The bases for the court's exercise of subject matter jurisdiction are 6 *Del. C.* §§ 18-110, 18-111, 18-112, 18-205,
18-209, 18-216, & 18-802 and 10 *Del. C.* § 341. The case does not seek monetary relief under a merger agreement,
asset purchase agreement, or equity purchase agreement.

8. If the complaint initiates a summary proceeding under Sections 8 *Del. C.* §§ 145(k), 205, 211(c), 220, or
comparable statutes, check here _____.  (If #8 is checked, you must either (i) file a motion to expedite with a

3/1/2023

proposed form of order identifying the schedule requested or (ii) submit a letter stating that you do not seek an expedited schedule and the reason(s)—e.g., you have filed to preserve standing and do not seek immediate relief.)

9. If the complaint is accompanied by a request for a temporary restraining order, a preliminary injunction, a status quo order, or expedited proceedings other than in a summary proceeding, check here ___. (If #9 is checked, a motion to expedite <u>must</u> accompany the transaction with a proposed form of order identifying the schedule requested.)

10. If counsel believe that the case should not be assigned to a Magistrate in the first instance, check here and attach a statement of good cause. <u>X</u>

<u>/s/ *Steven L. Caponi* (No. 3484)</u>
Signature of Attorney of Record & Bar ID

3/1/2023

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MAXWELL ROUX, JOHN DUFF III,
HENRY SMITH, and BRUNO NISPEL,

    Plaintiffs,

      v.

KRISHNA OKHANDIAR (a/k/a Rohit
Okhandiar, Charlotte Fang, Charlie Fang,
Wonyoung Jang, Miya, Xinma33, MissJo,
and Sonya); REMILIA CORPORATION
LLC, a Delaware limited liability
company; REMILIA INDUSTRIES LLC,
a Delaware limited liability company,

    Defendants.

C.A. No.:

## STATEMENT OF GOOD CAUSE

It is the opinion of counsel for Plaintiffs that this action should not be assigned to a Master in the first instance. This is a complex commercial action related to breach of fiduciary and tortious interference. Furthermore, Plaintiffs may seek preliminary injunctive relief. This action, therefore, should proceed directly before the Chancellor or a Vice Chancellor.

Dated: September 22, 2023

**K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000

steven.caponi@klgates.com
matthew.goeller@klgates.com

*Attorneys for Plaintiffs*

EFiled: Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

# K&L GATES

September 22, 2023

Steven L. Caponi, Esq.
steven.caponi@klgates.com
T 302-416-7080

**VIA ELECTRONIC FILING**

Register in Chancery
Court of Chancery
500 North King Street
Wilmington, DE 19801

**Re:** *Maxwell Roux, et al. v. Krishna Okhandiar, et al.*

Dear Register in Chancery,

This firm represents Plaintiffs Maxwell Roux, John Duff III, Henry Smith, and Bruno Nispel (collectively "Plaintiffs"). Filed concurrently with this letter is Plaintiff's Verified Complaint (the "Complaint"). Our office will prepare and submit for your approval summonses for service of the Complaint and accompanying documents on the following Defendant pursuant to 10 *Del. C.* § 3114 to be served by U.S. Certified Mail with return receipt:

> Krishna Okhandiar
> 89 Arthur Hills Ct
> Last Vegas, NV 89074

Our office will also prepare and submit for your approval summonses for service of the Complaint on the following Defendants pursuant to 6 *Del. C.* § 18-105 to be served by special process server, Parcels, Inc.:

Remilia Corporation LLC
c/o ZenBusiness Inc.
611 South DuPont Highway, Suite 102
Dover, DE 19901

Remilia Industries LLC
c/o ZenBusiness Inc.
611 South DuPont Highway, Suite 102
Dover, DE 19901

If you need any additional information or have any questions, please do not

hesitate to contact me.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi (No. 3484)

Words: 159

EFiled: Sep 22 2023 04:00PM EDT
Transaction ID 70932733
Case No. 2023-0961-

**K&L GATES**

September 22, 2023

**VIA ELECTRONIC FILING**

Register in Chancery
Court of Chancery of the State of Delaware
500 N. King Street
Wilmington, DE 19801

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

**Re:   *Maxwell Roux, et al. v. Krishna Okhandiar, et al.***

Dear Register in Chancery,

     I write on behalf of Plaintiffs Maxwell Roux, John Duff III, Henry Smith, and Bruno Nispel (collectively "Plaintiffs") in the above-captioned action. Exhibit L to Plaintiffs' Verified Complaint was filed under seal as a Confidential Filing in accordance with Court of Chancery Rule 5.1(e).

     I hereby certify compliance with Court of Chancery Rule 5.1 in accordance with Rule 5.1(c). In accordance with Court of Chancery Rule 5.1(d)(2), Exhibit L will remain confidential.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi (No. 3484)
Words: 72

K&L GATES LLP
600 N. KING STREET  SUITE 901  WILMINGTON  DE 19801
T +1 302 416 7000  F +1 302 416 7020  klgates.com

# EXHIBIT B

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MAXWELL ROUX, JOHN DUFF III,   )
HENRY SMITH, and BRUNO NISPEL,  )
                                   )
          Plaintiffs,        )
                                   )
      v.                   )   C.A. No. 2023-0961-PAF
                                   )
KRISHNA OKHANDIAR (a/k/a Rohit  )
Okhandiar, Charlotte Fang, Charlie Fang, )
Wonyoung Jang, Miya, Xinma33, MissJo, )
and Sonya); REMILIA CORPORATION  )
LLC, a Delaware limited liability       )
company; REMILIA INDUSTRIES LLC, )
a Delaware limited liability company,   )
                                   )
          Defendants.       )

## <u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>

Please take notice that on September 27, 2023, Defendants filed the attached

Notice of Removal in the United States District Court for the District of Delaware,

thereby removing this case to that court pursuant to 28 U.S.C. §§ 1332, 1441, and

1446.  A copy of this notice was filed with the Notice of Removal in the District

Court.

Defendants respectfully request that this Court proceed no further in this

action, unless and until such time as the action may be remanded by order of the

District Court.

OF COUNSEL:

James P. Fieweger
MICHAEL BEST & FRIEDRICH LLP
River Point
444 West Lake Street, Suite 3200
Chicago, IL 60606
(312) 222-0800

Evan S. Strassberg
MICHAEL BEST & FRIEDRICH LLP
170 South Main Street, Suite 1000
Salt Lake City, UT 84101
(385) 695-6450

Steven J. Joffee
Ethan J. Bercot
Bradley W. Madsen
MICHAEL BEST & FRIEDRICH LLP
2750 E Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
(801) 833-0500

Dated: September 27, 2023

*/s/ Catherine G. Dearlove*
Catherine G. Dearlove (#3328)
Matthew D. Perri (#6066)
Andrew L. Milam (#6564)
Cassandra L. Thompson (#6937)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Counsel for Defendants*

- 2 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 27, 2023, true and correct copies of the

Notice of Filing of Notice of Removal were caused to be served by File &

Serve*Xpress* on the following counsel of record:

>Steven L. Caponi
>Matthew Goeller
>K&L GATES LLP
>600 King Street, Suite 901
>Wilmington, Delaware 19801

>*/s/ Cassandra L. Thompson*
>Cassandra L. Thompson (#6937)

- 3 -