## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MAXWELL ROUX, JOHN DUFF III, HENRY SMITH, and BRUNO NISPEL, <br><br> Plaintiffs, <br><br> v. <br><br> KRISHNA OKHANDIAR (a/k/a Rohit Okhandiar, Charlotte Fang, Charlie Fang, Wonyoung Jang, Miya, Xinma33, MissJo, and Sonya); REMILIA CORPORATION LLC, a Delaware limited liability company; and REMILIA INDUSTRIES LLC, a Delaware limited liability company, <br><br> Defendants. | Case No. 1:23-cv-01056-GBW |

### SECOND AMENDED COMPLAINT

Plaintiffs Maxwell Roux ("Roux"), John Duff III ("Duff"), Henry Smith ("Smith"), and Bruno Nispel ("Nispel") (collectively "Plaintiffs"), by and through their undersigned counsel, respectfully submit this First Amended Complaint against defendants Krishna Okhandiar ("Okhandiar"), Remilia Corporation LLC, a Delaware limited liability company ("RemCorp"), and Remilia Industries LLC ("RemIndustries") (collectively "Defendants").

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ............................................................................................... 3

PARTIES ............................................................................................................................... 6

JURISDICTION AND VENUE ............................................................................................. 7

FACTUAL ALLEGATIONS ................................................................................................. 8

     A.     Background on Digital Assets, Cryptocurrency, and NFTs ................................... 8

     B.     The Founding Group Members Form the Remilia DAO ...................................... 11

     C.     The Remilia DAO's NFT Projects ....................................................................... 17

     D.     Defendants' Wrongful Conduct ........................................................................... 24

COUNT I  Breach of Fiduciary Duty ................................................................................. 30

COUNT II  Declaratory Judgments and Injunctions ........................................................ 35

COUNT III  Breach of Agreement to Form the Legal Wrapper RemCo Entity ............................ 38

COUNT IV  Breach of the Implied Covenant of Good Faith and Fair Dealing .......................... 41

COUNT V  Promissory Fraud ............................................................................................ 42

COUNT VI  Negligent Misrepresentation .......................................................................... 44

COUNT VII  Promissory Estoppel ..................................................................................... 45

COUNT IX  Equitable Estoppel ......................................................................................... 46

COUNT IX  Conversion ...................................................................................................... 48

COUNT X  Money Had and Received ................................................................................. 49

COUNT XI  Unjust Enrichment .......................................................................................... 50

COUNT XIV  Tortious Interference with Prospective Economic Advantage ........................... 51

COUNT XV  Defamation .................................................................................................... 52

COUNT XVI  Trade Libel ................................................................................................... 58

COUNT XVII  VIOLATIONS OF THE FEDERAL FAIR LABOR STANDARDS ACT
(FLSA) 29 U.S.C. § 201, et seq. ....................................................................................... 59

COUNT XVII  VIOLATIONS OF DELAWARE WAGE PAYMENT AND
COLLECTION ACT ............................................................................................................ 61

PRAYER FOR RELIEF ...................................................................................................... 65

DEMAND FOR JURY TRIAL ............................................................................................ 68

## SUMMARY OF THE ACTION

1.      This case involves the formation, development, and profitable operation of a digital art decentralized autonomous organization (the "Remilia DAO") by the four Plaintiffs and Defendant Okhandiar.  Unfortunately, it was not long before Okhandiar's greed, megalomaniacal thirst for control, and demand for cult-leader adoration and "loyalty" not only from the Plaintiffs but from everyone associated with the Remilia DAO, its projects, and the broader digital art community, revealed his true nature and intentions.

2.      Decentralized autonomous organizations are unincorporated associations.  They therefore have difficulty contracting with suppliers, vendors, contractors, and other third parties who are rightfully suspicious about the nature of the entity with which they are being asked to transact business.  As unincorporated associations, DAOs are also treated by federal and state laws as de facto general partnerships.  As such, each of the DAO's members owe each other fiduciary duties, and may also be held jointly and severally liability for the DAO's acts and any claims levied against the DAO or one of its members unless the members specifically and expressly contract to limit such fiduciary duties and liabilities.  To overcome these problems and concerns, Plaintiffs and Okhandiar agreed (as is typical with many DAOs) that the Remilia DAO would eventually require the formation of a "legal wrapper," a formal registered corporate entity to assist with the Remilia DAO's contracting needs and limit its members' fiduciary duties and liabilities, while allowing the DAO to retain ownership and decentralized governance of its assets and treasury. When integrated with the DAO, the legal wrapper entity would provide a legal framework for the Remilia DAO to interact with traditional financial and legal systems while maintaining its decentralized nature and established ecosystem.

3. Okhandiar schemed to seize control of the DAO's operations, assets, and treasury of valuable digital assets, including stealing the assets and treasury that belonged to Plaintiffs. Instead of forming the legal wrapper that the parties agreed, Okhandiar formed several of his own "Remilia" Delaware LLCs in which he secretly made himself the sole member. Rather than integrating the LLCs with the Remilia DAO to preserve its decentralized governance and to maintain the Plaintiffs' equal ownership shares of the assets and treasury, he used the LLCs as vehicles to seize unilateral control of the Remilia DAO so he could misappropriate its digital assets and embezzle its treasury to enrich only himself.

4. Once in control of the Remilia DAO, Okhandiar refused to pay Plaintiffs' the compensation and bonuses they were owed for the work they did creating and marketing the Remilia DAO's digital art NFT projects, soliciting investors, and managing the project software engineers. Okhandiar then purported to terminate the Plaintiffs' employment by the DAO and siphoned $600,000 from its crypto wallet into his personal fiat account.

5. Plaintiffs demanded that Okhandiar return the Remilia DAO's funds, pay their wages and bonuses, and reinstate their roles in the Remilia DAO's governance and treasury, which they proposed could be accomplished either through the formation of a new legal wrapper entity or through amendments to the operating agreements and structures of the existing LLCs that Okhandiar had unilaterally and improperly formed without them.

6. In response, Okhandiar and his LLCs asked Plaintiffs not to file suit or to go public about their claims so they could propose a solution. Okhandiar and the LLCs never responded. Instead, they doubled-down on their plot to steal and seize full control of the Remilia DAO's business by removing Plaintiffs from the Remilia DAO's online multi-signature wallet that controlled its digital assets, seizing control of and locking Plaintiffs out of their Remilia email

-4-

accounts, draining additional digital assets worth in excess of $1.7 million from the treasury, and filing their own preemptive and baseless lawsuit in Nevada without jurisdiction and without attaching a single document in support of that complaint.

7. It was all part of Okhandiar's nefarious plot. In addition to countless writings and correspondence in which he recognized Plaintiffs as "co-founders" and "significant equity holders" in the Remila DAO, he referred to them as "board members" and "c-suite level officers," offered them letters of intent, NDAs, and written promises to negotiate as a tactic to entice Plaintiffs to continue providing uncompensated services to the Remilia DAO, including the creation of additional NFT projects. He sent Plaintiffs Duff, Roux, and Smith termination letters, and purported to kick all of the Plaintiffs out of the DAO, including removing their access to the multi-signature treasury wallet. Okhandiar then released the digital art projects that the Plaintiffs had created and developed into the public market for in excess of $20 million, solely for himself.

8. But apparently Okhandiar is not the mastermind he claims. Shortly after this lawsuit was filed, Plaintiffs discovered on the blockchain and through public investor posts that more than $7 million had suddenly and anonymously been removed from the Remilia DAO's treasury. Whether Okhandiar stole the funds, or whether (as he claims) he was the negligent victim of a phishing scam that allowed a third party hacker to access the multi-signature wallet passwords, he is responsible for that lost money, which belongs in equal parts to the Plaintiffs. Since then, blockchain tracing shows that Okhandiar has continued to steadily drain the treasury of its remaining funds, sometimes upwards of $700,000 per month, to fiat accounts that he has established in the British Virgin Islands.

9. While Okhandiar falsely mislabels Plaintiffs as mere former "independent contractors" whom he accuses of extortion and breaching non-disclosure agreements, that is a wild

distortion of the truth. Plaintiffs were defrauded into signing the NDAs with the understanding that they were part of the legal wrapping entity for the Remilia DAO with which Okhandiar repeatedly assured them they would be co-founders, equity holders, directors and officers. Despite his prior pleas for confidentiality, he then began waging an online campaign of defamation and threats against Plaintiffs, not only through his own social media accounts, but through those belonging to other "independent contractors" and agents that he pays and has cultishly induced to follow him with false claims of "spirituality" and "righteousness."

10.     For their own parts, and contrary to Okhandiar's attempted retaliatory finger-pointing, Plaintiffs have not "stolen" anything from the Remilia DAO. Plaintiffs have also refused to engage in Okhandiar's war of libel and slander. Despite his self-anointed and self-aggrandizing titles, Okhandiar is neither the "Crown Prince" of the business nor the Plaintiffs' "Father." He was supposed to be their partner, but instead revealed himself as a schemer, thief and fraudster. This action is necessary to remedy his breaches of fiduciary duty, misappropriations, lies, and recover the Plaintiffs' financial interests in the Remilia DAO treasury that they helped create, and to salvage their reputations and interests in the digital art community.

## PARTIES

11.     Plaintiff Roux is an individual and resident of Montana. He is a founding member of the Remilia DAO.

12.     Plaintiff Duff is an individual and resident of New York. He is a founding member of the Remilia DAO.

13.     Plaintiff Smith is an individual and resident of New Zealand. He is a founding member of the Remilia DAO.

14.     Plaintiff Nispel is an individual and resident of New York. He is a founding

member of the Remilia DAO.

15.     Upon information and belief, Defendant Okhandiar is an individual residing in Nevada.  With the Plaintiffs, he is the only other member of the Remilia DAO.

16.     Defendant RemCorp is a Delaware limited liability company, with its registered agent, Zenbusiness Inc., located at 611 South DuPont Highway, Suite 102 Dover, DE 19901.  Upon information and belief, Okhandiar is RemCorp's only member.

17.     Defendant RemIndustries is a Delaware limited liability company, with its registered agent, LegalInc Corporate Services Inc., located at 651 N. Broad Street, Suite 201, Middletown, DE 19709.  Upon information and belief, Okhandiar is RemIndustries' only member, and on RemIndustries' formation documents, Okhandiar lists his address as 651 N. Broad St., Suite 205 #9409, Middleton, Delaware 19709.

18.     On information and belief, at all material times and except when expressly noted below, each of the Defendants was acting as the principal, agent, partner, representative, fiduciary, successor or assignee of each of the other Defendants, and each such Defendant was acting within his or its authority, with the approval or ratification of each of the other Defendants, in committing the breaches, acts, omissions and occurrences alleged herein.  Each Defendant is therefore responsible, jointly and severally, for the wrongful acts of the other Defendants and each is liable for a judgment in Plaintiffs' favor.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1332(a)(1), (2) & (3), this Court has subject matter jurisdiction over this action because the Plaintiffs and Defendants are of diverse citizenship and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, and citizens of a State and a foreign state, and citizens

of different States and in which citizens or subjects of a foreign state are additional parties.

20.    This Court also has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331, as this action being brought under the federal Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. (the "FLSA").  The Court has jurisdiction over the FLSA claim under 29 U.S.C. § 203(e), and has supplemental jurisdiction over the other claims in this complaint, all of which claims are related and form part of the same case or controversy under Article III of the United States Constitution.

21.    Jurisdiction over the Defendants and venue of this action is also proper under 28 U.S.C. § 1391(b) because Defendants either reside or transact business in this district, or the claims asserted in this action arose in this district where as a substantial part of the activities, conduct, and/or damages giving rise to the claims occurred in this district, and Defendants have substantial contacts with this district, including but not limited to the fact that the LLC Defendants are incorporated in this State, Okhandiar is the sole member of the those Defendants, and he lists his address in filings made with the State of Delaware in this State, and because the Defendants transact business in this State, have directed activities to this State, have expressly and intentionally sought to take advantage of the protection of the laws of this State, and because a substantial part of the activities, conduct, and/or because of Okhandiar's incorporation of RemCorp and RemIndustries in Delaware as part of and in furtherance of his tortious conduct to wrongfully seize control of the Remilia business, assets and treasury, and thereby profit from his breaches of fiduciary duty, misappropriation and fraud, through the Delaware LLCs he formed.

## FACTUAL ALLEGATIONS

**A.    Background on Digital Assets, Cryptocurrency, and NFTs**

22.    A "cryptocurrency" is a digital or "virtual" asset transacted over the internet and

typically used as a medium of exchange.  Cryptocurrencies are created, and their transaction records are verified and maintained, by a decentralized network of computers using cryptography, rather than a centralized authority like a bank or government.  Cryptocurrencies are one popular type of digital asset, an emerging asset class that includes, among other things, tokens, stablecoins, and NFTs.

23.    Cryptocurrency is controlled using digital "wallets." Wallets are software interfaces that allow cryptocurrency users to control and spend their digital assets. Certain wallets may support multiple different types of digital assets.  Through a wallet, a user may use cryptographically generated credentials referred to as keys to facilitate transfers of digital assets (*i.e.* to spend) between wallet addresses.

24.    Transactions of cryptocurrency are generally completed using (1) a "public key address," which is akin to a logical location on a blockchain where assets may be controlled, and (2) a corresponding "private key," which is used to authorize a spend of an asset to another address on that blockchain network.  A user authorizes a spend transaction using their private key; the recipient of that transaction uses their public key.  Only the holder of the private key corresponding to a public key address can authorize a spend of digital assets from that address to another cryptocurrency address.  A user may control multiple wallets and thus assets controlled at multiple public key addresses simultaneously.

25.    A multi-signature wallet is a cryptocurrency wallet that requires the use of multiple private keys derived from a single key— instead of just the single key— to control digital assets. When assets are controlled by a multi-signature wallet, any transaction involving the wallet must be authorized by the use of a defined threshold of the existing keys.  For example, a "3 of 5" multi-signature wallet would have five private keys, for which any three must be used together to

authorize a spend of any digital asset controlled thereby.

26.    Generally, transactions of digital assets like cryptocurrencies are recorded on a "blockchain," which is a network of computers operating software that creates and maintains a ledger that tracks the state of transactions made by users of that system.  Unlike a traditional bank ledger which is generally only maintained and viewable by the bank, a blockchain network is comprised of numerous computers called nodes that collectively maintain and update the ledger of transactions by users of that blockchain.  Most blockchains publicly display transactions by its users via a blockchain explorer, which is a web-enabled viewer that allows anyone to view information about transactions of assets occurring on that blockchain, which typically includes the date and time, the public key addresses of the sender(s) and recipient(s) of the transaction, and the amount of cryptocurrency transferred.

27.    An NFT or "non-fungible token" is a type of digital asset that is uniquely identifiable and distinguishable from other assets on its blockchain.  Because it is a unique digital asset created and tracked on a blockchain, many NFTs are linked to or associated with digital audiovisual content, real life experiences, or sometimes combinations thereof and used to represent unique claims or rights over that content. NFTs are often used as a novel means of distributing art, typically through associated or linked image data files similar to a .jpeg image file (i.e. NFT art).

28.    NFT art can be collected, sold or traded, just like traditional art.  Many NFTs have been created on the Ethereum blockchain due to its early adoption of a standard for NFT tokens, ERC721.

29.    NFTs are created through a process referred to as "minting," which relies on the use of a "smart contract."  Despite its name, a smart contract is an instruction to a computer, not a legal contract.  Smart contracts are code that is deployed at specific blockchain public key address

which can control digital assets sent to it and which may automatically execute to cause a transaction affecting that digital asset when and if certain information is provided to that code. For example, a smart contract might be coded to transact a digital asset within its control upon the report to the code of the occurrence of an event. The code for smart contracts are generally publicly viewable using a blockchain explorer.

30. A single NFT can also be created by combining multiple NFTs, thereby creating what are known as "composable NFTs." Composable NFTs allow creators and collectors to bundle together different NFT assets and create a bespoke NFT package. For example, a single image of a girl linked to an NFT can be broken down into an image of the girl's hair linked to an NFT or the image of her shirt can be linked to a separate NFT, *etc*.

**B. The Founding Group Members Form the Remilia DAO**

31. Plaintiffs met Okhandiar through a community of digital artists and began collaborating as friends in 2020 and 2021. Okhandiar is not an artist, and even well into the first half of 2021, knew very little about NFTs. What he knew, he learned primarily from the Plaintiffs.

32. It was not until around September 2021 when the Plaintiffs and Okhandiar agreed to start a digital art business. Plaintiffs, together with Okhandiar (collectively the "Founding Group"), created the Remilia DAO, an unincorporated digital art collective association, whose primary business is creating and distributing art NFTs and related NFT Projects (as defined below). The Remilia DAO originated informally online through direct message group chats on Twitter, Discord, Guilded, and Telegram by and amongst the Founding Group.

33. The Founding Group agreed, both orally and as memorialized in their written correspondence, that they would each participate in the development, growth, operation and management of the Remilia DAO, and share in its decision-making as well as its profits and losses.

That is how the Founding Group operated the Remilia DAO for years.  While each of the Founding Group members played different roles in the Remilia DAO (e.g., artist, developer, *etc*.), significant decisions on how the Remilia DAO would operate and be managed, such as the control of its digital assets and treasury, were to be made collectively.  These decisions were sometimes made between and among the Founding Group members orally, and sometimes through a hybrid of online communications including written chat group messages and blockchain-based decisions evidenced by code and smart contracts.  No single member of the Founding Group was given the authority or right to control, access, or distribute the Remilia DAO's digital assets or treasury without the knowledge and consent of at least a majority of the Founding Group members.

34.     The Founding Group members' contributions to the Remilia DAO, including any intellectual property they created or developed, would be controlled and exploited by the Remilia DAO.  However, each Founding Group member retained the right to exit the Remilia DAO and to remove their lifetime contributions from it at any time.

35.     The Founding Group, as part of the Remilia DAO, also agreed that at some time in the future the Remilia DAO would form a corporate "legal wrapper" entity to formally employ or contract with the Founding Group and others to support the Remilia DAO's operations and promote the sale, distribution and monetization of its NFT Projects.  The intent was that the legal wrapper entity would also provide certain legal liability and tax protections for the Founding Group because, as an unincorporated business entity, the Remilia DAO would be treated as a general partnership whereby each of the Founding Members would be subject to pass-through taxation and could be held jointly and severally liable for each of the other Founding Members' actions and the Remilia DAO as a whole.  The Founding Group called this intended legal wrapper company Remilia Corporation, or "RemCo" for short.

36.     Each member of the Founding Group was to be an equity holder in RemCo when it was formed and incorporated.  Okhandiar proposed orally and in writing that RemCo would be governed by an Executive Board comprised of at least three members, including but not limited to a CEO, a COO or CFO, and a Lead Artist.  The Executive Board would manage RemCo's strategic operations as the legal wrapper to ensure that the otherwise decentralized nature, assets and treasury of the Remilia DAO would be preserved without the difficulties and risks of continuing to operate as an unincorporated business association.  According to Okhandiar, the decentralized and collective governance of the DAO could be preserved by having RemCo operated with a "1/4 vote structure," with the CEO retaining two votes, and the other two Executive Board members each having 1 vote. In this way, the CEO would have veto power to prevent the other two Executive Board members from acting in concert together, but the CEO would need the supporting vote of at least one other Executive Board member before taking action.  Upon formation, Okhandiar was to be RemCo's CEO, with Nispel as COO, and Smith as Lead Artist.  The Plaintiffs agreed to this proposed structure.

37.     Throughout the last six months of 2021, the Founding Group considered, negotiated, and in some instances entered into various related oral and written agreements (the "Agreements") concerning the business and management of the Remilia DAO and the structure and formation of RemCo.

38.     The Agreements provide, in pertinent part, that:

a.      The Remilia DAO would continue to own and control the assets and funds generated by sales of its collection of works.

b.      The Founding Group agreed that all of the Remilia DAO's funds and digital assets would be held in a treasury under their joint control that would require

-13-

at least a majority of the Founding Group members to approve any significant transaction.

c.    The Remilia DAO established a commission payment structure based on the revenue generated from the sale of the NFTs. For example, the Founding Group agreed that most of the members would be paid $100,000 as consideration for their work on the Milady Maker NFT project.

d.    As it became necessary, the Remilia DAO would form and incorporate the legal wrapper entity, RemCo, to act as an agent for the Remilia DAO, to help handle administrative tasks, for contracting, to assist with the use, disposition, and exploitation of the Remilia DAO's intellectual property, assets and treasury, to provide taxation benefits to the Founding Group, and to limit their individual liability exposures. As alleged above, that expected corporation was referred to as "RemCo."

e.    While one of Okhandiar's designated tasks and responsibilities to the Remilia DAO was to establish RemCo when and as agreed, the five Founding Group members were each to be considered "co-founders" and "equity holders" in RemCo.

f.    At least two Plaintiffs and Okhandiar would be appointed to a seat on RemCo's Executive Board, and all Founding Group members would be employed with executive officer roles in RemCo.

g.    The members of the Founding Group would each have a unique role in the Remilia DAO and in RemCo, and as a result would receive annual salaries and bonuses from RemCo that might differ in amount, but that would also

-14-

preserve their pro rata equal shares to the Remilia DAO treasury and assets.

39.     As alleged above, some of the terms of these Agreements were memorialized in signed written contracts that the parties labeled "Letters of Intent" (hereinafter "LOIs").  Other parts of the Agreements were memorialized in emails and chats.  Among other things, the Agreements provided the Plaintiffs' salaries and other compensation understandings, and expressly recognized Plaintiffs as co-founders and substantial equity holders in RemCo when formed.

40.     For example, in October 2021, Okhandiar provided Smith a Letter of Intent (the "Smith LOI"), ratifying the Founding Group's agreement that Smith would be recognized as a co-founder and Lead Artist.  The "Expectation" for Smith as Lead Artist was that he would commit his full-time efforts to the Remilia DAO.  As a "co-founder with a significant stake in Remilia," he would have certain fiduciary duties to it, including an obligation to "make a good faith effort to introduce any new enterprises and opportunities to Remilia," and "not expend significant time pursuing interests that do not in some way have a path to feed back into Remilia," and "to make best efforts to develop [those paths] towards Remilia."  Smith would be compensated "$60,000.00 annual salary and up to $25,000.00 annual incentive bonus in a USD pegged cryptocurrency."  *See* **Exhibit A**, the contents of which are incorporated herein by this reference.

41.     The Smith LOI included the Remilia DAO's intent to create a formal legal wrapper corporate infrastructure, and expressly recognized that the then-unincorporated RemCo would have a principal-agent relationship whereby the decentralized Remila DAO would authorize and control RemCo's actions as its agent.

42.     The Smith LOI recognized Smith "as a co-founder with a significant stake" in the then still unincorporated RemCo.  It explicitly stated:

-15-

[T]his letter of intent is provided in place of an employment agreement *as a written promise of the offered role and its compensation and expectations*.

43.     The Smith LOI also recognized that Smith would be part of RemCo's "formal governance," which would be comprised of an Executive Board of three of the co-founders holding a total of four votes. Okhandiar, who would hold the title of CEO, would hold two votes on the Executive Board. Smith, as the Lead Artist and creative director member of the Executive Board would hold one vote. As discussed below, Nispel, as Chief Operating Officer, would be the third member of the Executive Board also holding one vote.

44.     On several other occasions, members of the Founding Group assured Smith that his position as co-founder of RemCo was definite and that as a co-founder, he would receive equity once the Remilia DAO formed that legal wrapper company. Indeed, on several occasions, Smith agreed to accept lesser amounts of salary and compensatory payments from the Remilia DAO than his contributions would otherwise merit because he was promised to be compensated with a larger equity stake in or salary from RemCo instead.

45.     In October 2021, Nispel also signed an LOI (the "Nispel LOI") with the same terms as Smith, including fiduciary duties, except that he had the formal title of Chief Operating Officer and was supposed to receive an annual salary of $125,000, and up to $125,000 annual incentive bonus is a USD pegged cryptocurrency. *See* **Exhibit B**, the contents of which are incorporated herein by this reference.

46.     Like Smith, Nispel was recognized as a co-founder of the then-unincorporated RemCo, and was to be issued a significant equity stake in that corporation upon its formation. Indeed, Okhandiar countersigned the Nispel LOI, and as such, acknowledged the Founding Group's Agreements that Nispel would be a co-founder and substantial equity holder in RemCo

-16-

when it was formed.

47.     As described more fully below, Roux was Remilia's lead financial and quantitative analyst, as well as being a developer, project manager, and artistic director of several NFT Projects. In several verbal and written communications authored or acknowledged by Okhandiar, Roux was acknowledged as a Remilia DAO co-founder and was to receive a substantial amount of equity resulting in his "serious exposure" to RemCo's ownership.  *See* **Exhibit C**, the contents of which are incorporated herein by this reference.

48.     Duff, who was the Lead Programmer and project manager, was also provided an LOI in October 2021 with the same general terms as the Smith and Nispel LOIs, including the fiduciary duties they agreed would continue to exist between and amongst themselves just as they existed with the membership in the Remilia DAO.  He was to receive an annual salary of $70,000, with bonus and commission compensation for his work on specific NFT Projects (the "<u>Duff LOI</u>"). *See* **Exhibit D**, the contents of which are incorporated herein by this reference.  Like the other Founding Group members, Duff was recognized as a co-founder of the Remilia DAO and was to receive a significant equity ownership stake in RemCo upon its formation.

**C.     The Remilia DAO's NFT Projects**

49.     Since its inception, the Remilia DAO, as a brand, has valued esotericism, anonymity, and underground originality.  Among other attractive elements of the Remilia DAO's past and current projects, these characteristics resonate with thousands of cryptocurrency and NFT market participants.   As a result, the Remilia DAO had an estimated total value of over $12,500,000, including stablecoins, ether, and NFTs held by its treasury.

50.     Each Founding Group member had a critical role in developing and managing the NFT Projects, and in growing and managing the Remilia DAO's business long before Okhandiar

unilaterally formed RemCorp and RemIndustries in Delaware.

51.    Okhandiar, otherwise known as "Charlotte Fang," "Charlie Fang," "Wonyoung Jang," "Miya," "Xinma33," "MissJo," and "Sonya," was tasked by the Founding Group with operational oversight and some project management responsibilities.  He also held treasurer duties.  While he had the ability to move funds into and out of the Remilia DAO's wallets, such as for paying approved expenses, he did not have unilateral authority over the treasury, which authority was vested in the decentralized Remilia DAO.  While Okhandiar acted as a coordinator and liaison between the Founding Group members, at no point did the Founding Group agree that Okhandiar was authorized to act as the sole principal or owner of the Remilia DAO or of the eventual RemCo legal wrapper.

52.    Smith, otherwise known as "Sprite," "Sonora Milady," and "Nijino Saki," was the Remilia DAO's lead artist, and was been responsible for its NFTs' creative design and direction, including the creation of the original art from which Milady was derived.

53.    Milady is the original character art on which the Remilia DAO's most valuable NFT project is based.  Smith solely created Milady for his personal Twitter account in August 2020.  *See* **Exhibit E**, the contents of which are incorporated herein by this reference.

54.    In April 2021, at the time "Milady Maker" was first coined as the project's title, Smith established Milady's proof of concept website and created the composable art of Milady's hair, shirt, hat, *etc.*, that could be reassembled on a website.  Smith's "Milady Maker" concept and project therefore predated the eventual Milady Maker NFT, which he brought into existence before joining the Remilia DAO.

55.    From June 11, 2021, through July 22, 2021, Smith organized and carried out the Remilia DAO's first showing, making prints of its art, maintaining online systems, and setting up

its physical art gallery.  He was the only Founding Group member present in person during this inaugural showing of Milady in New Zealand.  Smith also developed the metadata naming conventions of Milady that enabled Milady's NFT mint in August 2021.  Smith also designed, produced and coordinated with manufacturers for the first Milady Fumo Merchandise, and then also produced the initial design that would be adapted by 3D Artists into the Milady Alien Fumo for the $FUMO token.  The first mint of Milady was completed on August 24, 2021.

56.    In addition to his role as Milady's primary creator, Smith created the Bonkler collection, has acted as the director of graphic design for the Remilia DAO collective as a whole, and generated promotional materials including flyers, posters, and merchandise.  He undertook a majority of the groundwork for the NFT Projects, including acquiring the merchandise, and securing and setting up venues, such as the RemiliaCon Tokyo event.

57.    Nispel, otherwise known as "Jimbo" and "Yojimbo," acted as the Remilia DAO's Chief Operating Officer, as well as its head of sales and marketing, public representative, and strategic advisor.  He brought vast knowledge and experience, along with a broad network of contacts, in the NFT and cryptocurrency space to the Remilia DAO.  Okhandiar also referred to him as a co-founder.  *See* **Exhibit F**, the contents of which are incorporated herein by this reference.

58.    Nispel led the marketing side of the Milady launch in August 2021 and advised the Founding Group on strategy for the project.  Nispel led several large-scale sales of Milady which led to Milady's successful mint and launch.

59.    Nispel played an essential role in establishing the Remilia DAO's collaborations with Canto in March 2023 for the Yayo project.  In addition, he was primarily responsible for the development and success of the Fumo project, which launched in July 2023.

-19-

60.    In his various roles, Nispel also organized and hosted Milady Raves, concerts, and parties in Los Angeles, New York City and Denver, and helped to organize a Bonkler event held in Tokyo, Japan.

61.    Nispel, along with Roux, also created the Remilia DAO's investor opportunity pitch materials and played a key role in seeking investors.

62.    Roux, otherwise known as "Reginald," "Q," and "Peabody," was the Remilia DAO's lead financial and quantitative analyst, and served as its developer, project manager, and artistic director for several projects.  Along with Plaintiff Nispel, Roux created the Remilia DAO's investor opportunity pitch materials and took the primary lead and key role in its search for investors.

63.    In June 2022, Roux and another artist, Ursula G., created and curated the original art for the Remilia DAO's Remilio project.  In July 2022, Roux, with Duff, developed and launched the Remilio.org website.  Roux and Ursula G. also created and curated a majority of the original art for Fumo in June 2023.

64.    Roux also managed several social media accounts and chat servers promoting the Remilia DAO's NFTs, including @REMILIONAIRE, an official Remilio Twitter Account.

65.    Duff, otherwise known as "ccc," and "ccccaa" and "ika" was the lead engineer, programmer, developer and project manager of the Remilia DAO.  He acted as its Director of Software Development, programmer, web developer, and project manager.  Duff was primarily responsible for the creation of Yayo, and Bonkler.  He also implemented an image generator for Milady and saved the project from catastrophic failure at its launch as the technical lead on the project.

66.    An estimated fifty percent of the Remilia DAO's workforce reported directly to Mr.

Duff.  He acted as the head manager and oversaw the development of one of the Remilia DAO's unreleased products, RemiChat, since September 2022 until this dispute arose.

67.    The Remilia DAO generated revenue from the various NFT Projects (collectively, the "NFT Projects") that Plaintiffs played the primary roles in creating, developing and actively managing, including:

    a.  Milady Maker NFT ("Milady"), the sales of which has generated estimated revenues for the collective of $3,250,000 in USD since August 2021;

    b.  Banners NFT, the sales of which has generated estimated revenues for the collective of $100,000 in USD since July 2022;

    c.  Redacted Remilio Babies NFT ("Remilio"), the sales of which has generated estimated revenues for the collective of $1,750,000 in USD since August 2022;

    d.  Bonkler NFT ("Bonkler"), the sales of which has generated estimated revenues for the collective of $1,400,000 in USD since April 2023;

    e.  Yayo NFT ("Yayo"), the sales of which has generated estimated revenues for the collective of $250,000 in USD since May 2023.

    f.  Milady Fumo NFT ("Fumo"), the sales of which has generated estimated revenues for the collective of $800,000 in USD since July 2023; and

68.    From September 2021 until May 2022, the Founding Group focused their attention on the Remilia DAO's first and primary NFT project, Milady Maker, which is a limited collection of NFT profile pictures modeled after "Chibi"-style anime art that purchasers use as online profile pictures such as Twitter avatars.  Smith had created the first Milady before the Founding Group had agreed to form the Remilia DAO.  He contributed this art to the Remilia DAO, and the sales of the Milady Maker NFTs earned in excess of $3 million.

69.     The Founding Group never formed or incorporated RemCo before Okhandiar nearly destroyed the Milady Maker project and the entire Remilia DAO in May 2022.  In a 20-tweet megathread and detailed GitHub post, a Twitter user published a series of screenshots of extremist and overtly racist posts (e.g., repeated used of the "N-word" and lengthy anti-Semitic statements and other slurs) by a person using the name "Miya" apparently connected to Milady Maker.  The market price of Milady's crashed.  Under extreme community pressure, on May 21, 2022, Okhandiar made a "full disclosure" on Twitter that he was Miya.  In an attempt to avoid any correlation between his unrelated "Miya" posts and the Remilia DAO's activities, Okhandiar publicly stepped down from any involvement in the Milady Maker NFT Project.



♡ **Charlotte Fang** 🐉 **Crown Prince**
@CharlotteFang77

OK, full disclosure: I was Miya. And its toxic baggage that's hurting Milady community & poisoning the vibe. I apologize about trying to hide the past account—Miya has nothing to do with Milady Maker & should stay that way so I'll be stepping down from the team from here.

5:21 AM · May 21, 2022

70.     The Remilia DAO announced that Smith and Nispel would be taking the lead on the Milady Maker project, and they pressed on with developing the other NFT Projects as part of the Remilia DAO, with Okhandiar eventually joining back into the daily operations.  Going forward, the Founding Group members agreed that Nispel and Smith would be added as key holder "signatories" to the Remilia DAO's multi-signature wallet so that Okhandiar would not have the ability to exercise unilateral control over the its treasury.

71.     Based on his contributions, Smith's agreed annual compensation was increased to $85,000, and he was supposed to receive 20% of the Bonkler mint funds.

72. By July/August 2022, a logistical and administrative need arose to form the envisioned legal wrapper, RemCo, so that the Remilia DAO could continue to market and sell certain products and continue running promotional events. For example, a company needed to be formed so proper labels could be applied to clothing items that the Remilia DAO was selling, and so contracts could be entered into with vendors and service providers for the rave events the Remilia DAO was promoting, as well as for tax reasons. It was Okhandiar's responsibility to form RemCo as agreed by the Founding Group's when appropriate.

73. Since August 2021, Plaintiffs continued to work on the NFT Projects based on their agreement and the understanding that each of them would continue to own and control their interests in the Remilia DAO. Moreover, Plaintiffs also reasonably believed they would earn significantly more as members of the Founding Group and as equity owners and, in some cases, executive officers and directors of RemCo from which their salaries and bonuses would eventually be paid.

74. The working experience was far from pleasant or acceptable. Okhandiar subjected the other Founding Group members and employees to verbal abuse and harassment. For example, in multiple chat messages Okhandiar has called Roux a "pathetic lazy retard," "faggot," "nigger" who "should just stop lying [that he] is a functioning human and leave the hot pot [group]…instead of wasting my time treating you like a person with a soul." *See* **Exhibit G**, the contents of which are incorporated herein by reference.

75. Despite the abuse, the Founding Group members continued to work on the Remilia DAO's NFT Projects in reliance on their continued ownership interests, receipt of their promised and earned compensation and bonuses, and expected roles in RemCo that would also provide the liability protections and tax benefits for which they agreed the legal wrapper would be formed.

**D.    Defendants' Wrongful Conduct**

76.    Despite his public resignation from the Milady Maker project (or perhaps because of it), and in violation of his fiduciary duties and in breach of the parties' agreements, Okhandiar started acting as if he single-handedly owns and controls the Remilia DAO, its assets, and its treasury.

77.    On July 5, 2022, in a concealed attempt to seize control of the Remilia DAO and unbeknownst to the Plaintiffs, Okhandiar unilaterally incorporated RemCorp, a Delaware limited liability company.  *See* **Exhibit H**, the contents of which are incorporated herein by reference. Okhandiar made himself the sole member of RemCorp to the exclusion of each of the other Founding Group members.  Okhandiar then hid RemCorp's existence from Plaintiffs for months, and when he finally revealed it, did not disclose that he had (1) failed to create RemCo as the parties had envisioned with a three-member Executive Board, (2) failed to include any of the Plaintiffs as equity owners, and (3) failed to provide a shareholders' agreement or an operating agreement for the company that would also continue to rest ownership, governance and management of the NFT Projects with the Remilia DAO.

78.    On October 14, 2022, also unbeknownst to Plaintiffs, Okhandiar formed RemIndustries, a second Delaware limited liability company.  *See* **Exhibit I**, the contents of which are incorporated herein by reference.  Okhandiar again made himself the sole member and owner of this company.  And again, Okhandiar (1) failed to create RemIndustries as the parties had envisioned with a 3-member Executive Board, (2) failed to include any of the Plaintiffs as equity owners, and (3) failed to provide a shareholders' agreement or an operating agreement for the company.  Indeed, Okhandiar has never explained the need for this second company, or its relation to Remilia, RemCo, or RemCorp.

79.     By November 2022, Okhandiar had added four other "persons" as key holders to the Remilia DAO's multi-signature wallet besides himself, Smith and Nispel.  Smith and Nispel knew the identity of one of the additional signatories, who was providing services to the Remilia DAO that Plaintiffs believed would provide additional oversight of the treasury and assist with approved transfers as needed.  However, Okhandiar led them to believe that the other three signatories were similarly-situated employees.  As it turns out, that was false.  Despite their agreement, Okhandiar secretly created three additional keys for himself, thereby giving himself control of four of the multi-signature wallet's seven keys, and thus full control over the Remilia DAO's treasury wallets.

80.     By November 2022, Plaintiffs were still owed various amounts of salary, bonuses and commissions from work they had completed and were still performing on the NFT Projects; however, Okhandiar refused to release these payments from the Remilia DAO's multi-signature wallet.

81.     On November 15, 2022, Okhandiar presented the Plaintiffs with and demanded they sign "Confidentiality and Non-Disclosure Undertaking" agreements with RemCorp (the "NDAs"). Smith, Roux, and Nispel, believing that they were already equity owners of RemCorp (and in Smith and Nispel's cases, members of its Executive Board), and fearing that they would not receive their owed compensation otherwise, agreed to sign their NDAs.  Okhandiar also led them to believe that he had also signed a similar NDA, as he represented that all members and employees of RemCo would be asked to do.

82.     In addition to withholding Duff's compensation, Okhandiar demanded that he sign the original LOI, which was previously presented to him by Okhandiar but which Duff had not yet signed, and the NDA, explaining that by the NDA, "You won't be giving anything new away."

Duff, however, refused to sign either document until he received written assurance from Okhandiar that he owned equity in RemCorp, that Duff would receive an acceptable form of a shareholders' agreement or operating agreement for RemCorp, and that the LOI would be amended to reflect the true amounts he was owed, which he demanded be paid.

83.      Okhandiar amended the original Duff LOI to recognize Duff's formal title as Director of Software Development with an increased annual salary of $100,000 (the "Duff Amended LOI").   Okhandiar then used ChatGPT to create what he called an "Agreement to Negotiate" between himself and Duff, by which Okhandiar promised that, in exchange for Duff's agreement to sign the NDA and the Duff Amended LOI, he would "come to an agreement on [Duff's] initial shareholding distribution," and that such "shareholding allotment" would be "in writing before any further shares are issued or allotted, including to the other founders, investors or employees."   Okhandiar and Duff then signed the Agreement to Negotiate, NDA and the Duff Amended LOI on December 28, 2022.   That Agreement to Negotiate attaches and incorporates the signed NDA and the Duff Amended LOI as **Exhibits A and B**, respectively.   *See* **Exhibit J**, the contents of which are incorporated herein by reference.

84.      Plaintiffs have still not been paid the full amount of what they are owed for their contributions to the Remilia DAO or any compensation from RemCo.  This includes:

    a.  Smith has not received his full bonuses.  He has also only received $60,000 of his revised salary, and has not received any of the 20% of the Bonkler project mint funds, which percentage amounts to approximately $440,000.

    b.  Nispel has not received his full $125,000 annual salary or any bonuses.  He is also still owed an additional $20,000 for his work on Milady.

    c.  Roux has not received any of the $15,000 for his work on Fumo, which was

-26-

supposed to be paid in the form of a Milady NFT asset worth $15,000 at the time.

d. Duff is owed $87,500 in unpaid wages, bonuses, and commissions, including at least $40,000 in unpaid commissions on the Milady project, $17,500 for his work on the Solsprites NFT project that the Founding Group had decided not to pursue, and $30,000 in an unpaid bonus.

85.    Plaintiffs then came to learn that Okhandiar, improperly using his control of the Remilia DAO's multi-signature wallet, transferred Remilia's digital assets at the time worth approximately $600,000 in part to his personal wallet as arbitrary unilateral "bonuses" that exceeded the amounts agreed would require majority approval by the Founding Group, and in part to RemCorp's treasury. *See* **Exhibit K**, the contents of which are incorporated herein by reference.

86.    Okhandiar did not form RemCo, and certainly did not form the legal wrapper for the Remilia DAO that the Founding Group had agreed.  Despite repeated requests, Okhandiar refused and continues to refuse to provide Plaintiffs with a signed shareholders' or operating agreement for any company, or provide Plaintiffs any corporate formation documents of any kind, such as a membership roll, for either RemCorp or RemIndustries.  He also refuses to recognize any of Plaintiffs as members of any Executive Board for either RemCorp or RemIndustries, or even to acknowledge that an Executive Board exists.  He refuses to recognize Plaintiffs' ownership interests in, governance roles with, or employment by any legal wrapping entity, despite his fiduciary duties to Plaintiffs through their joint membership in the Remilia DAO and as evidenced by his written promises to do so.  And Okhandiar continues to refuse to release to Plaintiffs their earned and promised salaries and bonuses.

87.    On August 22, 2023, Plaintiffs sent Defendants a letter demanding several corrective actions if the Remilia DAO is to continue, and which were needed to redress

Okhandiar's breaches of fiduciary duty, including among other things:

    a.   that copies of all corporate books and records for RemCorp and RemIndustries be provided to the Plaintiffs;

    b.   the formation of the envisioned RemCo in which Plaintiffs would be equity owners and participate in the corporate governance through their seats on the Executive Board and roles as officers in the company, *or* that they be issued their equity shares and control of RemCorp;

    c.   payment of their owed compensation, bonuses and commissions; and

    d.   return of the embezzled funds and assets wrongfully taken by Okhandiar from the Remilia DAO's treasury.

*See* **Exhibit L**, the contents of which are incorporated herein by reference.

88.    In response, Defendants refused to disclose any of the corporate documents, and instead took the position that RemCorp (and Okhandiar as its sole member) control 100% of the Remilia DAO's treasury, assets and intellectual property.  They asked for additional time to respond to the Plaintiffs' claims to governance roles and ownership of whatever RemCo entity Okhandiar had created, and for the return of the misappropriated funds, and requested that Plaintiffs refrain from filing a lawsuit or making these issues public in the interim.  Contrary to their own request to keep things private at least until they responded to the issues in Plaintiffs' letter, however, Okhandiar and RemCorp then filed a preemptive and baseless lawsuit against Roux, Smith, and Duff in Nevada federal district court.  Okhandiar and RemCorp also delivered letters purporting to terminate Plaintiffs from their mischaracterized roles as "independent contractors" to RemCorp.  Okhandiar removed Plaintiffs' access to their Remilia DAO emails and social media accounts, and prevented Plaintiffs from accessing or continuing further work on any

of the NFT Projects.

89.     On September 11, 2023, Okhandiar made a public tweet proclaiming his intent to transfer all of the remaining funds from the Remilia DAO's online treasury to his own control, writing, "After this event I'll be moving funds from crypto into fiat." *See* **Exhibit M**, the contents of which are incorporated herein by reference.  That is exactly what he did.  Less than 24 hours later, he transferred digital assets then valued at $1.7 million from the Remilia DAO's publicly visible on-chain treasury to his personal fiat accounts, purportedly under the guise that he was protecting it from Plaintiffs.

90.     Then in a bald-faced attempt to deflect attention away from his own breaches and bad acts, Okhandiar began waging a malicious and defamatory online public smear campaign against Plaintiffs, wrongfully accusing them of having stolen potions of the Remilia DAO's treasury, lying about their involvement with the creation and development of the Remilia DAO and its NFT Projects and their roles with the Remilia DAO, and falsely depicting himself as being the Remilia DAO's sole creator and owner.

91.     Yet, when questioned by a third party investor about RemCorp's role in the Remilia DAO, Okhandiar confessed that the entire business began as an unincorporated collective venture, and that the RemCorp legal wrapper he had created was intended only to support the reinvestment of the Remilia DAO's funds into newer NFT projects.  On September 13, 2023, Okhandiar tweeted: "Before it was an LLC it was a wallet.  The openly stated plan was always to reinvest earnings into the new art and the new internet."

92.     RemCorp and RemIndustries are the shells through which Okhandiar continues to unlawfully exercise control over the Remilia DAO's assets and treasury, and to steal them away from Plaintiffs.  Their corporate existence and structures are being used as a sham and to perpetrate

a fraud.  RemCorp and RemIndustries are being operated as a mere tool and business conduit for Okhandiar to evade his legal obligations and breach his fiduciary duties, and to protect against the discovery of his crimes and to supposedly justify his wrongs.  The corporate veils for RemCorp and RemIndustries should therefore be pierced.

## COUNT I

### Breach of Fiduciary Duty

### (Plaintiffs against All Defendants)

93.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

94.    In or around September 2021, Plaintiffs and Okhandiar formed the Remilia DAO for the purpose of creating, developing and monetizing certain digital art NFT projects.  The Remilia DAO was created and conducted business for the Founding Group's mutual benefit.  Each Founding Group member contributed their intellectual property, assets, effects, skills, time, and/or knowledge in exchange for collective ownership of and control of the Remilia DAO and its assets and treasury.  The Founding Group members agreed, both orally and as memorialized in their written correspondence, that they would each participate in the development, growth, operation and management of the Remilia DAO, and share in its decision-making as well as its profits and losses, which is how they operated the Remilia DAO for years.

95.    While each of the Founding Group members played different roles in the Remilia DAO (e.g., artist, developer, *etc.*), the Founding Group agreed that significant decisions on how the Remilia DAO would operate and be managed, such as the control of its digital assets and treasury, were to be made collectively.  These decisions were sometimes made between and among the Founding Group members orally, and sometimes through a hybrid of online communications including written chat group messages and blockchain-based decisions evidenced by code and

smart contracts. No single member of the Founding Group was given the authority or right to control, access, or distribute the Remilia DAO's digital assets or treasury without the knowledge and consent of at least a majority of the Founding Group members. The Founding Group members' contributions to the Remilia DAO, including any intellectual property they created or developed, would be controlled and exploited by the Remilia DAO. However, each Founding Group member retained the right to exit the Remilia DAO and to remove their lifetime contributions from it at any time.

96.     As an unincorporated association, a DAO is a de facto general partnership, and members of the DAO owe the same fiduciary duties of general partners. As members of the the Remilia DAO, the Founding Group members therefore owed each other fiduciary duties to act with the utmost good faith and care, fairness, honesty and loyalty with respect to their relationships and dealings with each other and the Remilia DAO.

97.     Because DAOs are decentralized and unincorporated, they have difficulty contracting with suppliers, vendors, contractors, and dealing with financial institutions and other third parties who are rightfully suspicious about the nature and governance of the entity with which they are being asked to transact business. As de facto general partners, members of a DAO may also be held jointly and severally liability for the DAO's acts and any claims levied against the DAO unless the members specifically and expressly contract to limit such fiduciary duties and liabilities. Members of the DAO also pay pass-through taxes.

98.     To overcome these problems and concerns, Plaintiffs and Okhandiar agreed (as is typical with many DAOs) that the Remilia DAO would eventually require the formation of a "legal wrapper" they referred to as RemCo, which would be a formal registered corporate entity to assist with the Remilia DAO's contracting and business needs, to potentially limit the Founding Group

-31-

members' fiduciary duties and liabilities, and to avoid higher pass-through tax rates, while allowing the DAO to retain ownership and decentralized governance of the assets and treasury. When integrated with the Remilia DAO, the legal wrapper RemCo would provide a legal framework for the Remilia DAO to interact with traditional financial and legal systems while maintaining its decentralized nature and control of the collective assets and treasury.

99.     As their partner in the Remilia DAO, Plaintiffs trusted Okhandiar with the task of forming the legal wrapper RemCo, to distribute equal equity and their agreed upon salaries, and to establish the agreed-upon form of governance by an Executive Board comprised of at least two of the Plaintiffs holding at least 50% of the voting power, and management and operation of the legal wrapper that included Plaintiffs as salaried officers.  By the nature and terms of their partnership in the Remilia DAO and their agreement to form the RemCo legal wrapper, Plaintiffs and Defendants were in a confidential and fiduciary relationship whereas the Founding Group trusted Okhandiar with certain of the Remilia DAO's operations, assets, and treasury, including payment of certain salaries and bonuses and creation of RemCo.

100.     Plaintiffs reasonably relied on Okhandiar's promises, and continued to work on and provide ongoing contributions to the Remilia DAO's NFT Projects.

101.     Okhandiar breached his duties of care, loyalty and good faith when he surreptitiously formed RemCorp as a limited liability company with himself as the sole member instead of forming the RemCo legal wrapper as the Founding Group members had agreed; namely that Plaintiffs would be owners of the legal wrapper that would be governed by an Executive Board comprised of three members including at least two of the Plaintiffs.  Okhandiar further breached his duties of care, loyalty and good faith to the extent he claims that RemCorp and/or RemIndustries control or own any of the Remilia DAO's intellectual property, assets or treasury

with Plaintiffs.

102.    To the extent Okhandiar claims that RemCorp and/or RemIndustries are the RemCo legal wrapper the parties agreed and expected that Okhandiar would take the lead in forming, Okhandiar has further breached his fiduciary duties by forming them with the agreed governance structure, by refusing to provide Plaintiffs with RemCo's corporate books and records, and by continuing to refuse to provide Plaintiffs equity in the legal wrapper that supposedly operates on behalf the Remilia DAO or controls any of the Remilia DAO's intellectual property, assets or treasury, to which Plaintiffs contributed their own intellectual property, assets and work.

103.    Independent of RemCo, Okhandiar further breached his duties of care, loyalty and good faith when he secretly and fraudulently gave himself three additional keys to the Remilia DAO's multi-signature treasury wallet, and then used those keys to transfer and misappropriate to himself in excess of $600,000 worth of the Remilia DAO's funds and assets directly to his personal fiat account or indirectly through RemCorp and RemIndustries.

104.    Okhandiar further breached his duties of care, loyalty and good faith by removing Plaintiffs from the multi-signature wallet and then transferring and misappropriating in excess of $1.7 million of the Remilia DAO's funds and assets to RemCorp, RemIndustries, and to his personal wallet, and then moving those assets and funds off-chain and into his personal fiat account.

105.    Okhandiar further breached his duties of care, loyalty and good faith when he unilaterally purported to terminate Plaintiffs from the Remilia DAO directly or through their purported termination by RemCorp, which they understood and expected was the RemCo legal wrapper entity in which they had ownership interests and governance rights, not just employee or independent contractor roles.  Okhandiar further breached his duties of care, loyalty and good faith

by failing and refusing to release payment of Plaintiffs' respective salaries, bonuses and commissions from the Remilia DAO or indirectly through the RemCo legal wrapper entity, if formed.

106.    Okhandiar further breached his duties of care, loyalty and good faith when he wrongfully denied Plaintiffs access to their email accounts, social media accounts, and NFT Project software, data, and information.

107.    Okhandiar further breached his duties of care, loyalty and good faith by misappropriating for himself the NFT Projects upon which the Plaintiffs were creating, developing and seeking investors, and by releasing those NFT Projects as tokens or coins on the public market without Plaintiff's consent or authorization, and without sharing the profits therefrom.

108.    Okhandiar further breached his duties of care, loyalty and good faith by failing to secure the Remilia DAO multi-signature wallet from the claimed phishing scam and hacker attack by which Okhandiar, in granting himself multiple signature passwords and then storing such passwords collectively in a single file or electronic space, exposed the Remilia DAO's treasury to the theft in excess of $7 million.

109.    Okhandiar further breached his duties of care, loyalty and good faith by continuing to siphon and embezzle substantial amounts of the Remilia DAO's remaining treasury to his own fiat accounts, directly or indirectly, through RemCorp, RemIndustries, or other offshore entities and accounts, including in the British Virgin Islands.

110.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial damages.

111.    Okhandiar wrongfully and unilaterally formed RemCorp and RemIndustries, purportedly taking control of the Remilia DAO's business, assets and treasury, while excluding

-34-

and denying Plaintiffs their equity and directorship and managerial roles in the intended agent corporation, RemCo.

112.   As a direct and proximate result thereof, Plaintiff has suffered, and/or will suffer, substantial damages.

113.   To the extent Okhandiar, RemCorp and/or RemIndustries purport to own or control any of the Remilia DAO's assets, funds or intellectual property, whether by assignment, appropriation or otherwise, Plaintiffs are entitled to the imposition of a constructive trust for their benefit over those assets, funds and intellectual property, whether currently held in the Remilia DAO treasury wallet, in Okhandiar's personal wallet or fiat account, by RemCorp, by RemIndustries, or by an offshore entity or in an offshore account directly or indirectly controlled by Okhandiar.

114.   Defendants' aforesaid actions and inactions were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT II

### Declaratory Judgments and Injunctions

### (Plaintiffs against All Defendants)

115.   Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

116.   Plaintiffs are entitled to each of the following declaratory judgments and injunctive relief pursuant to 28 U.S.C. § 2201 and 6 *Del. C.* §§ 18-110, 18-111, 18-205, 18-209, 18-216, & 18-802 (among others), that:

   a.   Neither RemCorp nor RemIndustries are the legal wrapper corporation the parties intended and referred to as RemCo.

b.      Okhandiar failed to incorporate and structure RemCo in the manner and with the owners and governance structure agreed by the Founding Group members.

c.      To the extent RemCorp, RemIndustries or any other legal entity formed or controlled by Okhandiar is the legal wrapper Remco entity that the Founding Group agreed to form for the benefit of the Remilia DAO and the Founding Group members, and of the Founding Group members are owners of that entity, and thereby also indirectly still control or own the Remilia DAO's assets, treasury, and intellectual property; and further that Plaintiffs are entitled to entitled to key level control of any digital wallet that holds the Remilia DAO's assets and treasury, or any proceeds thereo.

d.      Neither Okhandiar, RemCorp nor RemIndustries separately control or own any of the Remilia DAO's assets, treasury or intellectual property.

e.      The Remilia DAO has not assigned or transferred any of its assets, funds or intellectual property to Okhandiar, RemCorp, RemIndustries, or any other entity owned or controlled directly or indirectly by Okhandiar, and any such assignments are invalid and unenforceable for lack of mutual consent, lack of consideration, and/or having been obtained by fraud.

f.      To the extent Plaintiffs are found to be owners and/or directors of RemCorp or RemIndustries or any other entity determined to be RemCo, they are not liable for those company's past actions, omissions or contracts while they were wrongfully excluded from the governance of such entity.

g.     To the extent any work for hire, intellectual property, or contributions are owned or have been assigned to either the Remilia DAO or any corporate entity of any form (whether RemCo, RemCorp, RemIndustries, or otherwise), then to the extent a Founding Group member has exited or terminated their relationship with the Remilia DAO, then that Founding Group member has a right to remove their lifetime contributions from the Remilia DAO.

h.     That neither Okhandiar, RemCorp, nor RemIndustries has any right to terminate the Plaintiff's ownership interests in the Remilia DAO, or their employment by the Remilia DAO or the RemCo legal wrapper, except with Plaintiffs' vote and approval per their roles in the Remilia DAO and RemCo's Executive Board.

117.    Plaintiffs are also entitled to an injunction preventing Defendants and their agents from accessing, transferring, assigning, disposing of, or dissipating any of the Remilia DAO's intellectual property, funds and assets without the Plaintiffs' consent and approval.

118.    Plaintiffs are further entitled to a declaratory judgment and injunction requiring Defendants and their agents to return the Remilia DAO's intellectual property, assets and funds; or alternatively for the imposition of a constructive trust for the Plaintiffs' benefit over any such intellectual property, funds, and assets that are not capable of being returned, including but not limited to, an order that Defendants transfer all Remilia funds, assets, and treasury and the proceeds therefrom into a bona fide multi-signature wallet and/or bank account to be jointly controlled only by the Remilia DAO, a newly formed corporation, or RemCorp with each Plaintiff as a 20% owner and with equal ownership and governing rights as a director and managing officer.

119.    An actual and ripe case and controversy exists between Plaintiffs and Defendants

-37-

as to each of the foregoing issues and constructions of the Agreements.  Plaintiffs have been and will continue to be adversely affected by Defendants' assertions of Okhandiar's, RemCorp's and/or RemIndustries' ownership and rights to control of the Remilia DAO's assets, funds and intellectual property.  To the extent Okhandiar, RemCorp, RemIndustries or anyother party asserts ownership or control over any such assets, funds or intellectual property, Plaintiffs are further adversely affected by the Defendants' refusal to recognize them as owners, directors and officers of the Remilia DAO and those other entities.  Absent declaratory relief, Defendants will continue to exercise wrongful control over the Remilia DAO's assets, funds and intellectual property, which denies Plaintiffs their ownership rights and will continue to cause Plaintiffs direct and proximate harm, which may be inadequately compensable in monetary damages.

120.    Plaintiffs request equitable relief in the form of specific performance and/or injunctive relief, as described above and in their Prayer for Relief, with regard to each of the foregoing controversies.

## <u>COUNT III</u>

### Breach of Agreement to Form the Legal Wrapper RemCo Entity

### (Plaintiffs against Okhandiar)

121.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

122.    In connection with the formation of the Remilia DAO, Plaintiffs and Defendant Okhandiar agreed, orally and as evidenced in writing, that the Remilia DAO would create and be integrated with a legal wrapper entity they referred to as RemCo, with the purposes, structure and governance of an Executive Board previously described, but which would also preserve Remilia DAO's ownership and control of the treasury, intellectual property, and assets.  It was therefore understood and agreed by the parties that while the Founding Group members would contribute

their individual skills, time, intellectual property, effects, assets, and/or knowledge to create, mint, and advertise digital art for the mutual benefit of the Remilia DAO, and while each Founding Group member would have a joint property interest in the shared profits and losses of the digital art, assets, and funds, the Remilia DAO would form a legal wrapper entity, RemCo, which would, in turn, provide agency services, liability protections, and tax benefits for the Remilia DAO and the Founding Group members.  The Founding Group members would be owners of RemCo, and would also have specific roles and voting power on the Executive Board, and would be salaried officers and employees of RemCo.

123.    The contractual relationship was agreed and intended to be formed through numerous oral and written promises as described above, including:

a.      messages and other correspondence;

b.      smart contracts;

c.      the Smith LOI in October 2021, and as it was later revised in summer 2022 with regard to his salary and compensation;

d.      the Nispel LOI in October 2021;

e.      the original Duff LOI;

f.      the correspondence by and between Okhandiar and Roux;

g.      the NDAs; and

h.      the Agreement to Negotiate, along with the attached NDA and Duff Amended LOI.

124.    The Plaintiffs each performed their obligations related to the creation and management of the Remilia DAO, by and among investing their time, skills, intellectual property, effects, assets, and/or knowledge to create, mint, and various NFT Projects, by performing all work

and tasks for their roles with the Remilia DAO as described above, and by agreeing to the NDAs and amended LOIs.

125.    Okhandiar breached the terms of the agreement to form the legal wrapper RemCo and to provide the expected benefits of such an entity by failing to form RemCo, and by failing to form any other legal wrapper entity with the purpose, ownership and governance structure agreed by the Founding Group members, that also maintained the Remilia DAO's collective ownership of the NFT Projects, assets, treasury, and intellectual property.

126.    Okhandiar further breached the agreement by, having failed to form RemCo in the agreed manner, then:

    a.    asserting unilateral ownership and control over the Remilia DAO's assets, treasury and intellectual property, and other assets and intellectual property derived therefrom;

    b.    failing to hold the Remilia DAO's assets and funds in a multi-signature wallet and by removing an estimated $2.3 million worth of the Remilia DAO's assets and treasury from the wallet to himself and to RemCorp and RemIndustries;

    c.    purporting to unilaterally terminate Plaintiffs from the Remilia DAO when they had no authority to do so, and in response to Plaintiffs' demand to form RemCo as agreed, and to distribute equity and recognize Plaintiffs' roles and authority as directors and managing employees in RemCo, whether known as RemCorp, RemIndustries or otherwise; and

    d.    terminating and denying Plaintiffs' access to their email accounts, social media accounts, and NFT Project software, data, and information.

127.    As a direct and proximate result of Okhandiar's breaches, Plaintiffs have suffered

substantial damages and losses.

## COUNT IV

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Plaintiffs against Okhandiar)

128.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

129.    Plaintiffs and Okhandiar entered into the binding and enforceable agreement to form the legal wrapper entity RemCo as discussed above.  The agreement contained an implied covenant of good faith and fair dealing by which Plaintiffs reasonably expected that the purpose and structure of the legal wrapper RemCo entity would promote and protect the interests of the Founding Group members while preserving collective ownership of the NFT Project assets and treasury, and the decentralized governance of the Remilia DAO.

130.    By his actions, Okhandiar frustrated and impeded the benefits of the agreement by failing to create the agreed-upon RemCo entity, or by creating an altered entity that failed to promote and protect the interests of the Founding Group members while preserving collective ownership of the NFT Project assets and treasury, and the decentralized governance of the Remilia DAO that Plaintiffs expected to maintain and receive.  When Okhandiar unilaterally created RemCorp and RemIndustries, by which he purports to own 100% of the Remilia DAO's assets, treasury and intellectual property, he undermined, frustrated, impeded and destroyed the entire purpose of the Remilia DAO, which was for the Founding Group members to (a) make contributions to the collective, (b) share equally in its profits, (c) share in the decisions regarding the disposition and distribution of the Remilia DAO's assets and treasury, and the governance and management of its business, and (d) be able to exit the Remilia DAO with their own lifetime contributions.  As a result of Okhandiar's actions described above, Plaintiffs have not able to

-41-

exercise joint property ownership of the Remilia DAO's digital art, assets, and funds, or exercise managerial authority within the Remilia DAO.

131.    As a direct and proximate result of Okhandiar's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered substantial damages and losses.

## COUNT V

### Promissory Fraud

### (Plaintiffs against All Defendants)

132.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

133.    Okhandiar made numerous and various promises to Plaintiffs, on the dates and in the manners previously alleged and as further described below, about the purpose and construction of the legal wrapper RemCo entity to protect and secure the Founding Group member's interests in the Remilia DAO, to protect and secure the Remilia DAO's interests in the NFT Projects, assets, treasury and intellectual property, while also providing agency benefits to the Remilia DAO, and tax benefits and liability limitations for the Founding Group members as described above.

134.    During conversations on the telephone, chat messages, and written agreements, in and around August 2021 to November 2022, Okhandiar made various promises to each Plaintiff, with the understanding that the Plaintiffs would all be aware of these promises, that they would all share ownership of, have governance roles with, and be employed by the RemCo legal wrapper entity.  These conversations, messages, and agreements include but not limited to:

   a. Okhandiar telling Smith that he would be recognized as a co-founder with a significant stake in RemCo once it was formed;

   b. Okhandiar telling Nispel that he would be a co-founder of RemCo;

   c.   Okhandiar telling Duff they make good partners and that he is a co-founder and equity owner of RemCo in whatever form it would be created;

   d.   Okhandiar telling Roux that when he would distribute equity in the RemCo, once it was formed, Roux would have "serious exposure" to equity;

135.   In July 2022, Okhandiar made false statements to Plaintiffs about the inclusion of Plaintiffs and other persons as holding keys to control the Remilia DAO's's multi-signature wallet.

136.   In November 2022, Okhandiar made false statements to Plaintiffs about the existence and structure of, and Plaintiffs' ownership of and roles in, RemCorp and RemIndustries, and falsely portrayed RemCorp as the agreed-upon RemCo entity.

137.   Okhandiar similarly made various promises to each Plaintiff that the intellectual property was owned by the Remilia DAO.

138.   Unbeknownst to Plaintiffs, Okhandiar had no intention of including Plaintiffs in the formation or ownership of RemCo and instead intended to utilize the assets and funds Plaintiffs generated for the Remilia DAO as funds for his own benefit to the exclusion of Plaintiffs.

139.   Plaintiffs, who knew Okhandiar through a community of digital artists and began collaborating as friends in 2020, reasonably believed Okhandiar, and reasonably relied upon his promises and assurances with regard to the Remilia DAO and RemCo.

140.   Plaintiffs would have never entered into the NDAs and LOIs, and would not have continued to contribute their skill, intellectual property, and efforts to the Remilia DAO, including the continued creation and development of additional NFT Projects and the marketing of such projects to investors, had they known that Okhandiar would assert unilateral ownership and control over the NFT Projects, Remilia DAO's assets, treasury, and intellectual property, and further deny them their ownership, compensation, and roles in the Remilia DAO and RemCo.

141.    Okhandiar made these fraudulent statements and misrepresentations intentionally and with the purpose of having Plaintiffs rely on them to their own detriment.

142.    To the extent RemCorp is an alter ego of Okhandiar, any promise made by RemCorp should be imputed onto Okhandiar.

143.    As a direct and proximate result of Defendants' fraudulent statements and misrepresentations, Plaintiffs have suffered substantial damages and losses.

144.    Defendants' fraudulent statements, made without an intention to perform and in reckless disregard of Plaintiffs' rights, were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT VI

### Negligent Misrepresentation

### (Plaintiffs against All Defendants)

145.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

146.    Based on Okhandiar's membership in the Remilia DAO and as Plaintiffs' partner, he had a fiduciary and pecuniary duty to provide accurate information to Plaintiffs regarding the formation of, corporate structure, governance, ownership, and management of RemCo.  He also had a fiduciary and pecuniary duty to provide full and complete information to Plaintiffs about the identity of the signatory key holders on the Remilia DAO's multi-signature wallet.

147.    Okhandiar provided Plaintiffs with incomplete misinformation, and concealed material information known only to him, about RemCo and the signatories on the multi-signature wallet.

148.    Okhandiar failed to exercise reasonable care in obtaining or communicating the

information, thereby causing Plaintiffs to believe and understand that they held ownership interests in RemCo (in whatever form it might exist), and that they had authority through their signature and private key positions on the multi-signature wallet to jointly control the Remilia DAO's actions, assets and treasury.

149.    As a direct and proximate result of Okhandiar's false statements, Plaintiffs have suffered a substantial pecuniary loss and damages caused by justifiable reliance on the misleading and false information.

## COUNT VII

### Promissory Estoppel

### (Plaintiffs against All Defendants)

150.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

151.    Okhandiar made the false promises described above with the reasonable expectation that those promises would induce Plaintiffs' actions and forbearances, including but not limited to, their contributions of their own skill, effort, intellectual property, and funds to the Remilia DAO.

152.    Plaintiffs placed trust in and reasonably relied upon Okhandiar's promises to their own detriment.

153.    Okhandiar's promises are binding upon him, RemCorp and RemIndustries because injustice to Plaintiffs from the loss of their rights, financial well-being, and property can only be avoided by enforcement of the promises that the assets, treasury and funds are owned jointly by the Founding Group members as part of the Remilia DAO, and that they are equity owners, directors, and managing employees of the company (whether RemCo or any other entity) that purports to own those assets, treasury and funds.

154. As a direct and proximate result of Okhandiar's statements, Plaintiffs have suffered a substantial pecuniary loss and damages caused by justifiable reliance on the misleading and false information. Plaintiffs are also entitled to a constructive trust of such assets as held by the Defendants or other persons or entities owned or controlled by them, or to which they have wrongfully or fraudulently transferred such assets.

155. Defendants' fraudulent statements, made without an intention to perform and in reckless disregard of Plaintiffs' rights, were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT IX

### Equitable Estoppel

### (Plaintiffs against All Defendants)

156. Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

157. Defendants conduct and statements described above amount to false representations and concealments of material facts that were intended and calculated to convey to Plaintiffs the understandings they justifiably had about the nature of and their roles in the Remilia DAO and RemCo.

158. Defendants' prior promises and statements are inconsistent with the positions that Defendants now assert, namely that Plaintiffs do not have any ownership interest in the Remilia DAO, RemCorp, RemIndustries, and that all of the Remilia-related assets and funds, and all assets, funds and intellectual property related to the NFT Projects are owned exclusively by him and RemCorp and RemIndustries.

159. Based on the misrepresentations described above, the fact that Okhandiar created

-46-

and controlled the multi-signature wallet, and the fact that he was trusted to form RemCo, which he purports to have created as RemCorp and/or RemIndustries, Defendants had actual and constructive knowledge of the true facts and the Plaintiffs' lack of knowledge, either actual or constructive, of the real facts and the means of discovering the truth until after Defendants had seized the Remilia DAO's funds and assets.

160. Defendants intended and expected that Plaintiffs would rely upon, act upon and be influenced by their good faith reliance on Defendants' misrepresentations and concealments.

161. Plaintiffs did so act and forbear from acting, and were thereby affected to their detriment, by their reliance upon Defendants' promises and misrepresentations, such that they would not have contributed their skill, effort, time, funds, and intellectual property to the Remilia DAO, directly or indirectly through RemCorp, but for Defendants' prior inconsistent statements and promises.

162. As a result, Defendants should be equitably estopped from asserting that Plaintiffs are not co-owners of the Remilia DAO's assets, funds and intellectual property. Defendants should be further equitably estopped from asserting that Plaintiffs are not equity owners, directors, and managerial officers of RemCo, in whatever form that company will or does exist. Defendants should also be equitably estopped from asserting that they have the right to unilaterally own or control any of the Remilia DAO's assets, funds or intellectual property, including but not limited to all the Remilia DAO art, NFTs, merchandise, or any other asset of value related to the NFT Projects. Defendants should also be estopped from asserting that Plaintiffs have assigned any of their interests or intellectual property in the Remilia DAO or related to the NFT Projects to Okhandiar, RemCorp, or RemIndustries, or any other entity. Furthermore, Defendants should be estopped from asserting that Defendants are independent contractors of the Remilia DAO or

RemCo (in whatever form it may or does exists), and also estopped from asserting that they possess the authority or right to terminate Plaintiffs' ownership or employment roles with the Remilia DAO, RemCo, or RemCorp.

**COUNT IX**

**Conversion**

**(Plaintiffs against All Defendants)**

163. Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

164. Plaintiffs, through their contributions to and membership in t the Remilia DAO, own the assets and funds that were generated from creating and developing the various NFTs and NFT Projects. These include both the artwork/NFTs and the intellectual property rights and funds generated from the sale of the Remilia DAO's assets.

165. Defendants have wrongfully exercised dominion without excuse or justification over property of the Remilia DAO and Plaintiffs' rights to their portions of the Remilia DAO's funds and intellectual property by transferring the assets and funds to out of the on-chain multi-signature wallet to Okhandiar's personal crypto wallet and RemCorp's treasury, and by seizing control of the Remilia DAO's NFTs and other artistic designs.

166. As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.

167. Defendants' aforesaid actions and inactions were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

-48-

## COUNT X

### Money Had and Received

### (Plaintiffs against All Defendants)

168.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

169.    Defendants received assets in a wallet that belongs to the Remilia DAO and Plaintiffs.

170.    Okhandiar did not transfer those assets to a multi-signature wallet as agreed in their Founding Group member's creation of the Remilia DAO, and as agreed would be done and maintained in accordance with the creation and governance of the RemCo legal wrapper entity.

171.    Without the assets subject to the control of the multi-signature wallet as agreed, Okhandiar was able to, and did, transfer assets then valued at over $600,000 from the Remilia DAO to his personal wallet, to RemCorp's treasury, and to his personal crypto wallet.  Okhandiar additionally was able to, and did, transfer assets and funds at that time worth approximately $1.7 million from the Remilia DAO treasury to his personal crypto wallet and his off-chain fiat account.  He further misappropriated or allowed to be misappropriated $7 million of the Remilia DAO's treasury funds earned from the sale of the additonial NFT Projects that Plaintiffs created and developed.  Okhandiar has further continued to siphon substantial amounts of funds from the Remilia DAO treasury to his own wallet and personal fiat account, including recurring monthly withdrawals of upwards of $700,000.

172.    Okhandiar benefitted himself, RemCorp and RemIndustries from the receipt of the transferred and removed digital assets and funds.

173.    The money does not belong to Defendants.  Under principles of good conscience, Defendants should not be permitted to retain those funds.

174.    Defendants' actions and inactions were gross, oppressive, or aggravated and involved a breach of Plaintiffs' trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT XI

### Unjust Enrichment

### (Plaintiffs against All Defendants)

175.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

176.    Defendants, for their own personal benefit, have knowingly taken and accepted the contributions and benefits Plaintiffs have made to the Remilia DAO and RemCo, or to RemCorp or RemIndustries as the case may be.

177.    Unless Defendants return and disgorge the assets and funds that belong to the Remilia DAO, or form and formalize RemCo's corporate structure to include Plaintiffs as equity owners, shareholders, and directors, Defendants will be unjustly enriched to Plaintiffs' substantial detriment.

178.    Defendants lacked any substantial justification for their acceptance, taking, and withholding of the benefits provided by Plaintiffs.

179.    As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.  Plaintiffs lack an otherwise adequate remedy at law, and are entitled to return of the contributions or equivalent value for those contributions and benefits provided to the Remilia DAO and RemCo in whatever form it exists.

180.    Defendants' actions and inactions were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT XIV

### Tortious Interference with Prospective Economic Advantage

### (Plaintiffs against RemCorp and RemIndustries)

181. Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein. Plaintiffs allege this Count in the alternative and only to the extent that RemCorp and/or RemIndustries are found not to be an alter ego of Okhandiar, and not merely the agents of the Remilia DAO.

182. The Remilia DAO had at least the reasonable probability of completing and profiting by the many NFT Projects that it was and is continuing to develop, exploit and monetize. RemCorp and RemIndustries have also interfered with the investment by third parties in the Remilia DAO and RemCo.

183. RemCorp and RemIndustries intentionally interfered with the Remilia DAO's development and deployment of the ongoing NFT Projects, including but not limited to Bonkler and Yayo, because it purports to hold ownership of the Remilia DAO's art and intellectual property and other assets, when it has no ownership interests or agency to do so. RemCorp and RemIndustries have also intentionally interfered with t the Remilia DAO's opportunities when they terminated Plaintiffs access to their emails, software, and social media accounts and purported to terminate Plaintiffs' relationships with the Remilia DAO and its customers and investors.

184. As a direct and proximate result thereof, Plaintiffs have suffered substantial damages and losses.

185. Defendants' actions and inactions were gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

**COUNT XV**

**Defamation**

**(Plaintiffs against All Defendants)**

186.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

187.    From September 11, 2023, through at least the date of this First Amended Complaint, Okhandiar has made various false and defamatory statements in writing on the social media website X (formerly known as Twitter) wrongfully stating that Plaintiffs conspired to and did commit theft and extortion.

188.    The following are only a few examples of some of the defamatory statements describing Plaintiffs as criminals that Okhandiar has published and disseminated directly and through employees to tens of thousands of persons through X alone:

- Accusing Plaintiffs of "stealing $1 million from Remilia," and having "attacked the entire Remilia community;"

- Accusing Plaintiffs of transferring Remilia funds directly to their personal wallets;

- Encouraging other Remilia employees and representatives to make a posts and re-post false and defamatory statements accusing Plaintiffs of stealing company property worth in excess of $1 million, conspiring to extort Remilia, committing "theft and conspiracy to extort," among other "serious crimes;" and

- Encouraging other Remilia employees and representatives to make a posts and re-post statements that Plaintiffs are guilty of "fundamentally criminal acts" of which "[t]here is absolutely zero room for interpretation," that Plaintiffs "had no intent to continue Remilia operations," that instead "they were going to gut the treasury, take

their cut, and run this company completely into the ground, taking down all the projects with them."

*See* **Exhibit N**, the contents of which are incorporated herein by this reference.

189.    In addition, Okhandiar has published written and knowingly false statements, and encouraged others to do the same in their own words or by re-posting his statements, to the effect that Duff secretly coded a backdoor into the Bonkler project by implementing two contracts rather than one, with the nefarious and conspired purpose of diverting funds to his personal wallet and maintaining control over the operation of the Bonkler project.  *See* **Exhibit O**, the contents of which are incorporated herein by this reference.  Okhandiar has also made the false and defamatory statements that he instructed Duff to design the Bonkler code to direct commissions into the Remilia general treasury wallet, but that Duff purposely ignored and refused to follow those instructions.  *Id.*  These false statements have been published and re-published by Remilia employees in written posts and audio streams and recordings viewed by more than 25,000 X users. *See* **Exhibit P**, the contents of which are incorporated herein by this reference.

190.    In truth, the Founding Group agreed that the Bonkler project would be built upon an adapted copy, or fork, of the code of another project, NounsDAO, that used two smart contracts. Duff has maintained control of the Bonkler smart contracts since Bonkler's launch, in accordance with Remilia's normal business operations, to facilitate the execution of Bonkler auctions.  Duff has only transferred ownership of the Bonkler contracts in a limited nature to allow Bonkler to be listed on OpenSea, an NFT marketplace.  *See* **Exhibit Q**, the contents of which are incorporated herein by this reference.  The proceeds of Bonkler have not been stolen or misappropriated by Plaintiffs.  These false statements made by Okhandiar and Remilia employees have harmed and will continue to harm the Plaintiffs' reputation and credibility, particularly Duff's good name and

reputation in the programming, project management, and cryptocurrency industries.

191.   Okhandiar has also made or adopted various false and defamatory statements in writings and statements to the effect that Plaintiffs were not involved in the Remilia DAO's decision making or in the creation of the NFT Projects.  The following are only a few examples of some of these defamatory statements that Okhandiar has made and published:

- That Plaintiffs were at the "bottom of the [Remilia] hierarchy" with no one directly reporting to them;

- Fabricating a false organizational chart with each Plaintiff at the bottom of the organization in incorrect positions and roles;

- Claiming that Remilia has no co-founders, and particularly that the Plaintiffs had no role in co-founding Remilia and are not equity owners of the Remilia DAO's business; and

- Claiming that Plaintiffs never joined any work platforms, and had no understanding of operations.

See **Exhibit R**, the contents of which are incorporated herein by this reference.

192.   Okhandiar also made and published the following false and defamatory statements about Plaintiffs' work on the NFT Projects and the events giving rise to this Action:

- Wrongfully blaming failures of various NFT Projects on Plaintiffs and accusing Plaintiffs of sabotaging several Remilia operations;

- Claiming that Plaintiffs refused to engage in private resolution of this dispute; and

- Claiming that Plaintiffs demanded and "attempted to extort" stablecoins, Ethereum, all the NFT reserves, all IP, and R&D from Remilia.

See **Exhibit S**, the contents of which are incorporated herein by this reference.

193.   Okhandiar has also encouraged employees, contractors, and agents of RemCorp to make similar defamatory statements about Plaintiffs on X.  *See* **Exhibit T**, the contents of which are incorporated herein by reference.

194.   Additionally, Okhandiar encouraged employees, contractors, agents and representatives of RemCorp to make similar defamatory statements about Plaintiffs on X, including through "alternate" and fake X "sock-puppet accounts.  With the goal of inundating the public with defamatory statements about Plaintiffs and evading liability for these statements, Okhandiar paid for and ordered his and RemCorp's employees, contractors, representatives, and agents to purchase and create multiple alternate X accounts and post similar defamatory statements about Plaintiffs on X from these alternate X accounts.

195.   To accomplish this, Defendants and their employees and agents as directed and encouraged by Okhandiar paid to anonymously access disposable phones to setup and connect to these alternate X accounts, and paid for virtual private networks for the sole purpose of posting defamatory statements from these alternate X accounts so that the accounts are supposedly not traceable back to Okhandiar or RemCorp or their employees and agents.  They also paid and coordinated to have each of these alternate X accounts preloaded with a fake social media history so the each appears as if it is an unrelated member of the NFT community.  Plaintiffs have reason to believe that at least the following alternative X accounts, which have been used to defame and harass Plaintiffs, are all owned or controlled by Okhandiar or RemCorp or their employees, contractors, agents and representatives:

- @wintersgrasp1;

- @acc_0x;

- @ACCELERATECUTE;

- @pridestalker70;

- @x9domain;

- @syst3m99; and

- @dragonkagura.

196.    The following are only a few examples of some of the defamatory and harassing statements posted on these alternate social media accounts:

- The alternate X account with the handle @wintergrasp1 responded to Duff that he is "going to jail" for allegedly stealing from RemCorp and that he is "ruining [his] life;"

- The alternate X account with the handle @wintergrasp1 also posted to Plaintiffs' @Milady_Sonoro profile accusing Plaintiffs of "betraying your friends, stealing, extorting, and trying to rug an entire community is wrong Sprite is definitely going to prison;"

- The alternate X account with the handle @acc_0x accused Smith of stealing the credit for creating the original Milady Maker concept in 2020;

- The alternate X account with the handle @ACCELERATECUTE posted that Plaintiffs are "pathetic," guilty of "damaging the entire ecosystem" of the NFT community, thieves, and liars who "will never have the same influence" again and that the NFT community "disowns" them;

- The alterative X account with the handle @x9domain accused Plaintiffs of stealing;

- The alterative X account with the handle @syst3m99 posted that Smith was only a "contracted illustrator who stole from remilia;"

-56-

- The alterative X account with the handle @dragonkagura posted various tweets alleging Plaintiffs "stole on-chain" and are a joke.

*See* **Exhibit U**, the contents of which are incorporated herein by this reference.

197. At the direction or control of Okhandiar, RemCorp and their employees, contractors, agents and representatives, these alternate X accounts have also posted various harassing, abusive posts, including threats of physical and sexual violence, including but not limited to:

- The alternate X account with the handles @acceleratecute called Plaintiffs poor, drug addicts, and various homophobic slurs;

- The alterative X account with the handle @dragonkagura called Plaintiffs homophobic slurs;

- The alterative X account with the handle @syst3m99 insinuated Plaintiffs are poor and will live in lifelong poverty, called them derogatory names such as "retard;"

- The alterative X account with the handle @pridestalker70, which has since been deleted, tweeted to Plaintiffs that he/she "can[']t wait to torture you cartel style while I rape your hoe in 10 years *queermo*."

198. The Remilia DAO's fan base and online community has viewed, "liked," re-shared, and commented to many of Okhandiar's written statements, RemCorp's purported employees', contractors' and agents' written defamatory statements, and many of the embarrassing, harassing, and defamatory statements published by the various alternate X accounts under the control of or directed by Okhandiar and the other Defendants.

199. Defendants intended the statements to disgrace, lower, and exclude Plaintiffs from the NFT and cryptocurrency communities by bringing them into contempt or ridicule. These

statements have injured and continue to injure Plaintiffs' reputation in the ordinary sense of the word because the statements diminish Plaintiffs' esteem, respect, goodwill, and confidence in the community, and cause others to have bad feedings or opinions about Plaintiffs.  These statements have similarly injured and continue to injure the reputation of t the Remilia DAO of which Plaintiffs are the co-founding members and hold individual financial interests.  The statements deter third parties, including consumers of the Projects from purchasing them or wanting to support Plaintiffs creations.

200.    As a proximate result of Defendants' false and defamatory statements, Plaintiffs have suffered and will continue to suffer substantial losses and damages.

201.    Defendants' actions were malicious, gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT XVI

### Trade Libel

### (Plaintiffs against All Defendants)

202.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

203.    Defendants made each of the false and misleading statements and publications described above.  They intended the statements to disgrace, lower, and exclude Plaintiffs in the NFT and cryptocurrency communities and customers by bringing a campaign to confuse and deceive them about Plaintiffs' abilities, skills, and professions.  The statements and publications have injured and continue to injure Plaintiffs' trade because the statements diminish Plaintiffs' trade, and thus evoking unfair competition as it causes customers and the community to refrain

from supporting them. Moreover, the statements continue to harm Plaintiffs as Okhandiar is intimidating other Remilia employees to make false and libelous statements. These statements have similarly injured and continue to injure the reputation of t the Remilia DAO of which Plaintiffs are the cofounding members and hold individual financial interests. The statements deter third parties, including consumers of the Projects from purchasing them or wanting to support Plaintiffs creations.

204.    As a proximate result of Defendants' false and defamatory statements, Plaintiffs have suffered and will continue to suffer substantial losses and damages.

205.    Defendants' actions were malicious, gross, oppressive, or aggravated and involved a breach of Plaintiffs trust and confidence, for which Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT XVII

### VIOLATIONS OF THE FEDERAL FAIR LABOR STANDARDS ACT (FLSA)
### 29 U.S.C. § 201, et seq.

#### (Plaintiffs against All Defendants)

206.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

207.    To the extent that Plaintiffs worked for and were employees of Defendants, or any of them, then Plaintiffs allege that the employing Defendants have violated the FLSA by failing to pay all wages owed to Plaintiffs, including by willfully failing to pay all promised amounts and/or required minimum wage amounts and/or overtime amounts, and by misclassifying Plaintiffs as independent contractors, and further by failing to maintain and keep required employment and wage records, and by unlawfully retaliating against Plaintiffs.

208.    Each Plaintiff had an employer/employee relationship with the Defendants, or with at least one of the Defendants, within the meaning of the FLSA based on, among other things: the degree of each Defendant's right to control the manner in which Plaintiffs' work was to be performed; according to Defendants, the Plaintiffs' alleged lack of opportunities to receive profit or suffer losses depending upon their management skills; the Plaintiffs' lack of own payment for and investment in the equipment and materials required to perform their own work required for their tasks and their lack of personal employment of other helpers; that the services provided were not special skills outside of the normal type of skills required for the particular business purposes involved in the NFT Projects; the expected degree of permanence of the working relationship; and the degree of permanence of the working relationship.

209.    Each Plaintiff was engaged in interstate commerce and/or the production of goods and services in interstate commerce, and each Plaintiff was employed by Defendants, or at least one of them, and the Defendants are engaged in interstate commerce where the gross volume of their sales or business was not less than $500,000 per year for the years that Plaintiffs were so employed.

210.    Plaintiffs each performed in excess of 1,000 hours of work on the NFT Projects, typically working in excess of 8 hours per day and/or 40 hours per week, for which work Plaintiffs were not paid their promised wages or were paid less than the minimum hourly wages and overtime required by the FLSA, particularly in violation of 29 U.S.C. §§ 206(a) and 207(a).

211.    As a result of Defendants' willful failure to compensate Plaintiffs as promised and/or for each of their hours worked and at the required minimum rates, Defendants have violated FLSA, 29 U.S.C. § 201 *et seq*. including 29 U.S.C. § 207(a)(1) and 215(a).

212.    Plaintiffs are entitled to (i) unpaid wages from the employing Defendants for all of

-60-

the unpaid and undercompensated time they worked as required by law, (ii) liquidated damages, (iii) additional liquidated damages for unreasonably delayed payment of wages, (iv) reasonable attorney fees, (v) and costs and disbursements of this action, pursuant to U.S.C.§ 216(b).

213.    Defendants also purported to terminate Plaintiffs' employment as a result of and after they complained about Defendants' failure to pay the full amount of wages and other compensation owed to them.  As a direct and proximate result of Defendant's unlawful retaliation, by and through their agents and employees, Plaintiffs have been injured and have suffered and will continue to suffer pain, fear, humiliation, anxiety, depression, mental anguish, emotional distress, physical manifestation of anxiety and lost wages and lost benefits for which they are entitled to recover for such damages.

## COUNT XVII

## VIOLATIONS OF DELAWARE WAGE PAYMENT AND COLLECTION ACT

### 19 Del. Code § 1101, *et seq.*

### (Plaintiffs against All Defendants)

214.    Plaintiffs hereby re-allege and incorporate by reference all of the foregoing allegations as if fully set forth herein.

215.    Title 19 of Chapter 11 of the Delaware Codes is known as the Wage Payment and Collection Act (the "Act"), and its terms apply to all employees, including Plaintiffs, who are suffered or permitted to work by a Delaware employer, including RemCorp and RemIndustries, as well as Okhandiar pursuant to Section 1101(b) of the Act based on his role as an officer and managing agent of RemCorp and RemIndustries who knowingly permitted the companies to violate the provisions of the Act.

216.    Section 1102 of the Act requires payment of employee wages on regular paydays

designated in advance by the employer, which shall be at least once each calendar month and within 7 days from the close of the pay period in which the wages were earned, and such payments shall be paid in lawful money of the United States.

217.    Section 1102A of the Act makes it illegal for an employer to do any of the following:

> (1) Employ an individual without reporting the individual's employment to all appropriate government agencies and paying all applicable taxes and fees for the individual;
>
> (2) Fail to properly withhold state and federal taxes from an employee;
>
> (3) Fail to forward money withheld from an employee's wages to the appropriate state or federal agency within 7 days of the applicable pay period;
>
> (4) Pay an employee wages that are less than the minimum wage established under state and federal law for the work performed;
>
> (5) Misclassify a worker as an independent contractor for purposes of avoiding wage, tax, or workers' compensation obligations under this title; or
>
> (6) Knowingly conspire to assist, advise, or facilitate a violation of this section.

218.    Section 1103 of the Act requires wages to employees who have quit, resigned or been discharged be paid by the later of the next date that the wages would be paid if the employee had not been discharged or three business days after the last day worked.  Section 1103 also requires that those wages be paid without wrongful withholdings as set forth in Section 1107 of the Act.

219.    Section 1107 of the Act provides that no employer may withhold or divert any portions of an employee's wages unless the employer is required to do so by state or federal law,

or the deductions are made for certain medical service without any financial benefit to the employer and only when such withholdings are openly and clearly recorded in the employer's books, or when the employee has provided a signed authorization for the deductions for a lawful purpose accruing to the employee's benefit.

220.    Section 1108 of the Act also requires, among other things, that each employer with more than 3 employees do each of the following:

(1) Notify each employee in writing, at the time of hiring, of the rate of pay and of the day, hour and place of payment;

(2) Notify each employee in writing or through a posted notice maintained in a place accessible to the employees and where they normally pass of any reduction in the regular rate of pay, and day, hour and place of payment prior to the time of such reduction;

(3) Make available to each employee in writing or through a poster notice maintained in a place accessible to the employees and where they normally pass employment practices and policies with regard to vacation pay, sick leave and comparable matters;

(4) Furnish to each employee at the time of payment a statement, either on the check, or by a separate slip, or electronically, so long as the electronic statement is in a form capable of being retained by the employee, showing the wages due, the pay period for which the wages are due and the total amount of deductions, separately specified, which have been made from the wages due, provided such statement shall, for an employee who is paid at an hourly rate, show the total number of hours for the said pay period;

(5) Post and maintain in a place accessible to the employees and where they normally pass a summary of this chapter; and

(6) Make, keep and preserve for a period not less than 3 years the records specified in the chapter, including wage and hour records, in or about the premises or place of business or employment or at 1 or more central record keeping offices.

221.    Each Plaintiff had an employer/employee relationship with the Defendants, or with at least one of the Defendants within the meaning of the Act based on, among other things: the degree of each Defendant's right to control the manner in which Plaintiffs' work was to be performed; according to Defendants, the Plaintiffs' alleged lack of opportunities to receive profit or suffer losses depending upon their management skills; the Plaintiffs' lack of own payment for and investment in the equipment and materials required to perform their own work required for their tasks and their lack of personal employment of other helpers; that the services provided were not special skills outside of the normal type of skills required for the particular business purposes involved in the NFT Projects; the expected degree of permanence of the working relationship; and the degree of permanence of the working relationship.

222.    At all relevant times, including while Plaintiffs were employed by Defendants, each of the Defendants employed more than three employees.

223.    Defendants violated Section 1102 of the Act by failing to timely pay all wages due to Plaintiffs on a regular designated payday at least on a monthly basis within 7 days of such wages of having been earned and with payments made in lawful U.S. money.

224.    While the Plaintiffs were employed by Defendants, Defendants violated the provisions of Section 1102A as described above by, among other things: failing to report Plaintiffs' employment to all appropriate government agencies and paying all applicable taxes and fees

related to their employment; failing to withhold state and federal taxes; failing to forward money withheld Plaintiffs' wages to the appropriate state or federal agencies within 7 days of the applicable pay period; paying Plaintiffs' wages that are less than the minimum wage established under state and federal law for the work performed; misclassifying Plaintiffs' as independent contractors for purposes of avoiding wage, tax, or workers' compensation obligations; and knowingly conspiring with each other to assist, advise or facilitate these violations.

225.    Defendants have violated Sections 1103 and 1107 as described above by failing to pay Plaintiffs their earned wages and compensation within the times required after Defendants purportedly discharged them and terminated their employment on or about September 11, 2023, and/or by wrongfully withholding the earned wages and compensation without authorization and without openly and clearly accounting for such withholdings on their books and records.

226.    As for each of the Plaintiffs, Defendants have also violated each of the requirements of Section 1108 of the Act described above.

227.    Defendants have failed to pay Plaintiffs' wages at least in the following amounts: Duff is owed wages in excess of $87,500; Smith is owed wages in excess of $440,000; Nispel is owed in excess of $65,000 of wages; and Roux is owed wages in excess of $15,000.

228.    Section 1113(a) of the Act provides a private cause of action for Plaintiffs to recover their unpaid wages, penalties as set forth in Section 1112 of the Act, and liquidated damages of at least double the amount of unpaid wages, for each of the above-referenced violations.  Per Section 1113(c), Plaintiffs are also entitled to be awarded the costs of this action, including but not limited to their necessary costs of prosecution and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.      That judgment be entered in each of the Plaintiffs' favors, and against Defendants jointly and severally, on each of the Counts.

2.      For compensatory damages and wages, including actual, incidental, consequential, statutory, liquidated and all other permissible forms of damage in the amounts to be proven at trial.

3.      For a constructive trust to be created for the benefit of the Plaintiffs over the assets, funds and intellectual property that Defendants have misappropriated, embezzled, and converted to their own possession or control.

4.      For punitive and exemplary damages as available for the asserted Counts.

5.      For an award of attorneys' fees, costs, expenses, and disbursements in prosecuting this action to the extent permitted by applicable law, contract or equity.

6.      For a declaratory judgment and injunction over Defendants, and each of the agents, that:

      a.  Neither RemCorp nor RemIndustries are the intended legal wrapper entity known as RemCo, and that Okhandiar has failed to incorporate RemCo in the manner and with the owners and governance structure agreed by the Founding Group members and in compliance with the agreement.

      b.  Plaintiffs, and each of them, are equity owners in RemCo, or whatever corporate entity of whatever form (including but not limited to RemCorp and RemIndustries) that controls or owns the Remilia DAO's assets, treasury, and intellectual property; and further that Plaintiffs are entitled to signatory key authority on the digital wallet in which any of the Remilia DAO's assets and treasury are held such that Plaintiffs have key level control of any digital wallet that holds the Remilia DAO's assets and treasury, or any proceeds

-66-

thereo; and that they be issued shares or membership units in RemCo in whatever form in which that entity may or does exist.

c.  Neither Okhandiar, RemCorp, RemIndustries nor any other entity separately controls nor owns any of the Remilia DAO's assets, treasury or intellectual property.

d.  The Remilia DAO has not assigned or transferred any of its assets, funds or intellectual property to Okhandiar, RemCorp, RemIndustries or any other entity, and any such assignments are invalid and unenforceable for lack of mutual consent, lack of consideration, and/or having been obtained by fraud.

e.  To the extent Plaintiffs are found to be equity owners and/or directors of RemCorp or RemIndustries, or any other entity determined to be RemCo, that they are not liable for either of those company's past actions, omissions or contracts.

f.  To the extent any work for hire, intellectual property, or contributions are owned or have been assigned to either the Remilia DAO or any corporate entity of any form (whether RemCo, RemCorp, RemIndustries, or otherwise), then to the extent a Founding Group member exits or terminates their relationship with the Remilia DAO, then the Founding Group member has a right to remove their lifetime contributions from the Remilia DAO.

g.  That neither Okhandiar, RemCorp, nor RemIndustries has any right to terminate the directorships, equity holdings, or employment positions with the Remilia DAO or RemCo, except with Plaintiffs' vote and approval per their roles in the Remilia DAO and RemCo's Executive Board.

-67-

7.     For an injunction preventing Defendants and their agents from accessing, transferring, assigning, disposing of, or dissipating any of the Remilia DAO's intellectual property, funds and assets without the Plaintiffs' consent and approval.

8.     For a declaratory judgment and injunction requiring Defendants and their agents to return the Remilia DAO's intellectual property, assets and funds; or alternatively for the imposition of a constructive trust for the Plaintiffs' benefit over any such intellectual property, funds, and assets that are not capable of being returned, including but not limited to, an order that Defendants transfer all the Remilia DAO funds, assets, and treasury and the proceeds therefrom into a bona fide multi-signature wallet and/or bank account to be jointly controlled only by the Remilia DAO, a newly formed corporation, or modified RemCorp with each Plaintiff as a 20% owner and with equal ownership and governing rights as directors and managing officers.

9.     For pre- and post-judgment interest as permitted by law or contract.

10.    For all such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims for relief, counts, causes of action, and defenses so triable to a jury.

Dated: April 30, 2026                    **K&L GATES LLP**

                                         /s/ Steven L. Caponi
                                         Steven L. Caponi (No. 3484)
                                         Matthew Goeller (No. 6283)
                                         600 King Street, Suite 901
                                         Wilmington, DE 19801
                                         Telephone: (302) 416-7000
                                         steve.caponi@klgates.com
                                         matthew.goeller@klgates.com

                                         -and-

                                         Jonathan P. Hersey (admitted *pro hac vice*)
                                         K&L GATES LLP
                                         1 Park Plaza, Twelfth Floor
                                         Irvine, California 92614
                                         Telephone: (949) 253-0900
                                         jonathan.hersey@klgates.com

                                         *Counsel for Plaintiffs Maxwell Roux, John Duff
                                         III, Henry Smith, and Bruno Nispel*